# Exhibit 1

## 1542 N. CAHUENGA BOULEVARD

### RETAIL LEASE

This Retail Lease (the "**Lease**"), dated as of the date set forth in Section 1 of the Summary of Basic Lease Information (the "**Summary**"), below, is made by and between W-AP Cahuenga Owner VIII, L.P., a Delaware limited partnership ("**Landlord**"), and AH FOOD GROUP LIMITED LIABILITY COMPANY, a California limited liability company ("**Tenant**").

### SUMMARY OF BASIC LEASE INFORMATION

| TERMS OF LEASE | DESCRIPTION |
|---|---|
| 1. Date: | January 6, 2023. |
| 2. Premises: (Article 1) | |
| 2.1 Building: | That certain building with an address of 1542 N. Cahuenga Boulevard, Los Angeles, California. |
| 2.2 Premises: | 2,433 rentable square feet of space located on the ground floor of the Building and commonly known as Suite 180, as further depicted on **Exhibit A** to this Lease. |
| 2.3 Project: | The Building is part of that certain project, as further set forth in Section 1.1.2 of this Lease. |
| 3. Lease Term (Article 2): | |
| 3.1 Length of Term: | Approximately ten (10) years. |
| 3.2 Lease Commencement Date: | The earlier to occur of (i) the date that is thirteen (13) months following the mutual execution and delivery of this Lease by Landlord and Tenant (the "**Execution Date**"), and (ii) the date upon which Tenant first commences to conduct business in the Premises. |
| 3.3 Lease Expiration Date: | The last day of the calendar month in which the tenth (10th) anniversary of the Lease Commencement Date occurs. |
| 3.4 Option Term: | One (1) five (5)-year option(s) to renew, as more particularly set forth in Section 2.2 of this Lease. |
| 4. Rent (Article 3): | |
| 4.1 Base Rent (Section 3.1): | |

| Lease Year | Annual Base Rent | Monthly Installment of Base Rent | Monthly Rental Rate per Rentable Square Foot |
|---|---|---|---|
| 1 | $119,703.60 | $9,975.30 | $4.10 |
| 2 | $123,207.12 | $10,267.26 | $4.22 |
| 3 | $127,002.60 | $10,583.55 | $4.35 |
| 4 | $130,798.08 | $10,899.84 | $4.48 |
| 5 | $134,593.56 | $11,216.13 | $4.61 |
| 6 | $138,681.00 | $11,556.75 | $4.75 |
| 7 | $143,060.40 | $11,921.70 | $4.90 |
| 8 | $147,147.84 | $12,262.32 | $5.04 |
| 9 | $151,527.24 | $12,627.27 | $5.19 |
| 10 | $156,198.60 | $13,016.55 | $5.35 |

*Subject to the terms set forth in Section 3.2 below, fifty percent (50%) of the Base Rent attributable to the twelve (12) month period commencing on the first (1st) day of the first (1st) full calendar month of the Lease Term and ending on the last day of the twelfth (12th) full calendar month of the Lease Term shall be abated.

| 5. Tenant's Share (Article 4 and **Exhibit C**): | 5.84%, provided that Tenant's Tax Share (as defined in Section 1.1.7 of **Exhibit C**) shall be equal to |



|  |  |  | 34.50% of the land described in **Exhibit H** attached hereto, including the improvements thereon (**"Parcels 4 and 5"**). |
|---|---|---|---|
| 6. | Permitted Use (Article 5): |  | Tenant shall use the Premises solely for the operation of a sit down restaurant serving Caribbean and southern "soul food" style cuisine during lunch and dinner along with the incidental sale of wine and beer for on-site consumption, with a menu consistent with **Exhibit G** attached hereto (the "**Permitted Use**").   As used in this Section 6, the term "**incidental**" shall mean that Tenant's sale of any such incidental wine and beer items from the Premises shall in no event exceed, in the aggregate, fifteen percent (15%) of Tenant's Gross Sales (as that term is defined in Section 5.3.8 below) from the Premises. |
| 7. | Trade Name (Section 5.1.2): |  | Trade Name:  Pink Teacup. |
| 8. | Security Deposit (Article 21): |  | $26,033.10. |
| 9. | Intentionally Omitted |  |  |
| 10. | Address of Tenant (Section 29.16): |  | Pink Teacup 1114 Myron Street Uniondale, New York 11553. Attention: Astrid Headley Telephone Number: 646 806-5675 |
| 11. | Address of Landlord (Section 29.16): |  | W-AP Cahuenga Owner VIII, L.P. c/o Walton Street Capital, LLC 900 North Michigan Avenue, 19th Floor Chicago, IL 60611 Attention:  Mr. James Holmes

and

Artisan Ventures LLC 2415 Main Street Santa Monica, CA 90405 Attention:  Mark Laderman & Collin Komae

and

Allen Matkins Leck Gamble Mallory & Natsis LLP 1901 Avenue of the Stars, Suite 1800 Los Angeles, CA 90067 Attention:  John M. Tipton, Esq. |
| 12. | Broker (Section 29.20): |  | Jones Lang LaSalle Brokerage, Inc., representing Landlord

And Secret HQ Inc., representing Tenant |
| 13. | Minimum Hours of Operation (Section 5.1.4): |  | 11:00 a.m. to 9:00 p.m. Mondays through Sundays. |
| 14. | Guarantor (Section 29.35): |  | ASTRID HEADLEY PAGE, an individual |

1542 N. CAHUENGA BOULEVARD

[Pink Teacup]

## ARTICLE 1

## PREMISES, BUILDING, PROJECT, AND COMMON AREAS

1.1    **Premises, Building, Project and Common Areas**.

1.1.1    **The Premises**.  Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the premises set forth in Section 2.2 of the Summary (the "**Premises**").  The outline of the Premises is set forth in **Exhibit A** attached hereto and the Premises has  the number of rentable square feet as set forth in Section 2.2 of the Summary.  The parties hereto agree that the lease of the Premises is upon and subject to the terms, covenants and conditions (the "**TCCs**") herein set forth, and Tenant covenants as a material part of the consideration for this Lease to keep and perform each and all of such TCCs by it to be kept and performed and that this Lease is made upon the condition of such performance.  The parties hereto hereby acknowledge that the purpose of **Exhibit A** is to show the approximate location of the Premises in the "Building," as that term is defined in Section 1.1.2, below, only, and such Exhibit is not meant to constitute an agreement, representation or warranty as to the construction of the Premises, the precise area thereof or the specific location of the "Common Areas," as that term is defined in Section 1.1.3, below, or the elements thereof or of the accessways to the Premises or the "Project," as that term is defined in Section 1.1.2, below.  Landlord shall tender Premises in its existing "as-is" condition by making a key or access card available to Tenant (and no further action shall be required) and Landlord shall not be obligated to provide or pay for any improvement work or services related to the improvement of the Premises.  Tenant also acknowledges that neither Landlord nor any agent of Landlord has made any representation or warranty regarding the condition of the Premises, the Building or the Project or with respect to the suitability of any of the foregoing for the conduct of Tenant's business, except as specifically set forth in this Lease.  Provided that Tenant has delivered to Landlord evidence of the insurance required by Tenant under Article 10 below and Tenant has paid to Landlord all prepaid Rent and the Security Deposit required hereunder, Landlord shall allow Tenant access to the Premises upon the mutual execution and delivery of this Lease by Landlord and Tenant for the purpose of Tenant  installing furniture, specialty equipment (including appliances, supplemental HVAC equipment and IT room installations) or fixtures (including Tenant's data and telephone equipment and cabling) in the Premises.  Prior to Tenant's entry into the Premises as permitted by the terms hereof, Tenant shall submit a schedule to Landlord  which schedule shall detail the timing and purpose of Tenant's entry.  Tenant shall hold Landlord harmless from and indemnify, protect and defend Landlord against any loss or damage to the Building or Premises and against injury to any persons caused by Tenant's actions pursuant to any early entry hereunder.

1.1.2    **The Building and the Project**.  The Premises is a part of the building set forth in Section 2.1 of the Summary (the "**Building**").  The term "**Project**," as used in this Lease, shall mean (i) the Building and the Common Areas, (ii) the land (which is improved with landscaping, parking structures and/or facilities and other improvements) upon which the Building, parking facilities and the Common Areas are located, and (iii) the other buildings located adjacent to the Building with addresses of 1520 North Cahuenga Boulevard, 1540 North Cahuenga Boulevard, 1538 North Cahuenga Boulevard, and the land upon which such adjacent buildings are located, and (iv) at Landlord's discretion, any additional real property, areas, land, buildings or other improvements added thereto.

1.1.3    **Common Areas**.  Tenant shall have the non-exclusive right to use in common with other tenants in the Project, and subject to the rules and regulations referred to in Article 5 of this Lease, those portions of the Project which are provided, from time to time, for use in common by Landlord, Tenant and any other tenants of the Project (such areas, together with such other portions of the Project designated by Landlord, in its discretion, including certain areas designated for the exclusive use of certain tenants, or to be shared by Landlord and certain tenants, are collectively referred to herein as the "**Common Areas**"); provided, however, this Lease does not grant any right to Tenant to use the Project's parking facilities.  The Common Areas shall consist of the "Project Common Areas" and the "Building Common Areas" (as both of those terms are defined below).  The term "**Project Common Areas**," as used in this Lease, shall mean the portion of the Project designated as such by Landlord.  The term "**Building Common Areas**," as used in this Lease, shall mean the portions of the Common Areas located within the Building designated as such by Landlord.  The manner in which the Common Areas are maintained and operated shall be at the sole discretion of Landlord and the use thereof shall be subject to such rules, regulations and restrictions as Landlord may make from time to time, provided that such rules, regulations and restrictions do not unreasonably interfere with the rights granted to Tenant under this Lease and the permitted use granted under Article 5, below.  Landlord reserves the right to close temporarily, make alterations or additions to, or change the location of elements of the Project and the Common Areas; provided that no such changes shall be permitted which materially reduce Tenant's rights or access hereunder.

1.2    **Stipulation of Rentable Square Feet of Premises and Building**.  For purposes of this Lease, "rentable square feet" and "usable square feet" of the Premises shall be deemed as set forth in Section 2.2 of the Summary and the rentable square feet of the Building shall be deemed as set forth in Section 2.1 of the Summary.

## ARTICLE 2

## LEASE TERM; OPTION TERM

2.1    **Initial Lease Term**.  The TCCs and provisions of this Lease shall be effective as of the date of this Lease.  The term of this Lease (the "**Lease Term**") shall be as set forth in Section 3.1 of the Summary, shall commence on the date set forth in Section 3.2 of the Summary (the "**Lease Commencement Date**"), and shall terminate on the date set forth in Section 3.3 of the Summary (the "**Lease Expiration Date**") unless this Lease is sooner terminated as hereinafter provided.  For purposes of this Lease, the term "**Lease Year**" shall mean each consecutive twelve (12) calendar month period during the Lease Term; provided, however, that the first Lease Year shall commence on the Lease Commencement Date and end on the last day of the month in which the first anniversary of the Lease Commencement Date occurs  (or if the Lease Commencement Date is the first day of a calendar month, then the first Lease Year shall commence on the Lease Commencement Date and end on the day

4861-1176-4027.5
376931.00016/1-5-23//cb

-1-

1542 N. CAHUENGA BOULEVARD



[Pink Teacup]

immediately preceding the first anniversary of the Lease Commencement Date), and the second and each succeeding Lease Year shall commence on the first day of the next calendar month; and further provided that the last Lease Year shall end on the Lease Expiration Date. For purposes of this Lease, the term "**Lease Month**" shall mean each succeeding calendar month during the Lease Term; provided that the first Lease Month shall commence on the Lease Commencement Date and shall end on the last day of the first full calendar month of the Lease Term and that the last Lease Month shall expire on the Lease Expiration Date. At any time during the Lease Term, Landlord may deliver to Tenant a notice in the form as set forth in **Exhibit F**, attached hereto, as a confirmation only of the information set forth therein, which Tenant shall execute and return to Landlord within five (5) days of receipt thereof.

    2.2    **Option Term**.

        2.2.1    **Option Right**. Landlord hereby grants the tenant originally named herein (the "**Original Tenant**") one (1) option to extend the Lease Term for the entire Premises by a period of five (5) years the "**Option Term**"). Such option shall be exercisable only by "Notice" (as that term is defined in Section 29.16 of this Lease) delivered by Tenant to Landlord as provided below, provided that, as of the date of delivery of such Notice, (i) Tenant is not then in default under this Lease, (ii) Tenant has not been in breach or default under this Lease more than once during the Lease Term, and (iii) there has been no material adverse change in Tenant's financial condition during the prior twenty-four (24)-month period. Upon the proper exercise of such option to extend (and provided that, at Landlord's election, as of the end of the initial Lease Term, (A) Tenant is not in default under this Lease, and (B) Tenant has not been in breach or default under this Lease more than once during the prior Lease Term, then the Lease Term, as it applies to the entire Premises, shall be extended for a period of five (5) years. The rights contained in this Section 2.2 shall only be exercised by the Original Tenant (and not any assignee, sublessee or other transferee of the Original Tenant's interest in this Lease) if Original Tenant is in occupancy of the entire then-existing Premises.

        2.2.2    **Option Rent**. The rent payable by Tenant during the Option Term (the "**Option Rent**") shall be equal to the "Market Rent," as that term is defined below, for the Premises as of the commencement date of the Option Term, provided that the base rent component of the Option Rent, on an annual, per rentable square foot basis, shall in no event be less than the amount of Base Rent payable by Tenant for the Premises on an annual, per rentable square foot basis immediately prior to the commencement of the Option Term. Subject to the foregoing, the "**Market Rent**" shall be equal to the rent (including additional rent and considering any "base year" or "expense stop" applicable thereto or whether expenses are paid on a triple net basis), including all escalations, at which tenants, as of the commencement of the Option Term, are leasing non-sublease, non-encumbered, non-equity space comparable in size, location and quality to the Premises for a term of five (5) years, which comparable space is ground floor retail space located within the Project, and if there are no such transactions within the Project, then comparable ground floor retail space of buildings or centers in the immediate vicinity of the Project (i.e., in the Hollywood submarket of Los Angeles) ("**Comparable Transactions**"), taking into consideration only the following concessions (collectively, the "**Concessions**"): (a) rental abatement concessions, if any, being granted such tenants in connection with such comparable space, (b) tenant improvements or allowances provided or to be provided for such comparable space, taking into account, and deducting the value of, the existing improvements in the Premises, such value to be based upon the age, quality and layout of the improvements and the extent to which the same could be utilized by Tenant based upon the fact that the precise tenant improvements existing in the Premises are specifically suitable to Tenant, and (c) other reasonable monetary concessions being granted such tenants in connection with such comparable space; provided, however, that in calculating the Option Rent, no consideration shall be given to (i) the fact that Landlord is or is not required to pay a real estate brokerage commission in connection with Tenant's exercise of its right to lease the Premises during the Option Term or in connection with the Comparable Transactions or the fact that landlords are or are not paying real estate brokerage commissions in connection with such comparable space, and (ii) any period of rental abatement, if any, granted to tenants in Comparable Transactions in connection with the design, permitting and construction of tenant improvements in such comparable spaces. The Option Rent shall additionally include a determination as to whether, and if so to what extent, Tenant must provide Landlord with financial security, such as a security deposit, letter of credit or guaranty, for Tenant's rent obligations during the Option Term. Such determination shall be made by reviewing the extent of financial security then generally being imposed in Comparable Transactions from tenants of comparable financial condition and credit history to the then existing financial condition and credit history of Tenant (with appropriate adjustments to account for differences in the then-existing financial condition of Tenant and such other tenants). Notwithstanding the foregoing, during the Option Term, the base rent component of Market Rent shall increase by three percent (3%) per annum on each anniversary of the first (1st) day of the Option Term; provided that such annual increases shall be taken into consideration in connection with the determination of Market Rent.

        2.2.3    **Exercise of Option**. The option contained in this Section 2.2 shall be exercised by Tenant, if at all, only in the manner set forth in this Section 2.2.3. Tenant shall deliver notice (the "**Exercise Notice**") to Landlord not more than twelve (12) months nor less than nine (9) months prior to the expiration of the initial Lease Term, stating that Tenant is exercising its option. Concurrently with such Exercise Notice, Tenant shall deliver to Landlord Tenant's calculation of the Market Rent (the "**Tenant's Option Rent Calculation**"). Landlord shall deliver notice (the "**Landlord Response Notice**") to Tenant on or before the date which is thirty (30) days after Landlord's receipt of the Exercise Notice and Tenant's Option Rent Calculation (the "**Landlord Response Date**"), stating that (A) Landlord is accepting Tenant's Option Rent Calculation as the Market Rent, or (B) rejecting Tenant's Option Rent Calculation and setting forth Landlord's calculation of the Market Rent (the "**Landlord's Option Rent Calculation**"). Within ten (10) business days of its receipt of the Landlord Response Notice, Tenant shall deliver written notice (the "**Ratification Notice**") to Landlord setting forth, at its option, either (i) Tenant's acceptance of the Market Rent contained in the Landlord's Option Rent Calculation, or (ii) Tenant's rescission of its Exercise Notice. If Tenant fails to timely deliver the Ratification Notice, Tenant shall be deemed to have accepted the Market Rent contained in the Landlord's Option Rent Calculation.

    2.3    **Permit Contingency**. Tenant shall, at Tenant's sole cost and expense, submit for the applicable permits to allow the construction of the Initial Alterations (as defined in Section 8.1 below) in the Premises (collectively, "**Permits**", and the receipt of the same the "**Permit Contingency**")) within sixty (60) days following the full execution and delivery of this Lease by Landlord and Tenant and retain a permit expeditor immediately following the mutual



1542 N. CAHUENGA BOULEVARD

[Pink Teacup]

DocuSign Envelope ID: 630CC051-31EE-4EE3-80D5-826038BA1949

execution and delivery of this Lease by Landlord and Tenant.  Thereafter, Tenant shall use commercially reasonable efforts and all due diligence to receive the Permits (the receipt of the Permits, the "**Permit Contingency**").  Tenant shall keep Landlord apprised of the status of the processing of all such applications and Tenant's efforts to satisfy the Permit Contingency and Tenant shall provide Landlord with the applications for any such Permits concurrently with Tenant's submission of the same to the applicable governmental authorities and Tenant shall promptly notify Landlord in writing of the date it receives such permits (the "**Permit Contingency Removal Notice**").  If Tenant has not satisfied the Permit Contingency by the date which is twelve (12) months following the Execution Date (the "**Permit Contingency Date**"), then either Tenant or Landlord may terminate this Lease by giving the other party written notice (the "**Permit Termination Notice**") thereof, in which event this Lease will terminate.  In lieu of terminating the Lease or allowing the Lease to be terminated by Tenant, Landlord shall have the right, by written notice to Tenant given any time following the Permit Contingency Date and prior to the date which is five (5) business days after the receipt of a Permit Termination Notice from Tenant, to elect to attempt to obtain the Permits on behalf of Tenant (the "**Landlord Permit Notice**").  If Landlord delivers the Landlord Permit Notice, then Landlord shall have the right to attempt to obtain the Permits on behalf of Tenant, and Tenant shall reimburse Landlord all of the commercially reasonable, actual out-of-pocket costs expended by Landlord in connection with obtaining the Permits. If Landlord is able to obtain the Permits within sixty (60) days after delivery of the Landlord Permit Notice, then the Permit Termination Notice shall be deemed rescinded, and the Lease will continue in full force and effect.  If Landlord delivers a Permit Termination Notice, or if Landlord does not deliver the Landlord Permit Notice following receipt of a Permit Termination Notice from Tenant, or if Landlord fails to obtain the Permits within such sixty (60) day period, then this Lease shall terminate.  Upon any termination of this Lease hereunder, this Lease shall be of no further force or effect (except for those obligations that expressly survive termination) and Landlord shall return any unapplied portion of the Security Deposit to Tenant (it being acknowledged that in no event shall Tenant be entitled to any refund of Rent).  Notwithstanding the terms hereof, Tenant acknowledges that if Tenant commences business or physical construction of the Initial Alterations in the Premises (as opposed to other pre-construction preparation activities), then the Permit Contingency shall be deemed waived by Tenant (but not by Landlord).

## ARTICLE 3

## RENT

3.1    **Base Rent.**  Tenant shall pay, without prior notice or demand, to Landlord or Landlord's agent at the management office of the Project, or, at Landlord's option, at such other place as Landlord may from time to time designate in writing, by a check for currency which, at the time of payment, is legal tender for private or public debts in the United States of America, base rent ("**Base Rent**") as set forth in Section 4.1 of the Summary, payable in equal monthly installments as set forth in Section 4.1 of the Summary in advance on or before the first day of each and every calendar month during the Lease Term, without any setoff or deduction whatsoever.   In accordance with Section 4 of the Summary, any increases in Base Rent shall occur on the first day of the applicable Lease Month. The parties acknowledge, however, that Tenant shall pay Base Rent for each "calendar month" of the Lease Term (or a prorated portion of a "calendar month", as applicable), even though the first "Lease Month" may pertain to a period longer than one (1) calendar month.  One (1) month of Base Rent for the first full month of the Lease Term (i.e., $9,975.30) shall be paid at the time of Tenant's execution of this Lease and such amount shall be applied to the Base Rent next due for the Premises during the initial month and the second (2nd) month of the Lease Term.  If any payment of Rent is for a period which is shorter than one month, the Rent for any such fractional month shall accrue on a daily basis during such fractional month and shall total an amount equal to the product of (i) a fraction, the numerator of which is the number of days in such fractional month and the denominator of which is the actual number of days occurring in such calendar month, and (ii) the then-applicable Monthly Installment of Base Rent.  All other payments or adjustments required to be made under the TCCs of this Lease that require proration on a time basis shall be prorated on the same basis.

3.2    **Abated Base Rent.**  Provided that no event of default is occurring during the initial twelve (12) full calendar month period commencing on the first (1st) day of the first (1st) full calendar month of the Lease Term and ending on the last day of the twelfth (12th) full calendar month of the Lease Term (the "**Base Rent Abatement Period**"), Tenant's obligation to pay fifty percent (50%) of the Base Rent otherwise  due for the Premises shall be abated during such Base Rent Abatement Period  (the "**Base Rent Abatement**").  Landlord and Tenant acknowledge that the aggregate amount of the Base Rent Abatement equals $59,851.80  (i.e., $4,987.65 per month).  Tenant acknowledges and agrees that during such Base Rent Abatement Period, such abatement of fifty percent (50%) of the Base Rent for the Premises shall have no effect on the calculation of any future increases in Base Rent or Direct Expenses payable by Tenant pursuant to the terms of this Lease, which increases shall be calculated without regard to such Base Rent Abatement (it being acknowledged that Tenant shall remain responsible for the remainder of Base Rent during the Base Rent Abatement Period in the amount of $4,987.65 per month).  Additionally, Tenant shall be obligated to pay all "Additional Rent" (as that term is defined in Section 4.1.1 of this Lease) during the Base Rent Abatement Period.  Tenant acknowledges and agrees that the foregoing Base Rent Abatement has been granted to Tenant as additional consideration for entering into this Lease, and for agreeing to pay the Base Rent and perform the terms and conditions otherwise required under this Lease.  If Tenant shall be in default under this Lease and shall fail to cure such default within the notice and cure period, if any, permitted for cure pursuant to this Lease, or if this Lease, is terminated for any reason other than Landlord's breach of this Lease, then the dollar amount of the unapplied portion of the Base Rent Abatement as of the date of such default or termination, as the case may be, shall be converted to a credit to be applied to the Base Rent applicable at the end of the Lease Term (but in no event more than $4,987.65 per month) and Tenant shall immediately be obligated to begin paying Base Rent for the Premises in full.  The foregoing Base Rent abatement right set forth in this Section 3.2 shall be personal to the Original Tenant and shall only apply to the extent that the Original Tenant (and not any assignee, or any sublessee or other transferee of the Original Tenant's interest in this Lease) is the Tenant under this Lease during such Base Rent Abatement Period.



1542 N. CAHUENGA BOULEVARD

[Pink Teacup]

DocuSign Envelope ID: 630CC051-31EE-4EE3-80D5-826038BA1949

**ARTICLE 4**

**ADDITIONAL RENT**

4.1      **General Terms; Triple Net Lease**.

4.1.1      **In General**. In addition to paying the Base Rent specified in Article 3 of this Lease, Tenant shall pay "Tenant's Share" of the annual "Direct Expenses," as those terms are defined in Sections 1.1.6 and 1.1.2, respectively, of **Exhibit C** attached to this Lease, provided that, at Landlord's option, in lieu of Tenant paying Tenant's Share of the annual Tax Expenses attributable to the entire Project, Tenant shall pay Tenant's Tax Share of the annual Tax Expenses attributable to Parcels 4 and 5. Such payments by Tenant, together with any and all other amounts payable by Tenant to Landlord pursuant to the TCCs of this Lease, are hereinafter collectively referred to as the "**Additional Rent**," and the Base Rent and the Additional Rent are herein collectively referred to as "**Rent**." All amounts due under this Article 4 and **Exhibit C** as Additional Rent shall be payable for the same periods and in the same manner as the Base Rent; provided, however, the parties hereby acknowledge that the first monthly installment of Tenant's Share of any "Estimated Direct Expenses," as that term is set forth in, and pursuant to the terms and conditions of, Section 1.3.2 of **Exhibit C**, that is payable after the expiration of any free rent period shall be paid at the time of Tenant's execution of this Lease. Without limitation on other obligations of Tenant which survive the expiration of the Lease Term, the obligations of Tenant to pay the Additional Rent provided for in this Article 4 and **Exhibit C** shall survive the expiration of the Lease Term.

4.1.2      **Triple Net Lease**. Landlord and Tenant acknowledge that, except as otherwise provided to the contrary in this Lease, it is the intent and agreement of Landlord and Tenant that this Lease be a "triple net" lease and that as such, the provisions contained in this Lease are intended to pass on to Tenant or reimburse Landlord for all costs and expenses associated with this Lease, the Building and the Project, including, without limitation, all costs and expenses in connection with the ownership, management, maintenance, security, repair, replacement, restoration or operation thereof. To the extent such costs and expenses payable by Tenant cannot be charged directly to, and paid by, Tenant, such costs and expenses shall be paid by Landlord but reimbursed by Tenant as Additional Rent.

4.2      **Taxes and Other Charges for Which Tenant Is Directly Responsible**.

4.2.1      Tenant shall be liable for and shall pay ten (10) days before delinquency, taxes levied against Tenant's equipment, furniture, fixtures and any other personal property located in or about the Premises. If any such taxes on Tenant's equipment, furniture, fixtures and any other personal property are levied against Landlord or Landlord's property or if the assessed value of Landlord's property is increased by the inclusion therein of a value placed upon such equipment, furniture, fixtures or any other personal property and if Landlord pays the taxes based upon such increased assessment, which Landlord shall have the right to do regardless of the validity thereof but only under proper protest if requested by Tenant, Tenant shall upon demand repay to Landlord the taxes so levied against Landlord or the proportion of such taxes resulting from such increase in the assessment, as the case may be.

4.2.2      If the improvements in the Premises, whether installed and/or paid for by Landlord or Tenant and whether or not affixed to the real property so as to become a part thereof, are assessed for real property tax purposes at a valuation higher than the valuation at which improvements conforming to Landlord's "building standard" in other space in the Building are assessed, then the Tax Expenses levied against Landlord or the property by reason of such excess assessed valuation shall be deemed to be taxes levied against personal property of Tenant and shall be governed by the provisions of Section 4.2.1, above.

4.2.3      Notwithstanding any contrary provision herein, Tenant shall pay prior to delinquency any (i) rent tax or sales tax, service tax, transfer tax or value added tax, or any other applicable tax on the rent or services herein or otherwise respecting this Lease, (ii) taxes assessed upon or with respect to the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises or any portion of the Project, including the Project parking facility; or (iii) taxes assessed upon this transaction or any document to which Tenant is a party creating or transferring an interest or an estate in the Premises.

4.3      **Landlord's Records**. Upon Tenant's written request given not more than ninety (90) days after Tenant's receipt of a "Statement" (as that term is defined in Section 1.3.1. of **Exhibit C**) for a particular Expense Year, and provided that Tenant is not then in breach or default under this Lease, specifically including, but not limited to, the timely payment of Additional Rent (whether or not the same is the subject of the audit contemplated herein), Landlord shall furnish Tenant with such reasonable supporting documentation in connection with said Direct Expenses as Tenant may reasonably request. Landlord shall provide said documentation to Tenant within sixty (60) days after Tenant's written request therefor. Within one hundred eighty (180) days after receipt of a Statement by Tenant (the "**Audit Period**"), if Tenant disputes the amount of Direct Expenses set forth in the Statement, an independent certified public accountant (which accountant (A) is a member of a nationally or regionally recognized certified public accounting firm which has previous experience in auditing financial operating records of landlords of commercial buildings, (B) shall not already be providing primary accounting and/or lease administration services to Tenant and shall not have provided primary accounting and/or lease administration services to Tenant in the past three (3) years, (C) is not working on a contingency fee basis [*i.e.*, Tenant must be billed based on the actual time and materials that are incurred by the certified public accounting firm in the performance of the audit], and (D) shall not currently or in the future be providing accounting and/or lease administration services to another tenant in the Building and/or the Project in connection with a review or audit by such other tenant of Direct Expenses) designated and paid for by Tenant, may, after reasonable notice to Landlord and at reasonable times, audit Landlord's records with respect to the Statement at Landlord's corporate offices, provided that (*i*) Tenant is not then in breach or default under this Lease, (*ii*) Tenant has paid all amounts required to be paid under the applicable "Estimate Statement" (as that term is defined in Section 1.3.2 of **Exhibit C**) and Statement, and (*iii*) a copy of the audit agreement between Tenant and its particular certified public accounting firm has been delivered to Landlord prior to the commencement of the audit. In connection with such audit, Tenant and Tenant's certified public accounting firm must agree in advance to follow Landlord's reasonable rules and procedures regarding an audit of the aforementioned Landlord



1542 N. CAHUENGA BOULEVARD

[Pink Teacup]

records, and shall execute a commercially reasonable confidentiality agreement regarding such audit. Any audit report prepared by Tenant's certified public accounting firm shall be delivered concurrently to Landlord and Tenant within the Audit Period. Tenant's failure to dispute and/or audit the amount of Direct Expenses set forth in any Statement within the Audit Period shall be deemed to be Tenant's approval of such Statement and Tenant, thereafter, waives the right or ability to audit the amounts set forth in such Statement. If after such audit, Tenant still disputes such Direct Expenses, an audit to determine the proper amount shall be made, at Tenant's expense, by an independent certified public accountant (the "**Accountant**") selected by Landlord and subject to Tenant's reasonable approval; provided that if such audit by the Accountant proves that Direct Expenses set forth in the particular Statement were overstated by more than seven percent (7%), then the cost of the Accountant and the cost of such audit shall be paid for by Landlord. Tenant hereby acknowledges that Tenant's sole right to audit Landlord's records and to contest the amount of Direct Expenses payable by Tenant shall be as set forth in this Section 4.3, and Tenant hereby waives any and all other rights pursuant to Applicable Law to audit such records and/or to contest the amount of Direct Expenses payable by Tenant. The rights to inspect Landlord's books and records set forth in this Section 4.3 above are personal to Tenant, including any permitted assignee to whom Tenant's interest in this Lease has been assigned in accordance with the terms of Article 14 below (a "**Permitted Assignee**"), and may only be exercised by Tenant or its Permitted Assignee (and not any other assignee, sublessee or transferee of Tenant's interest in this Lease).

## ARTICLE 5

## USE OF PREMISES

5.1    **Permitted Use; Use Restrictions**.

5.1.1    **Permitted Use**. Tenant shall use the Premises solely for the Permitted Use set forth in Section 6 of the Summary and Tenant shall not use or permit the Premises to be used for any other purpose or purposes whatsoever. Tenant shall obtain Landlord's consent to any material change to the menu from that set forth on **Exhibit G** attached hereto.

5.1.2    **Tenant's Trade Name**. Tenant acknowledges that the name of Tenant's business establishment in the Premises is of utmost importance to Landlord. Landlord shall therefore have the right to approve, in Landlord's sole discretion, the name of Tenant's business establishment to be located in the Premises. Landlord hereby approves the trade name set forth in Section 7 of the Summary.

5.1.3    **Continued Operation**. Tenant covenants and agrees that on the Lease Commencement Date the Premises shall be fully staffed and open for the Permitted Use and thereafter Tenant will operate and conduct within the Premises, continuously and uninterruptedly during the Lease Term, the business which is required to operate and conduct under the provisions hereof, except while the Premises are untenantable by reason of fire or other unavoidable casualty, and that it will at all times keep and maintain within and upon the Premises an adequate stock of merchandise and trade fixtures and have sufficient personnel to service and supply the usual and ordinary demands and requirements of its customers. In the event Tenant fails to continuously operate its business in the Premises as required by this Section 5.1.3 during the minimum operating hours required by Section 5.1.4, then in addition to all other remedies available to Landlord (including without limitation, specific performance), Tenant shall pay to Landlord, as liquidated damages, an amount equal to fifty percent (50%) of the Base Rent prorated on a per diem basis until such failure is cured. Acceptance of such liquidated damages shall not be deemed permission for Tenant to continue such violation, and shall not preclude Landlord from seeking any other remedy for such violation, including, without limitation, specific performance or termination of this Lease.

5.1.4    **Minimum Operating Hours**. Tenant shall, at a minimum, keep the Premises open for business during the Minimum Hours of Operation set forth in Section 13 of the Summary except for the date of observation of New Year's Day, Independence Day, Labor Day, Memorial Day, Thanksgiving Day, Christmas Day and, at Landlord's discretion, other locally or nationally recognized holidays which are observed by other projects comparable to and in the vicinity of the Project.

5.1.5    **Quality Standards**. Landlord and Tenant acknowledge that Landlord's primary concern is with the quality and reputation of the retail operations located in the Building and Project and, therefore, the character and quality of Tenant's operation are of paramount concern to Landlord and have strongly influenced Landlord's selection of Tenant. Accordingly, Tenant agrees, as a material part of this Lease, that Tenant shall, throughout the Lease Term, maintain its quality and reputation, and the quality of its merchandise, consistent with a first-class business and shall utilize and operate its business and the Premises (or cause such utilization and operation) prudently and in a manner consistent with sound business practices, including, without limitation, the (i) maintenance of a proper staff of trained personnel, (ii) operation of Tenant's trade or business at the Premises on a fully-staffed basis, it being acknowledged by the parties that Tenant's staffing may well vary during the day and from day to day based on Tenant's anticipated labor needs for such day and time, and (iii) maintenance of the Premises fully stocked with new, first-class merchandise of current style and type consistent with the Permitted Use.

5.1.6    **Appearance of Premises**. Because of the location of the Premises in the Building and the critical importance of maintaining the Premises in a first-class condition so as not to detract from the appearance and condition of the Building, Landlord shall have the right during the Lease Term to approve the concept, plans and specifications of all improvements, including furniture, fixtures and signs for the Premises, both interior and exterior. Once approved, Tenant agrees not to allow the improvements, furniture, fixtures and signs to deteriorate beyond the standard approved by Landlord and to keep the same in a first-class condition, reasonable wear and tear excepted. If the improvements, furniture, fixtures or signs do not comply with the requirements of the preceding sentence, Landlord shall have the right to require Tenant to take such action as necessary to bring the same into compliance with such requirements.

5.1.7    **Additional Rules and Regulations**. In addition to the Rules and Regulations set forth in **Exhibit D**, attached hereto, and the other provisions of this Lease, Tenant hereby covenants not to: (i) use any area



of the Project outside of the Premises (a) for the sale of any merchandise, including food and beverage items, (b) to solicit business, (c) to display signs, (d) for any other business purposes other than the Permitted Use, or (e) for public meetings or entertainment; (ii) use, or permit to be used, any sound broadcasting or amplifying device or any video or vending machine that can be heard outside of the Premises; (iii) perform, or allow any employee or agent to perform, any act or carry on any practice that may, in Landlord's sole discretion, (a) damage the Premises or any other part of the Project, or (b) disturb any other tenant or other person in the Project; or (iv) leave the entrance doors to the Premises open or closed other than as Landlord in its sole discretion shall direct, excepting only the normal use and operation of such entrance doors by Tenant's employees, customers and invitees during normal business hours.

5.1.8    **Deliveries**.  The delivery or shipping of merchandise, supplies and fixtures to and from the Premises shall be done only at such times, in the areas, and through the entrances designated for such purposes, and shall be subject to such rules and regulations as are necessary, in the judgment of Landlord, for the proper operation of the Building and Project.

5.1.9    **Liquor Laws and Liquor Liability Insurance**.  In the event that Tenant shall sell alcoholic beverages at the Premises, Tenant shall, at its sole cost and expense, provide and maintain all licenses and/or permits required by applicable governmental authorities (collectively, the "**Liquor Licenses**") and shall at all times comply with applicable law related to the sale of alcoholic beverages.  At all times during the Lease Term during which Tenant offers for sale alcoholic beverages of any kind, Tenant at its expense, shall maintain an insurance policy or endorsement covering liability related to the sale of alcoholic beverages, which policy or endorsement shall be in form and content acceptable to Landlord and otherwise satisfy the requirements in Section 10.3.  Tenant shall, upon notice from Landlord following any default or breach of this Lease by Tenant, assign to Landlord or its designee all of Tenant's rights, title and interest to Tenant's Liquor Licenses and shall reasonably cooperate with Landlord in connection with the transfer to Landlord or its designee of the Liquor Licenses, including but not limited to the executing of a reasonable documentation to effectuate such transfer.  Tenant shall provide Landlord with a copy of its Liquor Licenses and any restrictions imposed by the applicable governmental authorities.  Tenant shall report to Landlord any infractions related to its Liquor Licenses within twenty-four (24) hours following Tenant's knowledge thereof.

5.1.10    **Essential Personnel**.  Tenant acknowledges that Landlord is relying upon the special business reputation and operating abilities and skills of Lawrence Page as a material inducement to Landlord's execution of this Lease.  Accordingly, Tenant agrees to cause Lawrence Page to devote an adequate percentage of his/her time and attention during the Lease Term to the business of opening and operating the contemplated business at the Premises.

5.2    **Prohibited Uses**.  Tenant shall use the Premises solely for the "Permitted Use," as that term is defined in Section 6 of the Summary, and Tenant shall not use or permit the Premises to be used for any other purpose or purposes whatsoever without the prior written consent of Landlord, which may be withheld in Landlord's sole and absolute discretion.  Tenant further covenants and agrees that it shall not use, or suffer or permit any person or persons to use, the Premises or any part thereof for any use or purpose (1) contrary to the rules and regulations promulgated by Landlord from time to time ("**Rules and Regulations**"), the current set of which (as of the date of this Lease) is attached to this Lease as **Exhibit D**; (2) in violation of the laws of the United States of America, the State of California, the ordinances, regulations or requirements of the local municipal or county governing body or other lawful authorities having jurisdiction over the Building, or in a manner otherwise inconsistent with the character of the Project as a first-class retail Project; or (3) in violation of the exclusive uses of the other tenants in the Project hereafter in effect of which Landlord has given Tenant written notice.  Tenant shall not (a) conduct any auction, fire, distress, going out of business, liquidation, bankruptcy or like sales in the Premises or on the Project; (b) display, sell, lease, or offer for sale or lease, in any manner on the Premises, alcoholic beverages (unless expressly allowed by the terms of this Lease) or pornographic material of any kind, including books, magazines and movies; or (c) engage in any activity or use the Premises for any purpose that is illegal or is not in keeping with the standards or character of a first-class mixed use project or would otherwise interfere with standard Project operations.  Tenant shall faithfully observe and comply with the Rules and Regulations.  Tenant shall comply with all recorded covenants, conditions, and restrictions currently affecting the Project.  Additionally, Tenant acknowledges that the Project may be subject to any future covenants, conditions and restrictions (the "**CC&Rs**") which Landlord, in Landlord's discretion, deems reasonably necessary or desirable, and Tenant agrees that this Lease shall be subject and subordinate to such CC&Rs and Tenant shall promptly recognize such CC&Rs by executing a commercially reasonable form of recognition.

5.3    **Operational Requirements**.  Tenant shall be solely responsible for performing all janitorial services and other cleaning of the Premises appropriate to maintain the Premises in a first-class manner and consistent with comparable buildings, including, without limitation, the following:

5.3.1    Tenant shall cause the carpets or other floor coverings in the Premises to be professionally cleaned at least once every three (3) months during the Lease Term.

5.3.2    Tenant shall cause to be provided (i) daily interior window washing, and (ii) daily sweeping and cleaning of the Premises.

5.3.3    Tenant shall deposit trash daily, or more often if required by Landlord, in the area designated by Landlord from time to time, which trash shall be sealed in double plastic bags.  All trash containers must be covered and stored in a manner to prevent the emanation of odors into the Premises, the Building or the Project.  If Landlord or any local governmental authority having jurisdiction over the Building requires separation of "wet" and "dry" garbage, Tenant shall comply with the requirements imposed by Landlord and/or such governmental entity (as the case may be) with respect to the separation of refuse.  If Tenant's use requires such separation for "wet" and "dry" garbage, Landlord shall require that Tenant either (i) maintain a separate dumpster for Tenant's "wet" garbage, which shall be installed and maintained by Tenant at Tenant's sole cost and expense in accordance with Landlord's specifications (which specifications shall include, without limitation, the specific dimensions of such dumpster and the



1542 N. CAHUENGA BOULEVARD

[Pink Teacup]

construction of an enclosure to screen such dumpster), or (ii) utilize a shared dumpster in common with other tenants of the Project for Tenant's "wet" garbage, which shall be installed and maintained by Landlord, subject to Tenant's payment to Landlord of Tenant's proportionate share of the cost of such installation and use.  In addition to the foregoing, Tenant shall be required to participate in any recycling program conducted by Landlord at the Building or Project.  Notwithstanding the foregoing, upon written notice to Tenant, Landlord may require that Tenant procure and maintain at Tenant's sole cost and expense, a contract providing for the pickup and disposal of Tenant's refuse from the Premises, which contract shall be subject to Landlord's prior review and approval.  If such a contract is required, Tenant shall no longer use Landlord's receptacles for disposal of Tenant's refuse.

5.3.4    Tenant shall cause to be provided pest eradication and control services, as required by Landlord, with respect to the Premises.

5.3.5    If requested by Landlord, Tenant shall install grease traps of sufficient size and design to catch grease, fat and oils disposed into the drains located in the Premises before entry into the Building's sewer system.  Tenant shall keep the grease traps clean and operational at all times.  Tenant, at its sole cost and expense, shall procure and maintain in full force and effect a contract for the maintenance of any grease traps, including the treatment, emptying and flushing thereof, with a service and maintenance firm, and with a maintenance schedule, reasonably acceptable to Landlord.  Tenant shall be liable for the cost of any maintenance to or repairs of any of the Building's or Project's pumps and pipes as a result of Tenant's failure to comply with the terms and conditions of this provision or as a result of any grease, garbage or other abnormal disposal through the Building's drain system by Tenant.  Landlord reserves the right to maintain the grease traps at Tenant's expense.  In addition, Landlord may require Tenant, at Tenant's sole cost and expense, to install and operate a monitoring and suppression system for any noxious gases.

5.3.6    Tenant shall take all actions necessary to prevent odors from escaping into the Premises, the Building or the Project.  The Premises and the equipment contained therein must at all times be adequately ventilated and filtered and any odors must be exhausted and dispersed in a manner acceptable to Landlord, including the installation of duct systems and exhaust hoods as may be required by Landlord.  Tenant shall keep such duct systems and exhaust hoods clean and operational at all times.  Tenant, at its sole cost and expense, shall procure and maintain in full force and effect a contract for the maintenance of any such duct systems and exhaust hoods with a service and maintenance firm, and within a maintenance schedule, reasonably acceptable to Landlord.  Tenant shall be liable for the cost of any maintenance to or repairs of the Building or Project as a result of Tenant's failure to comply with the terms and conditions of this provision.  Landlord reserves the right to maintain such duct systems and exhaust hood at Tenant's expense.

5.3.7    Tenant shall keep any display windows, including window or shadow boxes, in the Premises dressed and illuminated, and permitted signs and exterior lights lit during the hours of operation set forth in Section 5.1.4, above.

5.3.8    **Gross Sales Reporting**.  Tenant agrees to deliver to Landlord a statement of the "Gross Sales" (as defined hereinbelow) of Tenant within ten (10) days after the close of each quarter, and an annual statement, including a quarterly breakdown of Gross Sales, within twenty (20) days after the close of each calendar year.  Such statements shall show the gross selling prices of all food, beverages, merchandise and services, and shall be signed by the manager of Tenant's limited liability company.  Tenant shall keep the following items:  (a) full and accurate books of account and records in accordance with generally accepted accounting principles consistently applied.  Such books, receipts and records shall be kept for a period of three (3) years after the close of each calendar year and shall be available for inspection and audit by Landlord or its representative at the Premises at all times during regular business hours.  In addition, upon request of Landlord, Tenant agrees to furnish to Landlord a copy of Tenant's state and local sales and use tax returns.  The receipt by Landlord of any statement for any period shall not bind it as to the correctness of the statement or the payment.  Landlord shall, within three (3) years after the receipt of any such statement, be entitled to an audit of such Gross Sales (including the Gross Sales of any subtenant, licensee or concessionaire).  Such audit shall be conducted by either Landlord or a certified public accountant, to be designated by Landlord, during normal business hours at the principal place of business of Tenant.  As used herein, the term "**Gross Sales**" means the gross selling price of all food, beverages, merchandise or services from the Premises by Tenant and its subtenants, licensees, franchisees, agents, employees or concessionaires.  All Gross Sales shall be determined in accordance with accounting standards customarily accepted by the retail industry.

## ARTICLE 6

## SERVICES AND UTILITIES

6.1    **Services and Utilities**.

6.1.1    **In General**.  Tenant agrees, at its own expense, to pay for all water, power, gas, electric current, telephone, cable, wireless internet and all other utilities and services used by Tenant on the Premises (including, without limitation, all sales, use and other taxes imposed thereon by any governmental authority).  Tenant agrees to provide, at Tenant's sole cost and expense, any utility meters and utility panels of the type required by Landlord.  In the event that any utilities are furnished to the Premises by Landlord, whether submetered or otherwise, then Tenant shall pay to Landlord the cost of such utilities, including a reasonable administrative charge for Landlord's supervision.  If charges for any such utilities are not separately charged to Tenant by the utility company, or separately submetered to the Premises, Landlord will reasonably apportion the costs of such utilities among the tenants utilizing the utility or service on an equitable basis as determined by Landlord.  Within thirty (30) days after receipt of Landlord's statement of apportionment or statement setting forth the charges payable by Tenant, Tenant shall pay to Landlord as Additional Rent, the cost of such services and utilities so apportioned or so provided by Landlord.  If Landlord shall from time to time reasonably determine that the use of any such utility or service in the Premises is disproportionate to the use of other tenants, Landlord may adjust Tenant's share of the cost thereof to take equitable account of such disproportionate use.  If Landlord elects to utilize solar, wind or other alternatively generated electricity at the Building ("**Alternative Electricity**"), Tenant agrees to purchase from the provider of such Alternative Electricity up to 100% of



DocuSign Envelope ID: 630CC051-31EE-4EE3-80D5-826038BA1949

Tenant's electrical requirements, as and when such Alternative Electricity is produced, at the price in effect at the time of delivery; provided, however, in no event shall the price for Alternative Electricity exceed the total cost of comparable electric service that otherwise would have been purchased from the conventional electricity provider.

6.1.2    **HVAC**.  Tenant shall be solely responsible for supplying all HVAC to the Premises.  The existing heating, ventilation and air conditioning ("**HVAC**") systems serving the Premises (collectively, the "**Premises HVAC**") shall be in good working order as of the Lease Commencement Date, and Tenant shall otherwise accept the Premises HVAC in their current "as-is" condition as of the date of this Lease, and which HVAC systems shall be repaired and maintained by Tenant, at Tenant's sole cost and expense, and Tenant shall enter into and furnish to Landlord, a contract with a qualified HVAC service company for the regular maintenance of such HVAC systems serving the Premises.  If Tenant fails to establish and maintain a service and maintenance contract reasonably acceptable to Landlord, Landlord, in its sole discretion, may perform the work required to repair and maintain the Premises HVAC and charge Tenant any and all costs incurred in connection therewith.  Tenant shall pay, pursuant to Section 6.1 above, the cost of all electricity, water/chilled water, and/or any other utilities used by such Premises HVAC.

6.1.3    **Access**.  Except in the event of an emergency or as otherwise specifically required pursuant to Applicable Laws or the terms of this Lease, Tenant shall be granted access to the Premises and the Project parking facility twenty-four (24) hours per day, seven (7) days per week, every day of the year, during the Lease Term, subject to all Applicable Laws, Landlord's reasonable access control procedures, the Rules and Regulations and the terms of this Lease.

6.2    **Interruption of Use**.  Tenant agrees that Landlord shall not be liable for damages, by abatement of Rent or otherwise, for failure to furnish or delay in furnishing any service (including telephone and telecommunication services), or for any diminution in the quality or quantity thereof, when such failure or delay or diminution is occasioned, in whole or in part, by breakage, repairs, replacements, or improvements, by any strike, lockout or other labor trouble, by inability to secure electricity, gas, water, or other fuel at the Building or Project after reasonable effort to do so, by any riot or other dangerous condition, emergency, accident or casualty whatsoever, by act or default of Tenant or other parties, or by any other cause beyond Landlord's reasonable control; and such failures or delays or diminution shall never be deemed to constitute an eviction or disturbance of Tenant's use and possession of the Premises or relieve Tenant from paying Rent or performing any of its obligations under this Lease.  Furthermore, Landlord shall not be liable under any circumstances for a loss of, or injury to, property or for injury to, or interference with, Tenant's business, including, without limitation, loss of profits, however occurring, through or in connection with or incidental to a failure to furnish any of the services or utilities as set forth in this Article 6.

6.3    **Abatement Event**.  If (i) Landlord fails to perform the obligations required of Landlord under the TCCs of this Lease, (ii) such failure causes all or a material portion of the Premises to be untenantable and unusable by Tenant and Tenant actually ceases to use all or a material portion of the Premises, and (iii) such failure is reasonably within Landlord's ability to cure, then in order to be entitled to receive the benefits of this Section 6.3, Tenant must give Landlord notice (the "**Initial Notice**"), specifying such failure to perform by Landlord (the "**Abatement Event**").  If Landlord has not commenced to cure such Abatement Event within five (5) business days after the receipt of the Initial Notice and is not otherwise excused from such performance by this Lease, then prior to any abatement, Tenant must deliver an additional notice to Landlord (the "**Additional Notice**"), specifying such Abatement Event and Tenant's intention to abate the payment of Rent under this Lease.  If Landlord does not commence to cure such Abatement Event within five (5) business days of receipt of the Additional Notice and thereafter diligently pursue the cure to completion, Tenant may, upon written notice to Landlord, immediately abate Base Rent and Tenant's Share of Direct Expenses payable under this Lease for that portion of the Premises rendered untenantable and not actually used by Tenant, for the period beginning on the date five (5) business days after the Initial Notice to the earlier of the date Landlord cures such Abatement Event or the date Tenant recommences the use of such portion of the Premises.  If Tenant fails to immediately provide the Additional Notice and commence applying any abatement of Base Rent and Tenant's Share of Direct Expenses payable under this Lease for that portion of the Premises rendered untenantable and not actually used by Tenant, then Tenant's right to abate Base Rent and Tenant's Share of Direct Expenses shall be of no further force or effect with respect to the applicable Abatement Event.  Such right to abate Base Rent and Tenant's Share of Direct Expenses shall be Tenant's sole and exclusive remedy at law or in equity for an Abatement Event.  Except as provided in this Section 6.3, nothing contained herein shall be interpreted to mean that Tenant is excused from paying Rent due hereunder.

6.4    Tenant's Security System.  Tenant may, at its own expense, install its own security system ("**Tenant's Security System**") in the Premises, subject to Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed; provided, however, that in the event Tenant's Security System ties into the Building security system, Tenant shall coordinate the installation and operation of Tenant's Security System with Landlord to assure that Tenant's Security System is compatible with the Building security system and the Building Systems (as defined in Article 7 below) and to the extent that Tenant's Security System is not compatible with the Building security system or the Building Systems, Tenant shall not be entitled to install or operate it.  Tenant shall be solely responsible, at Tenant's sole cost and expense, for the monitoring, operation and removal of Tenant's Security System, provided that, notwithstanding the foregoing, Tenant may install any security system it desires that does not require linkage with the Building security system and which does not affect the Building security system and which does not (i) create (a) an adverse effect on the structural integrity of the Building; (b) a non-compliance with applicable governmental regulations or building codes; (c) an adverse effect on the Building Systems; (d) an effect on the exterior appearance of the Building; or (e) unreasonable interference with the normal and customary office operations of any other tenant in the Building, or (ii) affect Landlord's ability to operate the Building.  Tenant shall provide Landlord with any information reasonably required regarding Tenant's Security System in the event access to the Premises is necessary in an emergency.  At Landlord's option, upon the expiration or earlier termination of the Lease Term, Landlord may require Tenant to remove Tenant's Security System and repair all damage to the Building resulting from such removal, at Tenant's sole cost and expense.



1542 N. CAHUENGA BOULEVARD

[Pink Teacup]

## ARTICLE 7

### REPAIRS

Tenant shall, at Tenant's own expense, keep the Premises, including all improvements, fixtures, equipment, interior window coverings, and furnishings therein, Tenant's storefront and the floor or floors of the Building on which the Premises is located, in good order, repair and condition at all times during the Lease Term.  In addition, Tenant shall, at Tenant's own expense, but under the supervision and subject to the prior approval of Landlord, and within any reasonable period of time specified by Landlord, promptly and adequately repair all damage to the Premises and replace or repair all damaged, broken, or worn fixtures and appurtenances, except for damage caused by ordinary wear and tear or beyond the reasonable control of Tenant;  provided however, that, at Landlord's option, or if Tenant fails to make such repairs, Landlord may, after written notice to Tenant and Tenant's failure to repair within five (5) days thereafter, but need not, make such repairs and replacements, and Tenant shall pay Landlord the cost thereof, including a percentage of the cost thereof (to be uniformly established for the Building and/or the Project) sufficient to reimburse Landlord for all overhead, general conditions, fees and other costs or expenses arising from Landlord's involvement with such repairs and replacements forthwith upon being billed for same.  If Tenant's air-conditioning system serving the Premises exclusively serves the Premises, Tenant shall also contract with an air-conditioning service company for the periodic maintenance and the repair and replacement, as necessary, of the air-conditioning system, which contract and company shall be subject to Landlord's prior written approval.  Notwithstanding the foregoing, Landlord shall be responsible for repairs to the exterior walls (other than Tenant's storefront), foundation and roof of the Building, and the structural portions of the floors of the Building (collectively, the "**Building Structure**"), and the systems and equipment of the Building that serve the Building generally up to the point of connection to the Premises (the "**Building Systems**"), except to the extent that such repairs are required due to the negligence or willful misconduct of Tenant; provided, however, that if such repairs are due to the negligence or willful misconduct of Tenant, Landlord shall nevertheless make such repairs at Tenant's expense, or, if covered by Landlord's insurance, Tenant shall only be obligated to pay any deductible in connection therewith.  Landlord may, but shall not be required to, enter the Premises at all reasonable times to make such repairs, alterations, improvements or additions to the Premises or to the Project or to any equipment located in the Project as Landlord shall desire or deem necessary or as Landlord may be required to do by governmental or quasi-governmental authority or court order or decree; provided, however, except for (i) emergencies, (ii) repairs, alterations, improvements or additions required by governmental or quasi-governmental authorities or court order or decree, or (iii) repairs which are the obligation of Tenant hereunder, any such entry into the Premises by Landlord shall be performed in a manner so as not to materially interfere with Tenant's use of, or access to, the Premises; provided that, with respect to items (ii) and (iii) above, Landlord shall use commercially reasonable efforts to not materially interfere with Tenant's use of, or access to, the Premises.  Tenant hereby waives any and all rights under and benefits of subsection 1 of Section 1932 and Sections 1941 and 1942 of the California Civil Code or under any similar law, statute, or ordinance now or hereafter in effect.

## ARTICLE 8

### ADDITIONS AND ALTERATIONS

8.1      **Landlord's Consent to Alterations**.  Tenant may not make any improvements, alterations, additions or changes to the Premises or any mechanical, plumbing or HVAC facilities or systems pertaining to the Premises (collectively, the "**Alterations**") without first procuring the prior written consent of Landlord to such Alterations, which consent shall be requested by Tenant not less than fifteen (15) business days prior to the commencement thereof, and which consent shall not be unreasonably withheld by Landlord.  Landlord acknowledges that Tenant will be perform the following improvements in the Premises (subject to Landlord's review of Tenant's plans and the remaining terms of this Article 8) (collectively, the "**Initial Alterations**"): install the Identity Sign (as defined in Article 23 below), remove the take-away kitchen in the dining area to install a bar area, increase seating in the dining area, install roll up doors/windows, and polish concrete floors.  Notwithstanding the foregoing, it shall be deemed reasonable for Landlord to withhold its consent to any Alteration which adversely affects the Building Structure or Building Systems.  Notwithstanding the foregoing, Tenant shall be permitted to make Alterations following ten (10) business days' notice to Landlord, but without Landlord's prior consent, to the extent that such Alterations are not visible from the exterior of the Premises and do not (i) adversely affect the Building Structure, Building Systems, or exterior appearance of the Building, (ii) adversely affect the value of the Premises or Building, (iii) require a building or construction permit, (iv) cost more than Ten Thousand and 00/100 Dollars ($10,000.00) for a particular job of work or (v) trigger a legal requirement upon Landlord to make any improvement, alteration, addition or change to the Project (the "**Cosmetic Alterations**").  Landlord may impose, as a condition of its consent to any and all Alterations or repairs of the Premises or about the Premises, such requirements as Landlord in its reasonable discretion may deem desirable, including, but not limited to, the requirement that Tenant utilize for such purposes only contractors reasonably approved by Landlord, and any removal and/or restoration obligations required to be performed pursuant to the TCCs of Section 8.4 of this Lease.  If Landlord shall give its consent, the consent shall be deemed conditioned upon Tenant acquiring a permit to do the work from appropriate governmental agencies, the furnishing of a copy of such permit to Landlord prior to the commencement of the work, and the compliance by Tenant with all conditions of said permit in a prompt and expeditious manner.  If such Alterations will involve the use of or disturb hazardous materials or substances existing in the Premises, Tenant shall notify Landlord prior to performing such Alterations and comply with Landlord's rules and regulations concerning such hazardous materials or substances.  Tenant shall construct such Alterations and perform such repairs in a good and workmanlike manner, in conformance with any and all applicable federal, state, county, local or municipal laws, ordinances, rules and regulations and pursuant to a valid building permit, issued by the city in which the Building is located (or other applicable governmental authority), all in conformance with Landlord's construction rules and regulations; provided, however, that prior to commencing to construct any Alteration, Tenant shall meet with Landlord to discuss Landlord's design parameters and code compliance issues.  In the event Tenant performs any Alterations in the Premises which require or give rise to governmentally required changes to the "Base Building," as that term is defined below, then Landlord shall, at Tenant's expense, make such changes to the Base Building.  The "**Base Building**" shall include the Building

1542 N. CAHUENGA BOULEVARD

[Pink Teacup]



Structure and Building Systems. In performing the work of any such Alterations, Tenant shall have the work performed in such manner so as not to obstruct access to the Project or any portion thereof, by any other tenant of the Project, and so as not to obstruct the business of Landlord or other tenants in the Project. Tenant shall retain any union trades to the extent designated by Landlord. Further, Tenant shall not use (and upon notice from Landlord shall cease using) contractors, services, workmen, labor, materials or equipment that, in Landlord's reasonable judgment, would disturb labor harmony with the workforce or trades engaged in performing other work, labor or services in or about the Building or the Common Areas. In addition to Tenant's obligations under Article 9 of this Lease, upon completion of any Alterations, Tenant agrees to cause a Notice of Completion to be recorded in the office of the Recorder of the County of Los Angeles in accordance with Section 8182 of the Civil Code of the State of California or any successor statute, and as a condition precedent to the enforceability and validity of Landlord's consent, Tenant shall deliver to the management office for the Project a reproducible copy of the "as built" and CAD drawings of the Alterations, to the extent applicable, as well as all permits, approvals and other documents issued by any governmental agency in connection with the Alterations.

8.2    **Payment for Improvements**. With respect to payments to be made to Tenant's contractors for any Alterations, Tenant shall (i) comply with Landlord's requirements for final lien releases and waivers in connection with Tenant's payment for work to contractors, and (ii) sign Landlord's standard contractor's rules and regulations. In addition, in connection with all Alterations, Tenant shall pay Landlord an oversight fee equal to five percent (5%) of the cost of the work, and reimburse Landlord for Landlord's reasonable, actual, out-of-pocket costs and expenses actually incurred in connection with Landlord's review of such work.

8.3    **Construction Insurance**. In addition to the requirements of Article 10 of this Lease, in the event that Tenant makes any Alterations, prior to the commencement of such Alterations, Tenant shall provide Landlord with evidence that Tenant carries "Builder's All Risk" insurance in an amount reasonably approved by Landlord covering the construction of such Alterations, and such other insurance as Landlord may reasonably require, it being understood and agreed that all of such Alterations shall be insured by Tenant pursuant to Article 10 of this Lease immediately upon completion thereof. In addition, Landlord may, in its reasonable discretion, require Tenant to obtain a lien and completion bond or some alternate form of security satisfactory to Landlord in an amount sufficient to ensure the lien-free completion of such Alterations and naming Landlord as a co-obligee.

8.4    **Landlord's Property**. Landlord and Tenant hereby acknowledge and agree that all Alterations, improvements, fixtures, equipment and/or appurtenances which may be installed or placed in or about the Premises (excluding Tenant's removable trade fixtures, furniture or non-affixed office equipment), from time to time, shall be at the sole cost of Tenant and shall be and become part of the Premises and the property of Landlord . Furthermore, Landlord may, by written notice to Tenant prior to the end of the Lease Term, or given following any earlier termination of this Lease, require Tenant, at Tenant's expense, to remove any Alterations or improvements in the Premises, and to repair any damage to the Premises and Building caused by such removal and return the affected portion of the Premises to a building standard improved condition as determined by Landlord; provided, however, if, in connection with its notice to Landlord with respect to any such Alterations or Cosmetic Alterations, (x) Tenant requests Landlord's decision with regard to the removal of such Alterations or Cosmetic Alterations, and (y) Landlord thereafter agrees in writing to waive the removal requirement with regard to such Alterations or Cosmetic Alterations, then Tenant shall not be required to so remove such Alterations or Cosmetic Alterations; provided further, however, that if Tenant requests such a determination from Landlord and Landlord, within ten (10) business days following Landlord's receipt of such request from Tenant with respect to Alterations or Cosmetic Alterations, fails to address the removal requirement with regard to such Alterations or Cosmetic Alterations, Landlord shall be deemed to have agreed to waive the removal requirement with regard to such Alterations or Cosmetic Alterations. If Tenant fails to complete such removal and/or to repair any damage caused by the removal of any Alterations or improvements in the Premises, and/or to return the affected portion of the Premises to a building standard improved condition as determined by Landlord, then at Landlord's option, either (A) Tenant shall be deemed to be holding over in the Premises and Rent shall continue to accrue in accordance with the terms of Article 16, below, until such work shall be completed, and/or (B) Landlord may do so and may charge the cost thereof to Tenant. Tenant hereby protects, defends, indemnifies and holds Landlord harmless from any liability, cost, obligation, expense or claim of lien in any manner relating to the installation, placement, removal or financing of any such Alterations, improvements, fixtures and/or equipment in, on or about the Premises, which obligations of Tenant shall survive the expiration or earlier termination of this Lease.

## ARTICLE 9

## COVENANT AGAINST LIENS

Tenant shall keep the Project and Premises free from any liens or encumbrances arising out of the work performed, materials furnished or obligations incurred by or on behalf of Tenant, and shall protect, defend, indemnify and hold Landlord harmless from and against any claims, liabilities, judgments or costs (including, without limitation, reasonable attorneys' fees and costs) arising out of same or in connection therewith. Tenant shall give Landlord notice at least twenty (20) days prior to the commencement of any such work on the Premises (or such additional time as may be necessary under Applicable Laws) to afford Landlord the opportunity of posting and recording appropriate notices of non-responsibility. Tenant shall remove any such lien or encumbrance by bond or otherwise within five (5) days after notice by Landlord, and if Tenant shall fail to do so, Landlord may pay the amount necessary to remove such lien or encumbrance, without being responsible for investigating the validity thereof. The amount so paid shall be deemed Additional Rent under this Lease payable upon demand, without limitation as to other remedies available to Landlord under this Lease. Nothing contained in this Lease shall authorize Tenant to do any act which shall subject Landlord's title to the Building or Premises to any liens or encumbrances whether claimed by operation of law or express or implied contract. Any claim to a lien or encumbrance upon the Building or Premises arising in connection with any such work or respecting the Premises not performed by or at the request of Landlord shall be null and void, or at Landlord's option shall attach only against Tenant's interest in the Premises and shall in all respects be subordinate to Landlord's title to the Project, Building and Premises.



1542 N. CAHUENGA BOULEVARD
[Pink Teacup]

## ARTICLE 10

### INDEMNIFICATION AND INSURANCE

10.1    **Indemnification and Waiver**.  Tenant hereby assumes all risk of damage to property or injury to persons in, upon or about the Premises from any cause whatsoever and agrees that Landlord, its partners, subpartners and their respective officers, agents, servants, employees, and independent contractors (collectively, "**Landlord Parties**") shall not be liable for, and are hereby released from any responsibility for, any damage either to person or property or resulting from the loss of use thereof, which damage is sustained by Tenant or by other persons claiming through Tenant.  Tenant shall indemnify, defend, protect, and hold harmless the Landlord Parties from and against any and all loss, cost, damage, expense and liability (including without limitation court costs and reasonable attorneys' fees) incurred in connection with or arising from:  (a) any causes in, on or about the Premises; (b) the use or occupancy of the Premises by Tenant or any person claiming under Tenant; (c) any activity, work, or thing done, or permitted or suffered by Tenant in or about the Premises; (d) any acts, omission, or negligence of Tenant or any person claiming under Tenant, or the contractors, agents, employees, invitees, or visitors of Tenant or any such person, in, on or about the Project (collectively, "**Tenant Parties**"); (e) any breach, violation, or non-performance by Tenant or any person claiming under Tenant or the employees, agents, contractors, invitees, or visitors of Tenant or any such person of any term, covenant, or provision of this Lease or any law, ordinance, or governmental requirement of any kind; (f) any injury or damage to the person, property, or business of Tenant, its employees, agents, contractors, invitees, visitors, or any other person entering upon the Premises under the express or implied invitation of Tenant; or (g) the placement of any personal property or other items within the Premises.  Should Landlord be named as a defendant in any suit brought against Tenant in connection with or arising out of Tenant's occupancy of the Premises, Tenant shall pay to Landlord its costs and expenses incurred in such suit, including without limitation, its actual professional fees such as appraisers', accountants' and attorneys' fees.  Further, Tenant's agreement to indemnify Landlord pursuant to this Section 10.1 is not intended and shall not relieve any insurance carrier of its obligations under policies required to be carried by Tenant pursuant to the provisions of this Lease, to the extent such policies cover the matters subject to Tenant's indemnification obligations; nor shall they supersede any inconsistent agreement of the parties set forth in any other provision of this Lease.  The provisions of this Section 10.1 shall survive the expiration or sooner termination of this Lease with respect to any claims or liability arising in connection with any event occurring prior to such expiration or termination.

10.2    **Tenant's Compliance With Landlord's Fire and Casualty Insurance**.  Tenant shall, at Tenant's expense, comply with Landlord's insurance company requirements pertaining to the use of the Premises.  If Tenant's conduct or use of the Premises causes any increase in the premium for such insurance policies then Tenant shall reimburse Landlord for any such increase. Tenant, at Tenant's expense, shall comply with all rules, orders, regulations or requirements of the American Insurance Association (formerly the National Board of Fire Underwriters) and with any similar body.

10.3    **Tenant's Insurance**.  From and after delivery of possession of the Premises to Tenant, Tenant shall maintain the following coverages in the following amounts.  The required evidence of coverage must be delivered to Landlord on or before the date required under Section 10.4(I) sub-sections (x) and (y), or Section 10.4(II) below (as applicable).  Such policies shall be for a term of at least one (1) year, or the length of the remaining term of this Lease, whichever is less.

10.3.1   Commercial General Liability Insurance, including Broad Form contractual liability covering the insured against claims of bodily injury, personal injury and property damage (including loss of use thereof) based upon or arising out of Tenant's operations, occupancy or maintenance of the Project and all areas appurtenant thereto.  Such insurance shall be written on an "occurrence" basis.  Landlord and any other party the Landlord so specifies that has a material financial interest in the Project, including Landlord's managing agent, ground lessor and/or lender, if any, shall be named as additional insureds as their interests may appear using Insurance Service Organization's form CG2011 or a comparable form approved by Landlord.  Tenant shall provide an endorsement or policy excerpt showing that Tenant's coverage is primary and any insurance carried by Landlord shall be excess and non-contributing.  The coverage shall also be extended to include damage caused by heat, smoke or fumes from a hostile fire.  The policy shall not contain any intra-insured exclusions as between insured persons or organizations.  This policy shall include coverage for all liabilities assumed under this Lease as an insured contract for the performance of all of Tenant's indemnity obligations under this Lease.  The limits of said insurance shall not, however, limit the liability of Tenant nor relieve Tenant of any obligation hereunder.  Limits of liability insurance shall not be less than the following; provided, however, such limits may be achieved through the use of an Umbrella/Excess Policy:

| | |
|---|---|
| Bodily Injury and Property Damage Liability | $3,000,000 each occurrence |
| Personal Injury and Advertising Liability | $3,000,000 each occurrence |
| Tenant Legal Liability/Damage to Rented Premises Liability | $1,000,000.00 |

10.3.2   Property Insurance covering (i) all furniture, personal property, business and trade fixtures, office equipment, free-standing cabinet work, movable partitions, merchandise and all other items of Tenant's business personal property on the Premises installed by, for, or at the expense of Tenant, (ii) any improvements which exist in the Premises as of the Lease Commencement Date (excluding the Base Building) (the "**Original Improvements**"), and (iii) all Alterations performed in the Premises.  Such insurance shall be written on a Special Form basis, for the full replacement cost value (subject to reasonable deductible amounts), without deduction for depreciation of the covered items and in amounts that meet any co-insurance clauses of the policies of insurance


1542 N. CAHUENGA BOULEVARD

[Pink Teacup]

DocuSign Envelope ID: 630CC051-31EE-4EE3-80D5-826038BA1949

and shall include coverage for (a) all perils included in the CP 10 30 04 02 Coverage Special Form, (b) water damage from any cause whatsoever, including, but not limited to, sprinkler leakage, bursting, leaking or stoppage of any pipes, explosion, and backup or overflow from sewers or drains, and (c) terrorism (to the extent such terrorism insurance is available as a result of the Terrorism Risk Insurance Act of 2002 (Pub. L. 107-297, 116 Stat. 2322), the Terrorism Risk Insurance Program Reauthorization Act of 2005 (Pub. l. 109-144), and the Terrorism Risk Insurance Program Reauthorization Act of 2007 (Pub. L. 110-160, 121 Stat. 183), any successor statute or regulation, or is otherwise available at commercially reasonable rates).

10.3.2.1    **Increase in Project's Property Insurance**.  Tenant shall pay for any increase in the premiums for the property insurance of the Project if said increase is caused by Tenant's acts, omissions, use or occupancy of the Premises.

10.3.2.2    **Property Damage**.  Tenant shall use the proceeds from any such insurance for the replacement of personal property, trade fixtures, Original Improvements and Alterations.

10.3.2.3    **No Representation of Adequate Coverage**.    Landlord makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Tenant's property, business operations or obligations under this Lease.

10.3.2.4    **Property Insurance Subrogation**.    Landlord and Tenant intend that their respective property loss risks shall be borne by insurance carriers to the extent above provided (and, in the case of Tenant, by an insurance carrier satisfying the requirements of Section 10.4(i) below), and Landlord and Tenant hereby agree to look solely to, and seek recovery only from, their respective insurance carriers in the event of a property loss to the extent that such coverage is agreed to be provided hereunder.  The parties each hereby waive all rights and claims against each other for such losses, and waive all rights of subrogation of their respective insurers.  Landlord and Tenant hereby represent and warrant that their respective "all risk" property insurance policies include a waiver of (i) subrogation by the insurers, and (ii) all rights based upon an assignment from its insured, against Landlord and/or any of the Landlord Parties or Tenant and/or any of the Tenant Parties (as the case may be) in connection with any property loss risk thereby insured against.  Tenant will cause all subtenants and licensees of the Premises claiming by, under, or through Tenant to execute and deliver to Landlord a waiver of claims similar to the waiver in this Section 10.3.2.4 and to obtain such waiver of subrogation rights endorsements.  If either party hereto fails to maintain the waivers set forth in items (i) and (ii) above, the party not maintaining the requisite waivers shall indemnify, defend, protect, and hold harmless the other party for, from and against any and all claims, losses, costs, damages, expenses and liabilities (including, without limitation, court costs and reasonable attorneys' fees) arising out of, resulting from, or relating to, such failure.

10.3.3   Business Income Interruption for one year (1) plus Extra Expense insurance in such amounts as will reimburse Tenant for actual direct or indirect loss of earnings attributable to the risks outlined in Section 10.3.2 above.

10.3.4   Worker's Compensation or other similar insurance pursuant to all applicable state and local statutes and regulations, and Employer's Liability with minimum limits of not less than $1,000,000 each accident/employee/disease.

10.3.5   Commercial Automobile Liability Insurance covering all Owned (if any), Hired, or Non-owned vehicles with limits not less than $1,000,000 combined single limit for bodily injury and property damage.

10.3.6   In the event the Permitted Use includes the sale of alcoholic beverages, then, as a condition to the sale thereof, Tenant shall obtain an alcohol liability insurance policy with a limit of not less than the limits of bodily injury and property damage liability under Section 10.3.1 above.

10.4    **Form of Policies**.  The minimum limits of policies of insurance required of Tenant under this Lease shall in no event limit the liability of Tenant under this Lease.  Such insurance shall (i) be issued by an insurance company having an AM Best rating of not less than A-X (or to the extent AM Best ratings are no longer available, then a similar rating from another comparable rating agency), or which is otherwise acceptable to Landlord and licensed to do business in the State of California, (ii) be in form and content reasonably acceptable to Landlord and complying with the requirements of Section 10.3 (including, Sections 10.3.1 through 10.3.6), (iii) Tenant shall not do or permit to be done anything which invalidates the required insurance policies, and (iv) provide that said insurance shall not be canceled or coverage changed unless thirty (30) days' prior written notice shall have been given to Landlord and any mortgagee of Landlord, the identity of whom has been provided to Tenant in writing.  Tenant shall deliver said policy or policies or certificates thereof and applicable endorsements which meet the requirements of this Article 10 to Landlord on or before (I) the earlier to occur of:  (x) the Lease Commencement Date, and (y) the date Tenant and/or its employees, contractors and/or agents first enter the Premises for occupancy, construction of improvements, alterations, or any other move-in activities, and (II) five (5) business days after the renewal of such policies.  In the event Tenant shall fail to procure such insurance, or to deliver such policies or certificates and applicable endorsements, Landlord may, at its option, after written notice to Tenant and Tenant's failure to obtain such insurance within five (5) days thereafter, procure such policies for the account of Tenant and the sole benefit of Landlord, and the cost thereof shall be paid to Landlord after delivery to Tenant of bills therefor.

10.5    **Additional Insurance Obligations**.  Tenant shall carry and maintain during the entire Lease Term, at Tenant's sole cost and expense, increased amounts of the insurance required to be carried by Tenant pursuant to this Article 10 and such other reasonable types of insurance coverage and in such reasonable amounts covering the Premises and Tenant's operations therein, as may be reasonably requested by Landlord.

10.6    **Third-Party Contractors**.  Tenant shall obtain and deliver to Landlord, Third Party Contractor's certificates of insurance and applicable endorsements at least seven (7) business days prior to the commencement of work in or about the Premises by any vendor or any other third-party contractor (collectively, a "**Third Party Contractor**").  All such insurance shall (a) name Landlord as an additional insured under such party's liability policies as required by Section 10.3.1 above and this Section 10.6, (b) provide a waiver of subrogation in favor of Landlord



1542 N. CAHUENGA BOULEVARD

[Pink Teacup]

under such Third Party Contractor's commercial general liability insurance, (c) be primary and any insurance carried by Landlord shall be excess and non-contributing, and (d) comply with Landlord's minimum insurance requirements.

## ARTICLE 11

## DAMAGE AND DESTRUCTION

11.1     **Repair of Damage to Premises by Landlord**.  Tenant shall promptly notify Landlord of any damage to the Premises resulting from fire or any other casualty ("**Casualty**").  If the Premises or any Common Areas serving or providing access to the Premises shall be damaged by Casualty, Landlord shall promptly and diligently, subject to reasonable delays for insurance adjustment or other matters beyond Landlord's reasonable control, and subject to all other terms of this Article 11, restore the Base Building and such Common Areas.  Such restoration shall be to substantially the same condition of the Base Building and the Common Areas prior to the Casualty, except for modifications required by zoning and building codes and other Applicable Laws or by the holder of a mortgage on the Building or Project or any other modifications to the Common Areas deemed desirable by Landlord, provided that access to the Premises and any common restrooms serving the Premises shall not be materially impaired.  Upon the occurrence of any damage to the Premises, upon notice (the "Landlord Repair Notice") to Tenant from Landlord, Tenant shall assign to Landlord (or to any party designated by Landlord) all insurance proceeds payable to Tenant under Tenant's insurance required under Section 10.3 of this Lease, and Landlord shall repair any injury or damage to the Original Improvements installed in the Premises and shall return the Original Improvements to their original condition; provided that if the cost of such repair by Landlord exceeds the amount of insurance proceeds received by Landlord from Tenant's insurance carrier, as assigned by Tenant, the cost of such repairs shall be paid by Tenant to Landlord prior to Landlord's commencement of repair of the damage.  In the event that Landlord does not deliver the Landlord Repair Notice within sixty (60) days following the date the Casualty becomes known to Landlord, Tenant shall, at its sole cost and expense, repair any injury or damage to the Original Improvements installed in the Premises and shall return the Original Improvements to their original condition.  Whether or not Landlord delivers a Landlord Repair Notice, prior to the commencement of construction, Tenant shall submit to Landlord, for Landlord's review and approval, all plans, specifications and working drawings relating thereto, and Landlord shall select the contractors to perform such improvement work.  Landlord shall not be liable for any inconvenience or annoyance to Tenant or its visitors, or injury to Tenant's business resulting in any way from such damage or the repair thereof; provided however, that if such Casualty shall have damaged the Premises or Common Areas necessary to Tenant's occupancy, and if such damage is not the result of the willful misconduct of Tenant or Tenant's employees, contractors, licensees, or invitees, Landlord shall allow Tenant a proportionate abatement of Rent, during the time and to the extent the Premises are unfit for occupancy for the purposes permitted under this Lease, and not occupied by Tenant as a result thereof.  In the event that Landlord shall not deliver the Landlord Repair Notice, Tenant's right to rent abatement pursuant to the preceding sentence shall terminate as of the date which is reasonably determined by Landlord to be the date Tenant should have completed repairs to the Premises assuming Tenant used reasonable due diligence in connection therewith.  Notwithstanding any contrary provision of this Article 11, the parties hereby agree as follows: (i) the closure of the Project, the Building, the Common Areas, or any part of any of the same to protect public health shall not constitute a Casualty for purposes of this Lease, (ii) Casualty covered by this Article 11 shall require that the physical or structural integrity of the Premises, the Project, the Building, or the Common Areas is degraded as a direct result of such occurrence, and (iii) a Casualty under this Article 11 shall not be deemed to occur merely because Tenant is unable to productively use the Premises in the event that the physical and structural integrity of the Premises is undamaged.

11.2     **Landlord's Option to Repair**.  Notwithstanding the terms of Section 11.1 of this Lease, Landlord may elect not to rebuild and/or restore the Premises, Building and/or Project, and instead terminate this Lease, by notifying Tenant in writing of such termination within sixty (60) days after the date of discovery of the damage, such notice to include a termination date giving Tenant sixty (60) days to vacate the Premises, but Landlord may so elect only if the Building or Project shall be damaged by Casualty, whether or not the Premises is affected, and one or more of the following conditions is present: (i) in Landlord's reasonable judgment, repairs cannot reasonably be completed within one hundred eighty (180) days after the date of discovery of the damage (when such repairs are made without the payment of overtime or other premiums); (ii) the holder of any mortgage on the Building or Project or ground lessor with respect to the Building or Project shall require that the insurance proceeds or any portion thereof be used to retire the mortgage debt, or shall terminate the ground lease, as the case may be; (iii) the damage is not fully covered by Landlord's insurance policies; or (iv) Landlord decides to rebuild the Building or Common Areas so that they will be substantially different structurally or architecturally; or (v) the damage occurs during the last twelve (12) months of the Lease Term.  In the event this Lease is terminated in accordance with the terms of this Section 11.2, Tenant shall assign to Landlord (or to any party designated by Landlord) all insurance proceeds payable to Tenant under Tenant's insurance required under items (ii) and (iii) of Section 10.3.2 of this Lease.

11.3     **Waiver of Statutory Provisions**.  The provisions of this Lease, including this Article 11, constitute an express agreement between Landlord and Tenant with respect to any and all damage to, or destruction of, all or any part of the Premises, the Building or the Project, and any statute or regulation of the State of California, including, without limitation, Sections 1932(2) and 1933(4) of the California Civil Code, with respect to any rights or obligations concerning damage or destruction in the absence of an express agreement between the parties, and any other statute or regulation, now or hereafter in effect, shall have no application to this Lease or any damage or destruction to all or any part of the Premises, the Building or the Project.

## ARTICLE 12

## NONWAIVER

No waiver of any provision of this Lease shall be implied by any failure of Landlord to enforce any remedy on account of the violation of such provision, even if such violation shall continue or be repeated subsequently, any waiver by Landlord of any provision of this Lease may only be in writing, and no express waiver shall affect any

4861-1176-4027.5
376931.00016/1-5-23//cb

-13-



1542 N. CAHUENGA BOULEVARD

[Pink Teacup]

provision other than the one specified in such waiver and that one only for the time and in the manner specifically stated.  No receipt of monies by Landlord from Tenant after the termination of this Lease shall in any way alter the length of the Lease Term or of Tenant's right of possession hereunder or after the giving of any notice shall reinstate, continue or extend the Lease Term or affect any notice given Tenant prior to the receipt of such monies, it being agreed that after the service of notice or the commencement of a suit or after final judgment for possession of the Premises, Landlord may receive and collect any Rent due, and the payment of said Rent shall not waive or affect said notice, suit or judgment.

## ARTICLE 13

## CONDEMNATION

If the whole or any part of the Premises, Building or Project shall be taken by power of eminent domain or condemned by any competent authority for any public or quasi-public use or purpose, or if any adjacent property or street shall be so taken or condemned, or reconfigured or vacated by such authority in such manner as to require the use, reconstruction or remodeling of any part of the Premises, Building or Project, or if Landlord shall grant a deed or other instrument in lieu of such taking by eminent domain or condemnation, Landlord shall have the option to terminate this Lease effective as of the date possession is required to be surrendered to the authority.  If more than twenty-five percent (25%) of the rentable square feet of the Premises is taken, or if access to the Premises is substantially impaired, in each case for a period in excess of one hundred eighty (180) days, Tenant shall have the option to terminate this Lease effective as of the date possession is required to be surrendered to the authority.  Tenant shall not because of such taking assert any claim against Landlord or the authority for any compensation because of such taking and Landlord shall be entitled to the entire award or payment in connection therewith, except that Tenant shall have the right to file any separate claim available to Tenant for any taking of Tenant's personal property and fixtures belonging to Tenant and removable by Tenant upon expiration of the Lease Term pursuant to the terms of this Lease, and for moving expenses, so long as such claims do not diminish the award available to Landlord, its ground lessor with respect to the Building or Project or its mortgagee, and such claim is payable separately to Tenant.  All Rent shall be apportioned as of the date of such termination.  If any part of the Premises shall be taken, and this Lease shall  not be so terminated, the Rent shall be proportionately abated.  Tenant hereby waives any and all rights it might otherwise have pursuant to Section 1265.130 of The California Code of Civil Procedure.  Notwithstanding anything to the contrary contained in this <u>Article 13</u>, in the event of a temporary taking of all or any portion of the Premises for a period of one hundred and eighty (180) days or less, then this Lease shall not terminate but the Base Rent and the Additional Rent shall be abated for the period of such taking in proportion to the ratio that the amount of rentable square feet of the Premises taken bears to the total rentable square feet of the Premises.  Landlord shall be entitled to receive the entire award made in connection with any such temporary taking.  Notwithstanding any contrary provision of this Lease, the following governmental actions shall not constitute a taking or condemnation, either permanent or temporary: (i) an action that requires Tenant's business or the Building or Project to close during the Lease Term, and (ii) an action taken for the purpose of protecting public safety (e.g., to protect against acts of war, the spread of communicable diseases, or an infestation), and no such governmental actions shall entitle Tenant to any compensation from Landlord or any authority, or Rent abatement or any other remedy under this Lease.

## ARTICLE 14

## ASSIGNMENT AND SUBLETTING

14.1    <u>**Transfers**</u>.  Tenant shall not, without the prior written consent of Landlord, assign, mortgage, pledge, hypothecate, encumber, or permit any lien to attach to, or otherwise transfer, this Lease or any interest hereunder, permit any assignment, or other transfer of this Lease or any interest hereunder by operation of law, sublet the Premises or any part thereof, or enter into any license or concession agreements or otherwise permit the occupancy or use of the Premises or any part thereof by any persons other than Tenant and its employees and contractors (all of the foregoing are hereinafter sometimes referred to collectively as "**Transfers**" and any person or entity to whom any Transfer is made or sought to be made is hereinafter sometimes referred to as a "**Transferee**").  In connection with any such Transfer contemplated by Tenant, Tenant shall submit a written request for consent notice to Landlord, together with any information reasonably required by Landlord which will enable Landlord to determine (i) the financial responsibility, character, and reputation of the proposed Transferee, (ii) the nature of such Transferee's business, (iii) the proposed use of the applicable portion of the Premises (which applicable portion of the Premises to which the proposed Transfer relates shall be known as the "**Subject Space**"), and (iv) any other reasonable consent parameters.  Any Transfer made without Landlord's prior written consent shall, at Landlord's option, be null, void and of no effect, and shall, at Landlord's option, constitute a default by Tenant under this Lease.  Whether or not Landlord consents to any proposed Transfer, Tenant shall pay Landlord's review and processing fees, as well as any reasonable professional fees (including, without limitation, attorneys', accountants', architects', engineers' and consultants' fees) incurred by Landlord, within thirty (30) days after written request by Landlord.

14.2    <u>**Landlord's Consent**</u>.  Landlord shall not unreasonably withhold its consent to any proposed Transfer of the Subject Space to the Transferee on the terms specified in Tenant's notice pertaining to the particular Transfer.  Without limitation as to other reasonable grounds for withholding consent, the parties hereby agree that it shall be reasonable under this Lease and under any Applicable Law for Landlord to withhold consent to any proposed Transfer where one or more of the following apply:  (i) Transferee is of a character or reputation or engaged in a business which is not consistent with the quality of the Building or the Project; (ii) Transferee is not a party of reasonable financial worth and/or financial stability in light of the responsibilities to be undertaken in connection with the Transfer on the date consent is requested; (iii) Transferee intends to use the Subject Space for purposes which are not permitted under this Lease; (iv) Transferee is either a governmental agency or instrumentality thereof; (v) the proposed Transfer would cause a violation of another lease for space in the Project, or would give an occupant of the Project a right to cancel its lease; or (vi) the proposed Transferee does not, in Landlord's reasonable business judgment, have sufficient business experience to successfully operate the Permitted Use.  Notwithstanding anything



1542 N. CAHUENGA BOULEVARD

[Pink Teacup]

to the contrary in this Lease, if Tenant or any proposed Transferee claims that Landlord has unreasonably withheld or delayed its consent under this Section 14.2 or otherwise has breached or acted unreasonably under this Article 14, their sole remedies shall be a declaratory judgment and an injunction for the relief sought without any monetary damages, and Tenant hereby waives the provisions of Section 1995.310 of the California Civil Code, or any successor statute, and all other remedies, including, without limitation, any right at law or equity to terminate this Lease, on its own behalf and, to the extent permitted under all Applicable Laws, on behalf of the proposed Transferee.  Tenant shall indemnify, defend and hold harmless Landlord from any and all liability, losses, claims, damages, costs, expenses, causes of action and proceedings involving any third party or parties (including without limitation Tenant's proposed subtenant or assignee) who claim they were damaged by Landlord's wrongful withholding or conditioning of Landlord's consent.

14.3    **Transfer Premium**.  If Landlord consents to a Transfer for which Landlord's consent is required under this Article 14, as a condition thereto which the parties hereby agree is reasonable, Tenant shall pay to Landlord fifty percent (50%) of any "Transfer Premium," as that term is defined in this Section 14.3, received by Tenant from such Transferee.  "**Transfer Premium**" shall mean all rent, additional rent or other consideration payable by such Transferee in connection with the Transfer in excess of the Rent and Additional Rent payable by Tenant under this Lease during the term of the Transfer (on a per rentable square foot basis if less than all of the Premises is transferred), after deducting the reasonable expenses incurred by Tenant for (i) any changes, alterations and improvements to the Premises in connection with the Transfer; (ii) any free base rent reasonably provided to the Transferee in connection with the Transfer (provided that such free rent shall be deducted only to the extent the same is included in the calculation of total consideration payable by such Transferee); (iii) any brokerage commissions in connection with the Transfer; and (vi)  legal fees reasonably incurred in connection with the Transfer; provided, however, such Transfer Premium shall not include cash consideration paid by Transferee to Tenant in connection with such Transfer, provided such sums paid therefor are not a subterfuge to avoid Tenant's obligations hereunder.

14.4    **Landlord's Option as to Subject Space**.  Notwithstanding anything to the contrary contained in this Article 14, Landlord shall have the option, by giving written notice to Tenant within thirty (30) days after receipt of Tenant's written request for consent to such Transfer for which Landlord's consent is required under this Article 14, to recapture the Subject Space.  Such recapture notice shall cancel and terminate this Lease with respect to the Subject Space as of the effective date of the proposed Transfer.  In the event of a recapture by Landlord, if this Lease shall be canceled with respect to less than the entire Premises, the Rent reserved herein shall be prorated on the basis of the number of rentable square feet retained by Tenant in proportion to the number of rentable square feet contained in the Subject Space, and this Lease as so amended shall continue thereafter in full force and effect, and upon request of either party, the parties shall execute written confirmation of the same.  If Landlord declines, or fails to elect in a timely manner to recapture the Subject Space under this Section 14.4, then, provided Landlord has consented to the proposed Transfer, Tenant shall be entitled to proceed to Transfer the Subject Space to the proposed Transferee, subject to provisions of this Article 14.

14.5    **Effect of Transfer**.  If Landlord consents to a Transfer, (i) the TCCs of this Lease shall in no way be deemed to have been waived or modified, (ii) such consent shall not be deemed consent to any further Transfer by either Tenant or a Transferee, (iii) Tenant shall deliver to Landlord, promptly after execution, an original executed copy of all documentation pertaining to the Transfer in form reasonably acceptable to Landlord, (iv) Tenant shall furnish upon Landlord's request a complete statement, certified by an independent certified public accountant, or Tenant's chief financial officer, setting forth in detail the computation of any Transfer Premium Tenant has derived and shall derive from such Transfer, and (v) no Transfer relating to this Lease or agreement entered into with respect thereto, whether with or without Landlord's consent, shall relieve Tenant or any guarantor of the Lease from any liability under this Lease, including, without limitation, in connection with the Subject Space.  Landlord or its authorized representatives shall have the right at all reasonable times to audit the books, records and papers of Tenant relating to any Transfer, and shall have the right to make copies thereof.  If the Transfer Premium respecting any Transfer shall be found understated, Tenant shall, within thirty (30) days after demand, pay the deficiency, and if understated by more than two percent (2%), Tenant shall pay Landlord's costs of such audit.

14.6    **Additional Transfers**.  Subject to the terms of Section 14.8 below, for purposes of this Lease, the term "**Transfer**" shall also include (i) if Tenant is a partnership, the withdrawal or change, voluntary, involuntary or by operation of law, of more than fifty percent (50%) or more of the partners, or transfer of more than fifty percent (50%) or more of partnership interests, within a twelve (12)-month period, or the dissolution of the partnership without immediate reconstitution thereof, and (ii) if Tenant is a closely held corporation (*i.e.*, whose stock is not publicly held and not traded through an exchange or over the counter), (A) the dissolution, merger, consolidation or other reorganization of Tenant or (B) the sale or other transfer of an aggregate of more than fifty percent (50%) or more of the voting shares of Tenant (other than to immediate family members by reason of gift or death), within a twelve (12)-month period, or (C) the sale, mortgage, hypothecation or pledge of an aggregate of more than fifty percent (50%) or more of the value of the unencumbered assets of Tenant within a twelve (12)-month period.

14.7    **Occurrence of Default**.  Any Transfer hereunder shall be subordinate and subject to the provisions of this Lease, and if this Lease shall be terminated during the term of any Transfer, Landlord shall have the right to: (i) treat such Transfer as cancelled and repossess the Subject Space by any lawful means, or (ii) require that such Transferee attorn to and recognize Landlord as its landlord under any such Transfer.  If Tenant shall be in default under this Lease, Landlord is hereby irrevocably authorized, as Tenant's agent and attorney-in-fact, to direct any Transferee to make all payments under or in connection with the Transfer directly to Landlord (which Landlord shall apply towards Tenant's obligations under this Lease) until such default is cured.  Such Transferee shall rely on any representation by Landlord that Tenant is in default hereunder, without any need for confirmation thereof by Tenant.  Upon any assignment, the assignee shall assume in writing all obligations and covenants of Tenant thereafter to be performed or observed under this Lease.  No collection or acceptance of rent by Landlord from any Transferee shall be deemed a waiver of any provision of this Article 14 or the approval of any Transferee or a release of Tenant from any obligation under this Lease, whether theretofore or thereafter accruing.  In no event shall Landlord's enforcement of any provision of this Lease against any Transferee be deemed a waiver of Landlord's right to enforce any term of



1542 N. CAHUENGA BOULEVARD
[Pink Teacup]

this Lease against Tenant or any other person.  If Tenant's obligations hereunder have been guaranteed, Landlord's consent to any Transfer shall not be effective unless the guarantor also consents to such Transfer.

14.8    **Permitted Transfers**.  Notwithstanding anything to the contrary contained in this Article 14, a Transfer to (i) an entity that controls, is controlled by or is under common control with Tenant as of the date of this Lease, or (ii) any entity that purchases all or substantially all of the stock or assets of Tenant (and the stock or assets of all affiliates of Tenant who operate stores under the same or similar trade name as Tenant), or (iii) any entity into which Tenant is merged or consolidated (provided that all affiliates of Tenant who operate stores under the same or similar trade name as Tenant are similarly merged or consolidated with such entity) (all such persons or entities described in clauses (i), (ii) and (iii) being sometimes hereinafter referred to as "**Permitted Transferees**"), shall not require Landlord's consent and shall not be subject to the provisions of Sections 14.1, 14.2, 14.3 or 14.4 above, provided that (a) any such Permitted Transferee was not formed as a subterfuge to avoid the obligations of this Article 14; (b) Tenant gives Landlord at least ten (10) days' prior written notice of any such Transfer to a Permitted Transferee (which notice also contains evidence of the satisfaction of the requirements of clause (c) below); (c) such Permitted Transferee shall have, as of the effective date of any such Transfer, a tangible net worth (i.e., excluding goodwill, patents, trademarks, organization costs and other intangible assets), computed in accordance with generally accepted accounting principles consistently applied and certified to Landlord by Tenant's certified public accountant, which are sufficient to meet the obligations of Tenant under this Lease and which are equal to or greater than that of Tenant and any guarantor as of the date of this Lease or of Tenant and any guarantor immediately prior to the merger or consolidation or acquisition, as the case may be, whichever is the greater; (d) any such Transfer shall be subject (and, in the case of a subletting, subordinate) to all of the terms and provisions of this Lease, and such Permitted Transferee shall assume, in a written document reasonably satisfactory to Landlord and delivered to Landlord upon or prior to the effective date of such Transfer, all the obligations of Tenant under this Lease, other than the amount of rent payable by Tenant with respect to a subletting; (e) Tenant and any guarantor shall remain fully liable for all obligations to be performed by Tenant under this Lease; (f) the Permitted Transferee has sufficient experience in successfully operating the Permitted Use and continues to operate the Permitted Use under the trade name approved by Landlord; and (g) such Transfer will not breach any covenant of Landlord respecting use or exclusivity relating to the Project.  The provisions of this Section 14.8 shall not apply to any Transfer by a Transferee unless such Transferee acquired its interest hereunder as a Permitted Transferee.  An assignee of Tenant's entire interest in this Lease who qualifies as a Permitted Transferee is referred to herein as a "**Permitted Transferee Assignee**."  "**Control**," as used in this Section 14.8, shall mean the ownership, directly or indirectly, of at least fifty-one percent (51%) of the voting securities of, or possession of the right to vote, in the ordinary direction of its affairs, of at least fifty-one percent (51%) of the voting interest in, any person or entity.

## ARTICLE 15

## SURRENDER OF PREMISES; OWNERSHIP AND REMOVAL OF TRADE FIXTURES

15.1    **Surrender of Premises**.  No act or thing done by Landlord or any agent or employee of Landlord during the Lease Term shall be deemed to constitute an acceptance by Landlord of a surrender of the Premises unless such intent is specifically acknowledged in writing by Landlord.  The delivery of keys to the Premises to Landlord or any agent or employee of Landlord shall not constitute a surrender of the Premises or effect a termination of this Lease, whether or not the keys are thereafter retained by Landlord, and notwithstanding such delivery Tenant shall be entitled to the return of such keys at any reasonable time upon request until this Lease shall have been properly terminated.  The voluntary or other surrender of this Lease by Tenant, whether accepted by Landlord or not, or a mutual termination hereof, shall not work a merger, and at the option of Landlord shall operate as an assignment to Landlord of all subleases or subtenancies affecting the Premises or terminate any or all such sublessees or subtenancies.

15.2    **Removal of Tenant Property by Tenant**.  Upon the expiration of the Lease Term, or upon any earlier termination of this Lease, Tenant shall, subject to the provisions of this Article 15, quit and surrender possession of the Premises to Landlord in as good order and condition as when Tenant took possession and as thereafter improved by Landlord and/or Tenant, reasonable wear and tear and repairs which are specifically made the responsibility of Landlord hereunder excepted.  Upon such expiration or termination, in addition to Tenant's obligations under Section 29.26, below, Tenant shall, without expense to Landlord, remove or cause to be removed from the Premises all debris and rubbish, and such items of furniture, equipment, business and trade fixtures, free-standing cabinet work, server and telephone equipment, movable partitions and other articles of personal property owned by Tenant or installed or placed by Tenant at its expense in the Premises, and such similar articles of any other persons claiming under Tenant, as Landlord may, in its sole discretion, require to be removed, and Tenant shall repair at its own expense all damage to the Premises and Building resulting from such removal.

15.3    **Landlord's Security Interest**.  Tenant hereby grants Landlord a security interest in Tenant's merchandise, equipment, fixtures and personal property located on the Premises (the "**Secured Property**") to secure Tenant's performance of any and all of Tenant's obligations under this Lease.  To perfect Landlord's security interest in the Secured Property, Landlord shall be entitled to file a Financing Statement (UCC-1) with the California Secretary of State (and any other appropriate filing location) and Tenant shall execute and deliver to Landlord any such financing statements and other documents as Landlord may request.  Notwithstanding any provision herein to the contrary, Tenant shall not, unless it is replaced with comparable property, remove any of the Secured Property from the Premises.

## ARTICLE 16

## HOLDING OVER

If Tenant holds over after the expiration of the Lease Term with the express written consent of Landlord, such tenancy shall be from month-to-month only, and shall not constitute a renewal hereof or an extension for any further



1542 N. CAHUENGA BOULEVARD

[Pink Teacup]

term, and in such case Base Rent shall be payable at a monthly rate of two hundred percent (200%) of the Base Rent applicable during the last rental period of the Lease Term under this Lease.  Such month-to-month tenancy shall be subject to every other applicable term, covenant and agreement contained herein.  If Tenant holds over after the expiration of the Lease Term without the express written consent of Landlord, such tenancy shall be a tenancy at sufferance, and shall not constitute a renewal hereof or an extension for any further term, and in such case daily damages in any action to recover possession of the Premises shall be calculated at a daily rate equal to the greater of (i) two hundred percent (200%) of the Base Rent applicable during the last rental period of the Lease Term under this Lease (calculated on a per diem basis) or (ii) the fair market rental rate for the Premises as of the commencement of such holdover period.   Nothing contained in this <u>Article 16</u> shall be construed as consent by Landlord to any holding over by Tenant, and Landlord expressly reserves the right to require Tenant to vacate and deliver possession of the Premises to Landlord as provided in this Lease upon the expiration or other termination of this Lease.  The provisions of this <u>Article 16</u> shall not be deemed to limit or constitute a waiver of any other rights or remedies of Landlord provided herein or at law.  If Tenant holds over without Landlord's express written consent, and tenders payment of rent for any period beyond the expiration of the Lease Term by way of check (whether directly to Landlord, its agents, or to a lock box) or wire transfer, Tenant acknowledges and agrees that the cashing of such check or acceptance of such wire shall be considered inadvertent and not be construed as creating a month-to-month tenancy, provided Landlord refunds such payment to Tenant promptly upon learning that such check has been cashed or wire transfer received.  Tenant acknowledges that any holding over without Landlord's express written consent may compromise or otherwise affect Landlord's ability to enter into new leases with prospective tenants regarding the Premises.  Therefore, if Tenant fails to vacate and deliver the Premises upon the termination or expiration of this Lease, in addition to any other liabilities to Landlord accruing therefrom, Tenant shall protect, defend, indemnify and hold Landlord harmless from and against all claims made by any succeeding tenant founded upon such failure to vacate and deliver, and any losses suffered by Landlord, including lost profits, resulting from such failure to vacate and deliver.  Tenant agrees that any proceedings necessary to recover possession of the Premises, whether before or after expiration of the Lease Term, shall be considered an action to enforce the terms of this Lease for purposes of the awarding of any attorney's fees in connection therewith.

## ARTICLE 17

### ESTOPPEL CERTIFICATES

Within ten (10) days following a request in writing by Landlord, Tenant shall execute, acknowledge and deliver to Landlord an estoppel certificate, which, as submitted by Landlord, shall be substantially in the form of **Exhibit E**, attached hereto (or such other form as may be required by any prospective mortgagee or purchaser of the Project, or any portion thereof), indicating therein any exceptions thereto that may exist at that time, and shall also contain any other information reasonably requested by Landlord or Landlord's mortgagee or prospective mortgagee.  Any such certificate may be relied upon by any prospective mortgagee or purchaser of all or any portion of the Project.  Tenant shall execute and deliver whatever other instruments may be reasonably required for such purposes.  At any time during the Lease Term, Landlord may require Tenant to provide Landlord with a current financial statement and financial statements of the two (2) years prior to the current financial statement year.  Such statements shall be prepared in accordance with generally accepted accounting principles and, if such is the normal practice of Tenant, shall be audited by an independent certified public accountant.  Failure of Tenant to timely execute, acknowledge and deliver such estoppel certificate or other instruments shall constitute an acceptance of the Premises and an acknowledgment by Tenant that statements included in the estoppel certificate are true and correct, without exception.

## ARTICLE 18

### SUBORDINATION

This Lease shall be subject and subordinate to all present and future ground or underlying leases of the Building or Project and to the lien of any mortgage, trust deed or other encumbrances now or hereafter in force against the Building or Project or any part thereof, if any, and to all renewals, extensions, modifications, consolidations and replacements thereof, and to all advances made or hereafter to be made upon the security of such mortgages or trust deeds, unless the holders of such mortgages, trust deeds or other encumbrances, or the lessors under such ground lease or underlying leases, require in writing that this Lease be superior thereto.  Tenant covenants and agrees in the event any proceedings are brought for the foreclosure of any such mortgage or deed in lieu thereof (or if any ground lease is terminated), to attorn, without any deductions or set-offs whatsoever, to the lienholder or purchaser or any successors thereto upon any such foreclosure sale or deed in lieu thereof (or to the ground lessor), if so requested to do so by such purchaser or lienholder or ground lessor, and to recognize such purchaser or lienholder or ground lessor as the lessor under this Lease, provided such lienholder or purchaser or ground lessor shall agree to accept this Lease and not disturb Tenant's occupancy, so long as Tenant timely pays the rent and observes and performs the TCCs of this Lease to be observed and performed by Tenant.  Landlord's interest herein may be assigned as security at any time to any lienholder.  Tenant shall, within five (5) days of request by Landlord, execute such further instruments or assurances as Landlord may reasonably deem necessary to evidence or confirm the subordination or superiority of this Lease to any such mortgages, trust deeds, ground leases or underlying leases. Tenant waives the provisions of any current or future statute, rule or law which may give or purport to give Tenant any right or election to terminate or otherwise adversely affect this Lease and the obligations of the Tenant hereunder in the event of any foreclosure proceeding or sale.

## ARTICLE 19

### DEFAULTS; REMEDIES

19.1    **Events of Default**.  In addition to any other Events of Default specified in this Lease, the occurrence of any of the following shall constitute an "**Event of Default**":

1542 N. CAHUENGA BOULEVARD

[Pink Teacup]



19.1.1   Any failure by Tenant to pay any Rent or any other charge required to be paid under this Lease, or any part thereof, when due; or

19.1.2   Except where a specific time period is otherwise set forth for Tenant's performance in this Lease, in which event the failure to perform by Tenant within such time period shall be an Event of Default by Tenant under this Section 19.1.2, any failure by Tenant to observe or perform any other provision, covenant or condition of this Lease to be observed or performed by Tenant where such failure continues for thirty (30) days after written notice thereof from Landlord to Tenant; provided that if the nature of such failure is such that the same cannot reasonably be cured within a thirty (30) day period, an Event of Default shall not be deemed to have occurred if Tenant diligently commences such cure within such period and thereafter diligently proceeds to rectify and cure such failure, but in no event exceeding a period of time in excess of sixty (60) days after written notice thereof from Landlord to Tenant; or

19.1.3   To the extent permitted by law, (i) Tenant or any guarantor of this Lease being placed into receivership or conservatorship, or becoming subject to similar proceedings under Federal or State law, or (ii) a general assignment by Tenant or any guarantor of this Lease for the benefit of creditors, or (iii) the taking of any corporate action in furtherance of bankruptcy or dissolution whether or not there exists any proceeding under an insolvency or bankruptcy law, or (iv) the filing by or against Tenant or any guarantor of any proceeding under an insolvency or bankruptcy law, unless in the case of such a proceeding filed against Tenant or any guarantor the same is dismissed within sixty (60) days, or (v) the appointment of a trustee or receiver to take possession of all or substantially all of the assets of Tenant or any guarantor, unless possession is restored to Tenant or such guarantor within thirty (30) days, or (vi) any execution or other judicially authorized seizure of all or substantially all of Tenant's assets located upon the Premises or of Tenant's interest in this Lease, unless such seizure is discharged within thirty (30) days; or

19.1.4   Abandonment or vacation of all or a substantial portion of the Premises by Tenant; or

19.1.5   The failure by Tenant to observe or perform according to the provisions of Articles 5, 14, 17 or 18 of this Lease, or any breach by Tenant of any representations and warranties set forth in this Lease, where, in each instance, such failure continues for more than two (2) business days after notice from Landlord;

19.1.6   Tenant's failure to commence business by the Lease Commencement Date

19.1.7   Any understatement of Gross Sales by more than five percent (5%), as set forth in Section 3.3.3 of this Lease; or

19.1.8   If the Permitted Use involves the sale and/or preparation of food, Tenant's failure to maintain a health department rating of "A" (or such other highest health department or similar rating is available), which failure continues for more than thirty (30) days.

The notice periods provided herein are in lieu of, and not in addition to, any notice periods provided by Applicable Law.

19.2   **Remedies Upon Default**.   Upon the occurrence of any event of default by Tenant, Landlord shall have, in addition to any other remedies available to Landlord at law or in equity (all of which remedies shall be distinct, separate and cumulative), the option to pursue any one or more of the following remedies, each and all of which shall be cumulative and nonexclusive, without any notice or demand whatsoever.

19.2.1   Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which it may have for possession or arrearages in rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof, without being liable for prosecution or any claim or damages therefor; and Landlord may recover from Tenant the following:

(a)     The worth at the time of award of the unpaid rent which has been earned at the time of such termination; plus

(b)     The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(c)     The worth at the time of award of the amount by which the unpaid rent for the balance of the Lease Term after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; plus

(d)     Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, specifically including but not limited to, brokerage commissions and advertising expenses incurred, expenses of remodeling the Premises or any portion thereof for a new tenant, whether for the same or a different use, and any special concessions made to obtain a new tenant; and

(e)     At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by Applicable Laws.

The term "**rent**" as used in this Section 19.2 shall be deemed to be and to mean all sums of every nature required to be paid by Tenant pursuant to the terms of this Lease, whether to Landlord or to others.  As used in Sections 19.2.1(a) and (b), above, the "worth at the time of award" shall be computed by allowing interest at the Interest Rate.  As used in Section 19.2.1(c), above, the "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

19.2.2   Landlord shall have the remedy described in California Civil Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has the right to sublet or assign, subject only to reasonable limitations).  Accordingly, if Landlord does not elect to



1542 N. CAHUENGA BOULEVARD

[Pink Teacup]

terminate this Lease on account of any Event of Default by Tenant, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all rent as it becomes due.

19.2.3    Landlord shall at all times have the rights and remedies (which shall be cumulative with each other and cumulative and in addition to those rights and remedies available under Sections 19.2.1 and 19.2.2, above, or any Applicable Law or other provision of this Lease), without prior demand or notice except as required by Applicable Law, to seek any declaratory, injunctive or other equitable relief, and specifically enforce this Lease, or restrain or enjoin a violation or breach of any provision hereof.

19.3    **Subleases of Tenant**.  Whether or not Landlord elects to terminate this Lease on account of any Event of Default, as set forth in this Article 19, Landlord shall have the right to terminate any and all subleases, licenses, concessions or other consensual arrangements for possession entered into by Tenant and affecting the Premises or may, in Landlord's sole discretion, succeed to Tenant's interest in such subleases, licenses, concessions or arrangements.  In the event of Landlord's election to succeed to Tenant's interest in any such subleases, licenses, concessions or arrangements, Tenant shall, as of the date of notice by Landlord of such election, have no further right to or interest in the rent or other consideration receivable thereunder.

19.4    **Form of Payment After Event of Default**.  Following the occurrence of an Event of Default by Tenant, Landlord shall have the right to require that any or all subsequent amounts paid by Tenant to Landlord hereunder, whether to cure the Event of Default in question or otherwise, be paid in the form of cash, money order, cashier's or certified check drawn on an institution acceptable to Landlord, or by other means approved by Landlord, notwithstanding any prior practice of accepting payments in any different form.

19.5    **Efforts to Relet**.  No re-entry or repossession, repairs, maintenance, changes, alterations and additions, reletting, appointment of a receiver to protect Landlord's interests hereunder, or any other action or omission by Landlord shall be construed as an election by Landlord to terminate this Lease or Tenant's right to possession, or to accept a surrender of the Premises, nor shall same operate to release Tenant in whole or in part from any of Tenant's obligations hereunder, unless express written notice of such intention is sent by Landlord to Tenant.  Tenant hereby irrevocably waives any right otherwise available under any law to redeem or reinstate this Lease.

19.6    **Landlord Default**.  Landlord shall be in default under this Lease if Landlord fails to perform any of its obligations hereunder following the Lease Commencement Date and such failure continues for thirty (30) days after Tenant delivers to Landlord written notice specifying such failure; however, if such failure cannot reasonably be cured within such thirty (30)-day period, but Landlord commences to cure such failure within such thirty (30)-day period and thereafter diligently pursues the curing thereof to completion, then Landlord shall not be in default hereunder or liable for damages therefor.  Except where the provisions of this Lease grant Tenant an express, exclusive remedy, or expressly deny Tenant a remedy, Tenant's exclusive remedy for Landlord's failure to perform its obligations under this Lease shall be limited to damages, injunctive relief, or specific performance; in each case, Landlord's liability or obligations with respect to any such remedy shall be limited as provided in Section 29.11.

## ARTICLE 20

## COVENANT OF QUIET ENJOYMENT

Landlord covenants that Tenant, on paying the Rent, charges for services and other payments herein reserved and on keeping, observing and performing all the other TCCs, provisions and agreements herein contained on the part of Tenant to be kept, observed and performed, shall, during the Lease Term, peaceably and quietly have, hold and enjoy the Premises subject to the TCCs, provisions and agreements hereof without interference by any persons lawfully claiming by or through Landlord.  The foregoing covenant is in lieu of any other covenant express or implied.

## ARTICLE 21

## SECURITY DEPOSIT

Concurrently with Tenant's execution of this Lease, Tenant shall deposit with Landlord a security deposit (the "**Security Deposit**") in the amount set forth in Section 8 of the Summary, as security for the faithful performance by Tenant of all of its obligations under this Lease.  If Tenant breaches or defaults with respect to any provisions of this Lease, including, but not limited to, the provisions relating to the payment of Rent, the removal of property and the repair of resultant damage, Landlord may, without notice to Tenant, but shall not be required to apply all or any part of the Security Deposit for the payment of any Rent or any other past due sum and Tenant shall, upon demand therefor, restore the Security Deposit to its original amount (including, without limitation, during any eviction moratorium, to the extent allowed by Applicable Laws).  Any unapplied portion of the Security Deposit shall be returned to Tenant, or, at Landlord's option, to the last assignee of Tenant's interest hereunder, within sixty (60) days following the expiration of the Lease Term.  Tenant shall not be entitled to any interest on the Security Deposit. Tenant hereby irrevocably waives and relinquishes any and all rights, benefits, or protections, if any, Tenant now has, or in the future may have, under Section 1950.7 of the California Civil Code, any successor statute, and all other provisions of law, now or hereafter in effect, including, but not limited to, any provision of law which (i) establishes the time frame by which a landlord must refund a security deposit under a lease, or (ii) provides that a landlord may claim from a security deposit only those sums reasonably necessary to remedy breaches or defaults in the payment of rent, to repair damage caused by a tenant, or to clean the subject premises.  Tenant acknowledges and agrees that (A) any statutory time frames for the return of a security deposit are superseded by the express period identified in this Article 21, above, and (B) rather than be so limited, Landlord may claim from the Security Deposit (i) any and all sums expressly identified in this Article 21, above, and (ii) any additional sums reasonably necessary to compensate Landlord for any and all losses or damages caused by Tenant's breach or default of this Lease, including, but not



1542 N. CAHUENGA BOULEVARD

[Pink Teacup]

limited to, all damages or rent due upon termination of this Lease pursuant to Section 1951.2 of the California Civil Code.

## ARTICLE 22

## INTENTIONALLY OMITTED

## ARTICLE 23

## SIGNS

Subject to the terms of this Article 23, Tenant shall have the right to install identifying signage on the signage band on the front facade of the Premises (the "**Identity Sign**") in accordance with Applicable Law, at Tenant's sole cost and expense, and such Identity Sign shall strictly comply with the Project's standard retail signage program, if any, and shall be subject in all respects to Landlord's prior written approval, which approval shall be reasonable. Tenant shall utilize a sign contractor selected from Landlord's list of approved sign contractors for the fabrication and installation of all exterior signs (including the Identity Sign).  The Identity Sign and any other signs, notices, logos, pictures, names or advertisements (collectively referred to herein as "**Signs**") which are installed and that have not been individually approved by Landlord may be removed without notice by Landlord at the sole expense of Tenant.  Except as specifically set forth herein, Tenant may not install any Signs on the exterior or roof of either the Building or the Premises, or on any portion of the Project or install any Signs which are visible from the exterior of the Premises, the Building, the Project or any portion thereof.  Without limiting the foregoing, Tenant shall not, without the prior written consent of Landlord, which consent may be withheld in Landlord's sole discretion, (i) affix any window or door lettering, sign decoration or advertising matter or any type of sun screen, tinting, film, solar screen or similar product to any window or door glass of the Premises, or (ii) erect or install any Signs, window or door lettering placard, decoration, or advertising media of any type which is visible from the exterior of the Premises, or erect or install any of the foregoing which are suspended from the ceiling of the Premises.  Any permitted Signs under this Article 23 shall comply with all applicable ordinances of governmental and quasi-governmental agencies; provided, however, that in no event shall the approval by the city (or other applicable governmental authority) of any Signs be deemed a condition precedent to the effectiveness of this Lease.  All permitted Signs shall be maintained, repaired or replaced, as necessary, by Tenant at its expense in order to keep the Signs in first-class condition and appearance.  Upon the expiration or earlier termination of this Lease (or within five (5) days following Tenant's receipt of written notice from Landlord that Tenant's rights to the Signs have terminated as a result of a default by Tenant under this Lease, beyond any applicable notice and cure period set forth in this Lease, or in accordance with Tenant's failure to satisfy the occupancy requirement set forth below), Tenant shall remove all Signs and Tenant shall repair any damage to the Premises, inside or outside, resulting from the erection, maintenance or removal of any Signs.  If Tenant fails to timely repair any Signs and/or remove the Signs and perform the restoration work required pursuant to the terms hereof, then Landlord may (but shall not be obligated to) perform such work at Tenant's sole cost and expense.  All costs and expenses incurred by Landlord in connection with this Article 23 shall constitute Additional Rent under this Lease and shall be paid by Tenant to Landlord within ten (10) days following Tenant's receipt of an invoice therefor.   In no event shall Signs contain any name or logo ("**Objectionable Name or Logo**") which relates to an entity which is of a character or reputation, or is associated with a political orientation or faction, which is inconsistent with the quality of the Project, or which would otherwise reasonably offend a landlord of other comparable buildings in the vicinity of the Building.  The rights granted to Tenant under this Article 23 are personal to the Original Tenant, and may only be exercised by the Original Tenant if the Original Tenant continually occupies the entire Premises.  In no event shall Tenant have any right to install or maintain the Signs if at any time during the Lease Term an Event of Default is then occurring under this Lease.

## ARTICLE 24

## COMPLIANCE WITH LAW

For purposes of Section 1938(a) of the California Civil Code, Landlord hereby discloses to Tenant, and Tenant hereby acknowledges, that the Premises have not undergone inspection by a Certified Access Specialist (CASp).As required by Section 1938(e) of the California Civil Code, Landlord hereby states as follows:  "A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law.  Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant.  The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises."  In furtherance of the foregoing, Landlord and Tenant hereby agree as follows:  (a) any CASp inspection requested by Tenant shall be conducted, at Tenant's sole cost and expense, by a CASp designated by Landlord, subject to Landlord's reasonable rules and requirements; (b) Tenant, at its sole cost and expense, shall be responsible for making any improvements or repairs within the Premises to correct violations of construction-related accessibility standards; and (c) if anything done by or for Tenant in its use or occupancy of the Premises shall require any improvements or repairs to the Building or Project (outside the Premises) to correct violations of construction-related accessibility standards, then Tenant shall reimburse Landlord upon demand, as Additional Rent, for the cost to Landlord of performing such improvements or repairs.

Tenant shall not do anything or suffer anything to be done in or about the Premises or the Project which will in any way conflict with any federal, state, county or municipal law, statute, ordinance or other rule, directive, order, regulation, guideline, or requirement of any governmental entity or governmental agency now in force or which may hereafter be enacted or promulgated, including, without limitation, any such laws, statutes, ordinances, rules,

1542 N. CAHUENGA BOULEVARD



[Pink Teacup]

DocuSign Envelope ID: 630CC051-31EE-4EE3-80D5-826038BA1949

regulations or requirements relating to hazardous materials or substances, as those terms are defined by such applicable laws, statutes, ordinances, rules, regulations or requirements now or hereafter in effect (collectively, "**Applicable Laws**").  At its sole cost and expense, Tenant shall promptly comply with all Applicable Laws (including the making of any alterations to the Premises required by Applicable Laws).  Should any standard or regulation now or hereafter be imposed on Landlord or Tenant by a state, federal or local governmental body charged with the establishment, regulation and enforcement of occupational, health or safety standards for employers, employees, landlords or tenants, then Tenant agrees, at its sole cost and expense, to comply promptly with such standards or regulations.  Tenant shall be responsible, at its sole cost and expense, to make all alterations to the Premises as are required to comply with the governmental rules, regulations, requirements or standards described in this Article 24.  The judgment of any court of competent jurisdiction or the admission of Tenant in any judicial action, regardless of whether Landlord is a party thereto, that Tenant has violated any of said governmental measures, shall be conclusive of that fact as between Landlord and Tenant.

## ARTICLE 25

## LATE CHARGES

If any installment of Rent or any other sum due from Tenant shall not be received by Landlord or Landlord's designee when due, then Tenant shall pay to Landlord a late charge equal to five percent (5%) of the overdue amount plus any attorneys' fees incurred by Landlord by reason of Tenant's failure to pay Rent and/or other charges when due hereunder.  The late charge shall be deemed Additional Rent and the right to require it shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as liquidated damages or as limiting Landlord's remedies in any manner.  In addition to the late charge described above, any Rent or other amounts owing hereunder which are not paid within ten (10) days after the date they are due shall bear interest from the date when due until paid at the "Interest Rate."  For purposes of this Lease, the "**Interest Rate**" shall be an annual rate equal to the lesser of (i) the annual "**Bank Prime Loan**" rate cited in the Federal Reserve Statistical Release Publication H.15(519), published weekly (or such other comparable index as Landlord and Tenant shall reasonably agree upon if such rate ceases to be published), plus four (4) percentage points, and (ii) the highest rate permitted by Applicable Law.

## ARTICLE 26

## LANDLORD'S RIGHT TO CURE DEFAULT; PAYMENTS BY TENANT

All covenants and agreements to be kept or performed by Tenant under this Lease shall be performed by Tenant at Tenant's sole cost and expense and without any reduction of Rent.  If Tenant shall fail to perform any of its obligations under this Lease, within a reasonable time after such performance is required by the terms of this Lease, Landlord may, but shall not be obligated to, after reasonable prior notice to Tenant, make any such payment or perform any such act on Tenant's part without waiving its right based upon any default of Tenant and without releasing Tenant from any obligations hereunder.  Except as may be specifically provided to the contrary in this Lease, Tenant shall pay to Landlord, within fifteen (15) days after delivery by Landlord to Tenant of statements therefor:  (i) sums equal to expenditures reasonably made and obligations incurred by Landlord in connection with the remedying by Landlord of Tenant's defaults pursuant to the provisions of this Article 26; (ii) sums equal to all losses, costs, liabilities, damages and expenses referred to in Article 10 of this Lease; and (iii) sums equal to all expenditures made and obligations incurred by Landlord in collecting or attempting to collect the Rent or in enforcing or attempting to enforce any rights of Landlord under this Lease or pursuant to law, including, without limitation, all legal fees and other amounts so expended.  Tenant's obligations under this Article 26 shall survive the expiration or sooner termination of the Lease Term.

## ARTICLE 27

## ENTRY BY LANDLORD

Landlord reserves the right at all reasonable times and upon reasonable notice to the Tenant to enter the Premises to (i) inspect them; (ii) show the Premises to prospective purchasers, mortgagees or tenants, or to the ground or underlying lessors; (iii) post notices of non-responsibility; or (iv) alter, improve or repair the Premises or the Building if necessary to comply with current building codes or other Applicable Laws, or for structural alterations, repairs or improvements to the Building.  Notwithstanding anything to the contrary contained in this Article 27, Landlord may enter the Premises at any time to (A) perform services required of Landlord; (B) take possession due to any breach of this Lease in the manner provided herein; and (C) perform any covenants of Tenant which Tenant fails to perform.  Any such entries shall be without the abatement of Rent and shall include the right to take such reasonable steps as required to accomplish the stated purposes.  Tenant hereby waives any claims for damages or for any injuries or inconvenience to or interference with Tenant's business, lost profits, any loss of occupancy or quiet enjoyment of the Premises, and any other loss occasioned thereby.  For each of the above purposes, Landlord shall at all times have a key with which to unlock all the doors in the Premises, excluding Tenant's vaults, safes and special security areas designated in advance by Tenant.  In an emergency, Landlord shall have the right to use any means that Landlord may deem proper to open the doors in and to the Premises.  Any entry into the Premises in the manner hereinbefore described shall not be deemed to be a forcible or unlawful entry into, or a detainer of, the Premises, or an actual or constructive eviction of Tenant from any portion of the Premises.

## ARTICLE 28

## TENANT PARKING

Subject to the terms and conditions of this Article 28, below, the parking areas servicing the Project (as reasonably determined by Landlord, the "**Parking Area**") shall be available for the nonexclusive use of Tenant's



1542 N. CAHUENGA BOULEVARD
[Pink Teacup]

customers and visitors during the Lease Term; provided, however, Tenant shall have the right to rent from Landlord, commencing on the Lease Commencement Date, up to five (5) reserved parking passes (the "**Allotted Passes**"), on a monthly basis throughout the Lease Term in the location within the Parking Area designated by Landlord (which location may be relocated by Landlord from time to time). Such Allotted Passes shall be payable on a monthly basis at the prevailing rate charged by Landlord (including taxes in connection therewith). Tenant may change the number of Allotted Passes rented pursuant to this Article 28 upon thirty (30) days prior written notice to Landlord, provided that in no event shall Tenant be entitled to rent more than amount and type of Allotted Passes as set forth in this Article 28 above. Unless Landlord expressly consents in writing, which consent may be withheld by Landlord in its sole and absolute discretion, Tenant's employees shall not be permitted to park in the Parking Area. If Landlord consents in writing to Tenant's right to park vehicles belonging to it or to its employees in the Parking Area, Landlord shall have the right to designate when and where such vehicles may be parked in the Parking Area. Tenant agrees that when and if requested by Landlord to do so, Tenant shall furnish Landlord with the license numbers of the vehicles of Tenant and Tenant's employees. Any Tenant parking privileges provided in this Lease shall not include the right to long-term (defined as a period in excess of 48 hours) storage or parking of motor vehicles in the Parking Area, except with Landlord's prior written approval. Landlord specifically reserves the right to change the size, configuration, design, layout, entrances, exits, traffic lanes, and the boundaries and locations of the Parking Area (as well as the design, number and location of available parking stalls) at any time and to close-off or restrict access to the Parking Area from time to time for purposes of permitting or facilitating any such construction, alteration or improvements. Landlord, as part of Direct Expenses to the extent permitted under Article 4, above, shall maintain the Parking Area. Tenant hereby acknowledges and agrees that any or all of the Parking Area may be managed, maintained or operated from time to time by an independent parking facility operator (a "**Parking Operator**") and not by Landlord, in which instance Landlord may delegate its responsibilities hereunder to any such Parking Operator and such Parking Operator shall have all the rights of control attributed hereby to Landlord. Tenant's (and Tenant's employees and invitees) continued right to use the Parking Area is conditioned upon Tenant abiding by all rules and regulations which are prescribed from time to time for the orderly operation and use of the Parking Area. Tenant may validate visitor parking by such method or methods as may be established by Landlord from time to time, at the validation rate from time to time generally applicable to visitor parking. Landlord reserves the right, in its sole and absolute discretion, to separately identify by signs or other markings the area to which Tenant's parking validations relate, to require Tenant and/or its customers and visitors to receive and utilize parking passes or tickets in connection with their use of the Parking Area and to otherwise employ and implement commercially reasonable measures to assist Landlord in the operation and management of the Parking Area. Landlord shall have no obligation to monitor the use of the parking facilities, nor shall Landlord be responsible for any loss or damage to any vehicle or other property or for any injury to any person.

## ARTICLE 29

### MISCELLANEOUS PROVISIONS

29.1    **Binding Effect**. Subject to all other provisions of this Lease, each of the covenants, conditions and provisions of this Lease shall extend to and shall, as the case may require, bind or inure to the benefit not only of Landlord and of Tenant, but also of their respective heirs, personal representatives, successors or assigns, provided this clause shall not permit any assignment by Tenant contrary to the provisions of Article 14 of this Lease.

29.2    **No Air Rights**. No rights to any view or to light or air over any property, whether belonging to Landlord or any other person, are granted to Tenant by this Lease. If at any time any windows of the Premises are temporarily darkened or the light or view therefrom is obstructed by reason of any repairs, improvements, maintenance or cleaning in or about the Project, the same shall be without liability to Landlord and without any reduction or diminution of Tenant's obligations under this Lease.

29.3    **Modification of Lease**. Should any current or prospective mortgagee or ground lessor for the Building or Project require a modification of this Lease, which modification will not cause an increased cost or expense to Tenant or in any other way materially and adversely change the rights and obligations of Tenant hereunder, then and in such event, Tenant agrees that this Lease may be so modified and agrees to execute whatever documents are reasonably required therefor and to deliver the same to Landlord within ten (10) days following a request therefor. At the request of Landlord or any mortgagee or ground lessor, Tenant agrees to execute a short form of Lease and deliver the same to Landlord within ten (10) days following the request therefor.

29.4    **Transfer of Landlord's Interest**. Tenant acknowledges that Landlord has the right to transfer all or any portion of its interest in the Project or Building and in this Lease, and Tenant agrees that in the event of any such transfer, Landlord shall automatically be released from all liability under this Lease and Tenant agrees to look solely to such transferee for the performance of Landlord's obligations hereunder after the date of transfer and such transferee shall be deemed to have fully assumed and be liable for all obligations of this Lease to be performed by Landlord, including the return of any Security Deposit, and Tenant shall attorn to such transferee. Tenant further acknowledges that Landlord may assign its interest in this Lease to a mortgage lender as additional security and agrees that such an assignment shall not release Landlord from its obligations hereunder and that Tenant shall continue to look to Landlord for the performance of its obligations hereunder.

29.5    **Prohibition Against Recording or Publication**. Neither this Lease, nor any memorandum, affidavit or other writing with respect thereto, shall be recorded or otherwise published by Tenant or by anyone acting through, under or on behalf of Tenant.

29.6    **Landlord's Title**. Landlord's title is and always shall be paramount to the title of Tenant. Nothing herein contained shall empower Tenant to do any act which can, shall or may encumber the title of Landlord.

29.7    **Application of Payments**. Landlord shall have the right to apply payments received from Tenant pursuant to this Lease, regardless of Tenant's designation of such payments, to satisfy any obligations of Tenant hereunder, in such order and amounts as Landlord, in its sole discretion, may elect.



DocuSign Envelope ID: 630CC051-31EE-4EE3-80D5-826038BA1949

29.8    **Time of Essence**.  Time is of the essence with respect to the performance of every provision of this Lease in which time of performance is a factor.

29.9    **Partial Invalidity**.  If any term, provision or condition contained in this Lease shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, provision or condition to persons or circumstances other than those with respect to which it is invalid or unenforceable, shall not be affected thereby, and each and every other term, provision and condition of this Lease shall be valid and enforceable to the fullest extent possible permitted by law.

29.10    **No Warranty**.  In executing and delivering this Lease, Tenant has not relied on any representations, including, but not limited to, any representation as to the amount of any item comprising Additional Rent or the amount of the Additional Rent in the aggregate or that Landlord is furnishing the same services to other tenants, at all, on the same level or on the same basis, or any warranty or any statement of Landlord which is not set forth herein or in one or more of the exhibits attached hereto.  Tenant agrees that neither Landlord nor any agent of Landlord has made any representation or warranty with respect to the physical condition of the Building, the Project, the land upon which the Building or the Project are located, or the Premises, or the expenses of operation of the Premises, the Building or the Project, or any other matter or thing affecting or related to the Premises, except as herein expressly set forth in the provisions of this Lease.

29.11    **Landlord Exculpation**.  The liability of Landlord or the Landlord Parties to Tenant for any default by Landlord under this Lease or arising in connection herewith or with Landlord's operation, management, leasing, repair, renovation, alteration or any other matter relating to the Project or the Premises shall be limited solely and exclusively to an amount which is equal to the lesser of (a) the interest of Landlord in the Building or (b) the equity interest Landlord would have in the Building if the Building were encumbered by third-party debt in an amount equal to eighty percent (80%) of the value of the Building (as such value is determined by Landlord), provided that in no event shall such liability extend to any sales or insurance proceeds received by Landlord or the Landlord Parties in connection with the Project, Building or Premises.  Neither Landlord, nor any of the Landlord Parties shall have any personal liability therefor, and Tenant hereby expressly waives and releases such personal liability on behalf of itself and all persons claiming by, through or under Tenant.  The limitations of liability contained in this Section 29.11 shall inure to the benefit of Landlord's and the Landlord Parties' present and future partners, beneficiaries, officers, directors, trustees, shareholders, agents and employees, and their respective partners, heirs, successors and assigns.  Under no circumstances shall any present or future partner of Landlord (if Landlord is a partnership), or trustee or beneficiary (if Landlord or any partner of Landlord is a trust), have any liability for the performance of Landlord's obligations under this Lease.  Notwithstanding any contrary provision herein, neither Landlord nor the Landlord Parties shall be liable under any circumstances for injury or damage to, or interference with, Tenant's business, including but not limited to, loss of profits, loss of rents or other revenues, loss of business opportunity, loss of goodwill or loss of use, in each case, however occurring.

29.12    **Entire Agreement**.  It is understood and acknowledged that there are no oral agreements between the parties hereto affecting this Lease and this Lease constitutes the parties' entire agreement with respect to the leasing of the Premises and supersedes and cancels any and all previous negotiations, arrangements, brochures, agreements and understandings, if any, between the parties hereto (including, without limitation, any confidentiality agreement, letter of intent, or request for proposal, or similar agreement previously entered into between Landlord and Tenant in anticipation of this Lease) or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease.  None of the terms, covenants, conditions or provisions of this Lease can be modified, deleted or added to except in writing signed by the parties hereto.  Any deletion of language from this Lease prior to its execution by Landlord and Tenant shall not be construed to raise any presumption, canon of construction or implication, including, without limitation, any implication that the parties intended thereby to state the converse of the deleted language.  The parties hereto acknowledge and agree that each has participated in the negotiation and drafting of this Lease; therefore, in the event of an ambiguity in, or dispute regarding the interpretation of, this Lease, the interpretation of this Lease shall not be resolved by any rule of interpretation providing for interpretation against the party who caused the uncertainty to exist or against the draftsman.

29.13    **Right to Lease**.  Landlord reserves the absolute right to effect such other tenancies in the Project as Landlord in the exercise of its sole business judgment shall determine to best promote the interests of the Building or Project.  Tenant does not rely on the fact, nor does Landlord represent, that any specific tenant or type or number of tenants shall, during the Lease Term, occupy any space in the Building or Project.

29.14    **Force Majeure**.  Notwithstanding anything to the contrary contained in this Lease, any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, acts of war, terrorist acts, inability to obtain services, labor, or materials or reasonable substitutes therefor, governmental actions, governmental laws, regulations or restrictions, civil commotions, Casualty, actual or threatened public health emergency (including, without limitation, epidemic, pandemic, famine, disease, plague, quarantine, and other significant public health risk), governmental edicts, actions, declarations or quarantines by a governmental entity or health organization (including, without limitation, any shelter-in-place orders, stay at home orders or any restrictions on travel related thereto that preclude Tenant, its agents, contractors or its employees from accessing the Premises, national or regional emergency), breaches in cybersecurity, and other causes beyond the reasonable control of the party obligated to perform, regardless of whether such other causes are (i) foreseeable or unforeseeable or (ii) related to the specifically enumerated events in this paragraph (collectively, a "Force Majeure"), shall excuse the performance of such party for a period equal to any such prevention, delay or stoppage.  If this Lease specifies a time period for performance of an obligation of either party, that time period shall be extended by the period of any delay in such party's performance caused by a Force Majeure.  Notwithstanding anything to the contrary contained in this Lease, no event of Force Majeure shall (a) excuse Tenant's obligations to pay Rent and other charges due pursuant to this Lease, (b) be grounds for Tenant to abate any portion of Rent due pursuant to this Lease, or entitle either party to terminate this Lease, except as allowed pursuant to Articles 11 and 13 of this Lease, (c) excuse Tenant's obligations under Articles 5 and 24 of this Lease, or (d) extend the occurrence of the Lease Commencement Date.


1542 N. CAHUENGA BOULEVARD
[Pink Teacup]

29.15    **Waiver of Redemption by Tenant**.  Tenant hereby waives, for Tenant and for all those claiming under Tenant, any and all rights now or hereafter existing to redeem by order or judgment of any court or by any legal process or writ, Tenant's right of occupancy of the Premises after any termination of this Lease.

29.16    **Notices**.  All notices, demands, statements or communications (collectively, "**Notices**") given or required to be given by either party to the other hereunder shall be in writing, shall be (A) delivered by a nationally recognized overnight courier, or (B) delivered personally.  Any such Notice shall be delivered (i) to Tenant at the appropriate address set forth in Section 10 of the Summary, or to such other place as Tenant may from time to time designate in a Notice to Landlord; or (ii) to Landlord at the addresses set forth in Section 11 of the Summary, or to such other firm or to such other place as Landlord may from time to time designate in a Notice to Tenant.  Any Notice will be deemed given on the date of receipted delivery, of refusal to accept delivery, or when delivery is first attempted but cannot be made due to a change of address for which no Notice was given.  If Tenant is notified of the identity and address of Landlord's mortgagee or ground or underlying lessor, Tenant shall give to such mortgagee or ground or underlying lessor written notice of any default by Landlord under the terms of this Lease by registered or certified mail, and such mortgagee or ground or underlying lessor shall be given a reasonable opportunity to cure such default prior to Tenant's exercising any remedy available to Tenant.  The party delivering Notice shall use commercially reasonable efforts to provide a courtesy copy of each such Notice to the receiving party via electronic mail.

29.17    **Authority**.  If Tenant is a corporation, trust, partnership or limited liability company, each individual executing this Lease on behalf of Tenant hereby represents and warrants that Tenant is a duly formed and existing entity qualified to do business in California and that Tenant has full right and authority to execute and deliver this Lease and that each person signing on behalf of Tenant is authorized to do so.  In such event, Tenant shall, within ten (10) days after execution of this Lease, deliver to Landlord satisfactory evidence of such authority and, if an entity, upon demand by Landlord, also deliver to Landlord satisfactory evidence of (i) good standing in Tenant's state of formation and (ii) qualification to do business in California.

29.18    **Attorneys' Fees**.  In the event that either Landlord or Tenant should bring suit for the possession of the Premises, for the recovery of any sum due under this Lease, or because of the breach of any provision of this Lease or for any other relief against the other, then all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party therein shall be paid by the other party, which obligation on the part of the other party shall be deemed to have accrued on the date of the commencement of such action and shall be enforceable whether or not the action is prosecuted to judgment.

29.19    **Governing Law; WAIVER OF TRIAL BY JURY**.  This Lease shall be construed and enforced in accordance with the laws of the State of California.  IN ANY ACTION OR PROCEEDING ARISING HEREFROM, LANDLORD AND TENANT HEREBY CONSENT TO (I) THE JURISDICTION OF ANY COMPETENT COURT WITHIN THE STATE OF CALIFORNIA, (II) SERVICE OF PROCESS BY ANY MEANS AUTHORIZED BY CALIFORNIA LAW, AND (III) IN THE INTEREST OF SAVING TIME AND EXPENSE, TRIAL WITHOUT A JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR THEIR SUCCESSORS IN RESPECT OF ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY.  IN THE EVENT LANDLORD COMMENCES ANY SUMMARY PROCEEDINGS OR ACTION FOR NONPAYMENT OF BASE RENT OR ADDITIONAL RENT, TENANT SHALL NOT INTERPOSE ANY COUNTERCLAIM OF ANY NATURE OR DESCRIPTION (UNLESS SUCH COUNTERCLAIM SHALL BE MANDATORY) IN ANY SUCH PROCEEDING OR ACTION, BUT SHALL BE RELEGATED TO AN INDEPENDENT ACTION AT LAW.

29.20    **Broker**.  Landlord and Tenant hereby warrant to each other that they have had no dealings with any real estate broker or agent in connection with the negotiation of this Lease, excepting only the real estate broker specified in Section 12 of the Summary (the "**Broker**"), and that they know of no other real estate broker or agent who is entitled to a commission in connection with this Lease.  Landlord shall pay the Broker pursuant to the terms of separate commission agreements.  Each party agrees to indemnify and defend the other party against and hold the other party harmless from any and all claims, demands, losses, liabilities, lawsuits, judgments, costs and expenses (including without limitation reasonable attorneys' fees) with respect to any leasing commission or equivalent compensation alleged to be owing on account of any dealings with any real estate broker or agent, other than the Brokers, occurring by, through, or under the indemnifying party.  Broker shall be paid a commission in connection with this Lease pursuant to a separate written agreement between Landlord and Broker.

29.21    **Independent Covenants**.  This Lease shall be construed as though the covenants herein between Landlord and Tenant are independent and not dependent and Tenant hereby expressly waives the benefit of any statute to the contrary and agrees that if Landlord fails to perform its obligations set forth herein, Tenant shall not be entitled to make any repairs or perform any acts hereunder at Landlord's expense or to any setoff of the Rent or other amounts owing hereunder against Landlord.

29.22    **Counterparts; Signatures**.  This Lease may be executed in counterparts with the same effect as if both parties hereto had executed the same document.  Both counterparts shall be construed together and shall constitute a single lease.  The parties hereto consent and agree that this Lease may be signed and/or transmitted by facsimile, e-mail of a .pdf document or using electronic signature technology (e.g., via DocuSign or similar electronic signature technology), and that such signed electronic record shall be valid and as effective to bind the party so signing as a paper copy bearing such party's handwritten signature.  The parties further consent and agree that (i) to the extent a party signs this Lease using electronic signature technology, by clicking "SIGN", such party is signing this Lease electronically, and (ii) the electronic signatures appearing on this Lease shall be treated, for purposes of validity, enforceability and admissibility, the same as handwritten signatures.

29.23    **Confidentiality**.  Tenant acknowledges that the content of this Lease and any related documents are confidential information.  Tenant shall keep such confidential information strictly confidential and shall not disclose



1542 N. CAHUENGA BOULEVARD

[Pink Teacup]

DocuSign Envelope ID: 630CC051-31EE-4EE3-80D5-826038BA1949

such confidential information to any person or entity other than Tenant's financial, legal, and space planning consultants.

29.24    **Building Renovations**.  It is specifically understood and agreed that Landlord has made no representation or warranty to Tenant and has no obligation and has made no promises to alter, remodel, improve, renovate, repair or decorate the Premises, Building, or any part thereof and that no representations respecting the condition of the Premises or the Building have been made by Landlord to Tenant except as specifically set forth herein.  However, Tenant hereby acknowledges that Landlord is currently renovating or may during the Lease Term renovate, improve, alter, or modify (collectively, the "**Renovations**") the Project, the Building and/or the Premises including without limitation the Parking Area, common areas, systems and equipment, roof, and structural portions of the same, which Renovations may include, without limitation, (i) installing sprinklers in the Building common areas and tenant spaces, (ii) modifying the common areas and tenant spaces to comply with Applicable Laws and regulations, including regulations relating to the physically disabled, seismic conditions, and building safety and security, (iii) installing new floor covering, lighting, and wall coverings in the Building common areas, and in connection with any Renovations, Landlord may, among other things, erect scaffolding or other necessary structures in the Building, limit or eliminate access to portions of the Project, including portions of the common areas, or perform work in the Building, which work may create noise, dust or leave debris in the Building, and (iv) demolishing the Parking Area and installing a new parking structure.  Tenant hereby agrees that such Renovations and Landlord's actions in connection with such Renovations shall in no way constitute a constructive eviction of Tenant nor entitle Tenant to any abatement of Rent.  Landlord shall have no responsibility or for any reason be liable to Tenant for any direct or indirect injury to or interference with Tenant's business arising from the Renovations, nor shall Tenant be entitled to any compensation or damages from Landlord for loss of the use of the whole or any part of the Premises or of Tenant's personal property or improvements resulting from the Renovations or Landlord's actions in connection with such Renovations, or for any inconvenience or annoyance occasioned by such Renovations or Landlord's actions.

29.25    **No Violation**.  Tenant hereby warrants and represents that neither its execution of nor performance under this Lease shall cause Tenant to be in violation of any agreement, instrument, contract, law, rule or regulation by which Tenant is bound, and Tenant shall protect, defend, indemnify and hold Landlord harmless against any claims, demands, losses, damages, liabilities, costs and expenses, including, without limitation, reasonable attorneys' fees and costs, arising from Tenant's breach of this warranty and representation.

29.26    **Communications and Computer Lines**.  Tenant may install, maintain, replace, remove or use any communications or computer wires and cables (collectively, the "**Lines**") at the Project in or serving the Premises, provided that (i) Tenant shall obtain Landlord's prior written consent, use Landlord's designated contractor for provision of cabling and riser management services (or, if Landlord does not have a designated contractor, then an experienced and qualified contractor reasonably designated by Landlord), and comply with all of the other provisions of Articles 7 and 8 of this Lease, (ii) an acceptable number of spare Lines and space for additional Lines shall be maintained for existing and future occupants of the Project, as determined in Landlord's reasonable opinion, (iii) the Lines therefor (including riser cables) shall be (x) appropriately insulated to prevent excessive electromagnetic fields or radiation, (y) surrounded by a protective conduit reasonably acceptable to Landlord, and (z) identified in accordance with the "Identification Requirements," as that term is set forth hereinbelow, (iv) any new or existing Lines servicing the Premises shall comply with all applicable governmental laws and regulations, (v) as a condition to permitting the installation of new Lines, Tenant shall remove existing Lines located in or serving the Premises and repair any damage in connection with such removal, and (vi) Tenant shall pay all costs in connection therewith.  All Lines shall be clearly marked with adhesive plastic labels (or plastic tags attached to such Lines with wire) to show Tenant's name, suite number, telephone number and the name of the person to contact in the case of an emergency (A) every four feet (4') outside the Premises (specifically including, but not limited to, the electrical room risers and other Common Areas), and (B) at the Lines' termination point(s) (collectively, the "**Identification Requirements**").  Upon the expiration of the Lease Term, or immediately following any earlier termination of this Lease, Tenant shall, at Tenant's sole cost and expense, remove all Lines installed by Tenant, and repair any damage caused by such removal.  In the event that Tenant fails to complete such removal and/or fails to repair any damage caused by the removal of any Lines, Landlord may do so and may charge the cost thereof to Tenant.  Landlord reserves the right to require that Tenant remove any Lines located in or serving the Premises which are installed in violation of these provisions, or which are at any time (1) are in violation of any Applicable Laws, (2) are inconsistent with then-existing industry standards (such as the standards promulgated by the National Fire Protection Association (*e.g.*, such organization's "2002 National Electrical Code")), or (3) otherwise represent a dangerous or potentially dangerous condition.

29.27    **Development of the Project**.

29.27.1    **Subdivision**.  Landlord reserves the right to further subdivide all or a portion of the Project.  Tenant agrees to execute and deliver, upon demand by Landlord and in the form requested by Landlord, any additional documents needed to conform this Lease to the circumstances resulting from such subdivision.

29.27.2    **The Other Improvements**.  If portions of the Project or property adjacent to the Project (collectively, the "**Other Improvements**") are owned by an entity other than Landlord, Landlord, at its option, may enter into an agreement with the owner or owners of any or all of the Other Improvements to provide (i) for reciprocal rights of access and/or use of the Project and the Other Improvements, (ii) for the common management, operation, maintenance, improvement and/or repair of all or any portion of the Project and the Other Improvements, (iii) for the allocation of a portion of the Direct Expenses to the Other Improvements and the operating expenses and taxes for the Other Improvements to the Project, and (iv) for the use or improvement of the Other Improvements and/or the Project in connection with the improvement, construction, and/or excavation of the Other Improvements and/or the Project. Nothing contained herein shall be deemed or construed to limit or otherwise affect Landlord's right to convey all or any portion of the Project or any other of Landlord's rights described in this Lease.

29.27.3    **Construction of Project and Other Improvements**.  Tenant acknowledges that portions of the Project and/or the Other Improvements may be under construction following Tenant's occupancy of the

4861-1176-4027.5
376931.00016/1-5-23//cb

-25-

1542 N. CAHUENGA BOULEVARD

[Pink Teacup]



Premises, and that such construction may result in levels of noise, dust, obstruction of access, etc. which are in excess of that present in a fully constructed project.  Tenant hereby waives any and all rent offsets or claims of constructive eviction which may arise in connection with such construction.

29.28    **Hazardous Substances**.  Tenant shall not cause or permit any hazardous materials or substances to be generated, produced, brought upon, used, stored, treated or disposed of in or about the Premises or the Project by Tenant, its agents, employees, contractors, affiliates, sublessees or invitees.  However, notwithstanding the preceding sentence, Landlord agrees that Tenant may use, store and properly dispose of commonly available household cleaners and chemicals to maintain the Premises and Tenant's routine office operations (such as printer toner and copier toner).  At any time following Tenant's receipt of a request from Landlord, Tenant shall promptly complete an "environmental questionnaire" using the form then-provided by Landlord.

29.29    **No Discrimination**.  Tenant covenants by and for itself, its heirs, executors, administrators and assigns, and all persons claiming under or through Tenant, and this Lease is made and accepted upon and subject to the following conditions:  that there shall be no discrimination against or segregation of any person or group of persons, on account of race, color, creed, sex, religion, marital status, ancestry or national origin in the leasing, subleasing, transferring, use, or enjoyment of the Premises, nor shall Tenant itself, or any person claiming under or through Tenant, establish or permit such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy, of tenants, lessees, sublessees, subtenants or vendees in the Premises.

29.30    **Joint and Several**.  If there is more than one person or entity constituting Tenant:  (i) the obligations imposed upon such persons or entities under this Lease shall be joint and several; and (ii) the act or signature of, or notice from or to, any one or more of them with respect to this Lease shall be binding upon each and all of such persons and entities with the same force and effect as if each and all of them had so acted or signed, or given or received such notice.

29.31    **Project or Building Name and Signage**.  Landlord shall have the right at any time to change the name of the Project or Building and to install, affix and maintain any and all signs on the exterior and on the interior of the Project or Building as Landlord may, in Landlord's sole discretion, desire.  Tenant shall not use the name of the Project or Building or use pictures or illustrations of the Project or Building in advertising or other publicity or for any purpose other than as the address of the business to be conducted by Tenant in the Premises, without the prior written consent of Landlord.

29.32    **Transportation Management**.  Tenant shall fully comply with all present or future programs intended to manage parking, transportation or traffic in and around the Building, and in connection therewith, Tenant shall take responsible action for the transportation planning and management of all employees located at the Premises by working directly with Landlord, any governmental transportation management organization or any other transportation-related committees or entities.

29.33    **OFAC**.  Tenant represents and agrees that neither Tenant nor any of its affiliates, nor any of its or their brokers or other agents acting in any capacity in connection with the transactions contemplated by this Lease is or will be (a) conducting any business or engaging in any transaction or dealing with any person appearing on the U.S. Treasury Department's OFAC list of prohibited countries, territories, "specifically designated nationals" (SDNs) or "blocked person" (each, a "**Prohibited Person**") (which lists can be accessed at the following web address: http://www.ustreas.gov/offices/enforcement/ofac/), including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (b) engaging in certain dealings with countries and organizations designated under Section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (c) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (d) a foreign shell bank or any person that a financial institution would be prohibited from transacting with under the USA PATRIOT Act; or (e) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (i) any U.S. anti-money laundering law, (ii) the Foreign Corrupt Practices Act, (iii) the U.S. mail and wire fraud statutes, (iv) the Travel Act, (v) any similar or successor statutes or (vi) any regulations promulgated under the foregoing statutes. If at any time the representation in this Section 29.33 becomes false, then that falsity will constitute a material default and the Landlord may, without limitation, immediately terminate this Lease.

29.34    **Guaranty**.  This Lease is subject to and conditioned upon Tenant delivering to Landlord, concurrently with Tenant's execution and delivery of this Lease, a guaranty in the form attached hereto as **Exhibit I** (the "**Guaranty**"), which Guaranty shall be fully executed by and binding upon ASTRID HEADLEY PAGE, an individual and subject to Section 23 thereof.

29.35    **Waiver of Claims**.  As a material inducement to Landlord to enter into this Lease, Tenant hereby releases Landlord from, and hereby waives, any and all losses, costs, damages, expenses, liabilities, claims and causes of action (collectively, the "**Released Claims**") arising from or related to Tenant's inability or limitation to conduct operations from the Premises as a result of any "shelter in place" orders or similar governmental directives, including, without limitation, any claims for, and/or rights of, termination of this Lease and/or abatement, offset and/or deferral of Rent under this Lease, at law and/or in equity related to the inability of Tenant to conduct operations from the Premises as a result of any "shelter in place" orders or similar governmental directives related thereto.  With respect to the Released Claims, Tenant acknowledges that Tenant has either been advised by legal counsel or has made itself familiar with the provisions of California Civil Code section 1542, which provides as follows:  **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**  Tenant, being aware of the foregoing code section, hereby expressly waives

1542 N. CAHUENGA BOULEVARD



[Pink Teacup]

any rights Tenant may have thereunder, as well as under any other statutes or common-law principles of similar effect, pertaining to the Released Claims.

29.36    **Landlord Termination Right**.  In the event at any time following the tenth (10th) month of the Lease Term, Landlord enters into a lease (or Landlord determines that it will require all or a portion of the Premises in connection with a lease or contemplated lease) with a third party for 25,000 rentable square feet or more in the Project (which includes all or a portion of the Premises), Landlord, upon one hundred twenty (120) days' prior notice in writing to Tenant, may terminate this Lease, in which event this Lease shall terminate as of the effective termination date set forth in such termination notice and Landlord and Tenant shall be relieved of their respective obligations under this Lease, except those obligations set forth in this Lease with respect to the period of Tenant's tenancy through and including the effective termination date or such obligations that specifically survive the expiration or earlier termination of this Lease, including, without limitation, the payment by Tenant of all amounts owed by Tenant under this Lease up to and including the effective termination date.  In the event of such termination, within thirty (30) days following the date that Tenant shall have vacated the Premises, paid all rents and performed all other accrued obligations under this Lease through to the effective date of such termination, Landlord shall pay to Tenant a sum (the "**Termination Fee**") equal to  the then unamortized amount as of the effective termination date of the Lease of $80,000.00, based on the up-front, out-of-pocket costs incurred by Tenant in constructing the tenant improvements (which amortization shall be calculated on a straight-line basis over the initial Lease Term).  As an example, if the termination date occurs on the last day of the forty-eighth (48th) month of the initial Lease Term with thirty-six (36) months remaining in the initial Lease Term, the Termination Fee (and unamortized amount) shall equal $34,285.71.

[*Signatures follow on next page*]

4861-1176-4027.5
376931.00016/1-5-23//cb

-27-

1542 N. CAHUENGA BOULEVARD
[Pink Teacup]



DocuSign Envelope ID: 688CC03T34EE-4EE3-80D5-628088BA1949

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be executed the day and date first above written.

**"LANDLORD":**

W-AP CAHUENGA OWNER VIII, L.P.,
a Delaware limited partnership

By: W-AP Cahuenga GP VIII, L.L.C.,
    a Delaware limited liability company,
    its General Partner

        By: W-AP Cahuenga Holdings VIII, L.L.C.,
            a Delaware limited liability company,
            its Sole Member

            By: W Cahuenga Investors VIII, L.L.C.,
                a Delaware limited liability company,
                its Member

                By: Walton Acquisition Holdings VIII, L.L.C.,
                    a Delaware limited liability company,
                    its Sole Member

                    By: Walton Street Real Estate Fund VIII, L.P.,
                        a Delaware limited partnership,
                        its Managing Member

                        By: Walton Street Managers VIII, L.P.,
                            a Delaware limited partnership,
                            its General Partner

                            By: WSC Managers VIII, Inc.,
                              a Delaware corporation,
                              its General Partner

                              By: _____
                              Name: _____
                              Title: Authorized Signatory

**"TENANT":**
AH FOOD GROUP LIMITED LIABILITY COMPANY,
a California limited liability company

By: _Astrid Headley Page_____
    AC1500A251AA478
Name: Astrid Headley Page

Title: MEMBER


By: _____

Name: _____

Title: MEMBER

1542 N. CAHUENGA BOULEVARD

[Pink Teacup]

**EXHIBIT A**

**1542 N. CAHUENGA BOULEVARD**

**OUTLINE OF PREMISES**



**EXHIBIT B**

**1542 N. CAHUENGA BOULEVARD**

**INTENTIONALLY OMITTED**



## EXHIBIT C

### 1542 N. CAHUENGA BOULEVARD

### OPERATING EXPENSE DEFINITIONS AND CALCULATION PROCEDURES

1.1     **Definitions of Key Terms Relating to Additional Rent**.  As used in this **Exhibit C**, the following terms shall have the meanings hereinafter set forth:

1.1.1     Intentionally deleted.

1.1.2     "**Direct Expenses**" shall mean "Operating Expenses" and "Tax Expenses".

1.1.3     "**Expense Year**" shall mean each calendar year in which any portion of the Lease Term falls, through and including the calendar year in which the Lease Term expires, provided that Landlord, upon notice to Tenant, may change the Expense Year from time to time to any other twelve (12) consecutive month period, and, in the event of any such change, Tenant's Share of Direct Expenses shall be equitably adjusted for any Expense Year involved in any such change.

1.1.4     "**Operating Expenses**" shall mean all expenses, costs and amounts of every kind and nature which Landlord pays or accrues during any Expense Year because of or in connection with the ownership, management, maintenance, security, repair, replacement, renovation, restoration or operation of the Project, or any portion thereof, in accordance with sound real estate management and accounting practices, consistently applied. Without limiting the generality of the foregoing, Operating Expenses shall specifically include any and all of the following:  (i) the cost of supplying all utilities  (but excluding the cost of electricity, gas, water and sewer services consumed in the Premises and the premises of other tenants of the Building and any other buildings in the Project (to the extent Tenant is separately paying for the cost of electricity, gas, water and sewer services pursuant to Section 6 of the Lease), the cost of operating, repairing, replacing, maintaining, renovating and restoring the utility, telephone, mechanical, sanitary, storm drainage, and elevator systems, and the cost of maintenance and service contracts in connection therewith; (ii) the cost of licenses, certificates, permits and inspections and the cost of contesting any governmental enactments which may affect Operating Expenses, and the costs incurred in connection with a governmentally mandated transportation system management program or similar program; (iii) the cost of all insurance carried by Landlord in connection with the Project; (iv) the cost of landscaping, relamping, and all supplies, tools, equipment and materials used in the operation, repair and maintenance of the Project, or any portion thereof; (v) costs incurred in connection with the parking areas servicing the Project; (vi) fees and other costs, including management fees, administration fees, consulting fees, legal fees and accounting fees, of all contractors and consultants in connection with the management, operation, maintenance, replacement, renovation, repair and restoration of the Project; (vii) payments under any equipment rental agreements and the fair rental value of any management office space; (viii) wages, salaries and other compensation and benefits, including taxes levied thereon, of all persons (other than persons generally considered to be higher in rank than the position of "Senior Asset Manager") engaged in the operation, maintenance and security of the Project; (ix) costs under any instrument pertaining to the sharing of costs by the Project; (x) operation, repair, maintenance, renovation, replacement and restoration of all systems and equipment and components thereof of the Project; (xi) the cost of janitorial, alarm, security and other services, replacement, renovation, restoration and repair of wall and floor coverings, ceiling tiles and fixtures in common areas, maintenance, replacement, renovation, repair and restoration of curbs and walkways, repair to roofs and re-roofing; (xii) amortization of the cost of acquiring or the rental expense of personal property used in the maintenance, operation and repair of the Project, or any portion thereof (which amortization calculation shall include interest at the "Interest Rate," as that term is set forth in Article 25 of this Lease); (xiii) the cost of capital improvements or other costs incurred in connection with the Project (A) which are intended to effect economies in the operation or maintenance of the Project, or any portion thereof, (B) that are required to comply with present or anticipated conservation programs, (C) which are replacements or modifications of nonstructural items located in the Common Areas required to keep the Common Areas in good order or condition, (D) that are required under any governmental law or regulation by a federal, state or local governmental agency, except for capital repairs, replacements or other improvements to remedy a condition existing prior to the Lease Commencement Date which an applicable governmental authority, if it had knowledge of such condition prior to the Lease Commencement Date, would have then required to be remedied pursuant to then-current governmental laws or regulations in their form existing as of the Lease Commencement Date and pursuant to the then-current interpretation of such governmental laws or regulations by the applicable governmental authority as of the Lease Commencement Date, (E) which are required in order for the Project, or any portion thereof, to obtain or maintain a certification under the U.S. Green Building Council's Leadership in Energy and Environmental Design ("**LEED**"), or other applicable certification agency in connection with Landlord's sustainability practices for the Project (as such sustainability practices are to be determined by Landlord, in its sole and absolute discretion, from time to time), or (F) that relate to the safety or security of the Project; provided, however, that any capital expenditure shall be amortized with interest at the Interest Rate over the shorter of (X) seven (7) years, (Y) its useful life as Landlord shall reasonably determine in accordance with sound real estate management and accounting practices consistently applied or (Z) with respect to those items included under item (A) above, their recovery/payback period as Landlord shall reasonably determine in accordance with sound real estate management and accounting practices, consistently applied; (xiv) costs, fees, charges or assessments imposed by, or resulting from any mandate imposed on Landlord by, any federal, state or local government for fire and police protection, trash removal, community services, or other services which do not constitute "Tax Expenses" as that term is defined in Section 1.1.5.1, below; (xv) payments under any easement, license, operating agreement, declaration, restrictive covenant, or instrument pertaining to the sharing of costs by the Building and/or the Project, and (xvi) costs of any additional services not provided to the Building and/or the Project as of the Lease Commencement Date but which are thereafter provided by Landlord in connection with its prudent management of the Building and/or the Project.  Notwithstanding the foregoing, for purposes of this Lease, Operating Expenses shall not, however, include:



(a)    costs, including marketing costs, legal fees, space planners' fees, advertising and promotional expenses, and brokerage fees incurred in connection with the original construction or development, or original or future leasing of the Project, and costs, including permit, license and inspection costs, incurred with respect to the installation of improvements made for new tenants initially occupying space in the Project after the Lease Commencement Date or incurred in renovating or otherwise improving, decorating, painting or redecorating vacant space for tenants or other occupants of the Project (excluding, however, such costs relating to any common areas of the Project or parking facilities);

(b)    except as set forth in items (xii), (xiii), and (xiv) above, depreciation, interest and principal payments on mortgages and other debt costs, if any, penalties and interest;

(c)    costs for which the Landlord is reimbursed by any tenant or occupant of the Project or by insurance by its carrier or any tenant's carrier or by anyone else (except to the extent of deductibles), and electric power costs for which any tenant directly contracts with the local public service company;

(d)    any bad debt loss, rent loss, or reserves for bad debts or rent loss;

(e)    costs associated with the operation of the business of the partnership or entity which constitutes the Landlord, as the same are distinguished from the costs of operation of the Project (which shall specifically include, but not be limited to, accounting costs associated with the operation of the Project).  Costs associated with the operation of the business of the partnership or entity which constitutes the Landlord include costs of partnership accounting and legal matters, costs of defending any lawsuits with any mortgagee (except as the actions of the Tenant may be in issue), costs of selling, syndicating, financing, mortgaging or hypothecating any of the Landlord's interest in the Project, and costs incurred in connection with any disputes between Landlord and its employees, between Landlord and Project management, or between Landlord and other tenants or occupants, and Landlord's general corporate overhead and general and administrative expenses;

(f)    the wages and benefits of any employee who does not devote substantially all of his or her employed time to the Project unless such wages and benefits are prorated to reflect time spent on operating and managing the Project vis-a-vis time spent on matters unrelated to operating and managing the Project; provided, that in no event shall Operating Expenses for purposes of this Lease include wages and/or benefits attributable to personnel above the level of Senior Asset Manager;

(g)    amount paid as ground rental for the Project by the Landlord;

(h)    overhead and profit increment paid to the Landlord or to subsidiaries or affiliates of the Landlord for services in the Project to the extent the same exceeds the costs of such services rendered by qualified, first-class unaffiliated third parties on a competitive basis;

(i)    any compensation paid to clerks, attendants or other persons in commercial concessions operated by the Landlord, provided that any compensation paid to any concierge, parking attendants or costs incurred in connection with the provision of any shuttle service serving the project for the purpose of facilitating access to public transportation at the Project shall be includable as an Operating Expense;

(j)    rentals and other related expenses incurred in leasing air conditioning systems, elevators or other equipment which if purchased the cost of which would be excluded from Operating Expenses as a capital cost, except equipment not affixed to the Project which is used in providing janitorial or similar services and, further excepting from this exclusion such equipment rented or leased to remedy or ameliorate an emergency condition in the Project;

(k)    all items and services for which Tenant or any other tenant in the Project reimburses Landlord or which Landlord provides selectively to one or more tenants (other than Tenant) without reimbursement;

(l)    costs, other than those incurred in ordinary maintenance and repair, for sculpture, paintings, fountains or other objects of art;

(m)    any costs expressly excluded from Operating Expenses elsewhere in this Lease;

(n)    rent for any office space occupied by Project management personnel to the extent the size or rental rate of such office space exceeds the size or fair market rental value of office space occupied by management personnel of comparable buildings in the Hollywood, California area, with adjustment where appropriate for the size of the applicable project; and

(o)    costs incurred to comply with laws relating to the removal of hazardous material or substance (as defined under Applicable Law) which was in existence in the Building or on the Project prior to the Lease Commencement Date, and was of such a nature that a federal, state, local or municipal governmental authority, if it had then had knowledge of the presence of such hazardous material or substance, in the state, and under the conditions that it then existed in the Building or on the Project, would have then required the removal of such hazardous material or substance or other remedial or containment action with respect thereto, but only to the extent those laws were then being actively enforced by the applicable government authority; and costs incurred to remove, remedy, contain, or treat hazardous material or substance , which hazardous material or substance is brought into the Building or onto the Project after the date hereof by Landlord or any other tenant of the Project and is of such a nature, at that time, that a federal, state, local or municipal governmental authority, if it had then had knowledge of the presence of such hazardous material or substance, in the state, and under the conditions, that it then exists in the Building or on the Project, would have then required the removal of such hazardous material or substance or other remedial or containment action with respect thereto, but only to the extent those laws were then being actively enforced by the applicable government authority.

If Landlord is not furnishing any particular work or service (the cost of which, if performed by Landlord, would be included in Operating Expenses) to a tenant who has undertaken to perform such work or service in lieu of the performance thereof by Landlord, Operating Expenses shall be deemed to be increased by an amount equal to the additional Operating Expenses which would reasonably have been incurred during such period by Landlord if it had

DocuSign Envelope ID: 630CC051-31EE-4EE3-80D5-826038BA1949

at its own expense furnished such work or service to such tenant.  If the Project is not at least one hundred percent (100%) occupied during all or a portion of any Expense Year (including, without limitation, if any portion of the Project is unleased or is leased, but is not then being used by a tenant in the ordinary course of its business), Landlord may elect to make an appropriate adjustment to the components of Operating Expenses for such Expense Year to determine the amount of Operating Expenses that would have been incurred had the Project been one hundred percent (100%) occupied; and the amount so determined shall be deemed to have been the amount of Operating Expenses for such Expense Year.  For purposes hereof, cost savings in components of Operating Expenses arising by reason of the cessation of use by tenants at the Project due to Casualty, Force Majeure, or other extraordinary circumstances are considered variable Operating Expenses that may be grossed up in Operating Expenses.

Further, notwithstanding the foregoing, in no event shall "Controllable Expenses," as that term is defined, below, for any calendar year following the first full calendar year of the Lease Term, exceed 110% of the Controllable Expenses incurred for the prior calendar year, calculated on a cumulative and compounded basis.  For purposes of this Lease, "**Controllable Expenses**" shall mean (i) the fee charged by the property manager of the Project, (ii) the amount of rent charged to Operating Expenses as rent for the Project management office, and (iii) the costs of janitorial service contracts, security service contracts, landscaping contracts, HVAC maintenance contracts, elevator maintenance contracts, and life safety maintenance contracts.  Furthermore, notwithstanding anything contained in this paragraph to the contrary, Controllable Expenses shall not include (A) the cost of union labor, including labor which is not union as of the date of this Lease but which unionizes after the date of this Lease, (B) market-wide labor-rate increases due to extraordinary circumstances, including without limitation, boycotts and strikes, (C) costs incurred due to an event of Force Majeure, and (D) costs incurred to comply with Applicable Laws.

1.1.5    **Taxes**.

1.1.5.1  "**Tax Expenses**" shall mean all federal, state, county, or local governmental or municipal taxes, fees, charges or other impositions of every kind and nature, whether general, special, ordinary or extraordinary, (including, without limitation, real estate taxes, general and special assessments, transit taxes, leasehold taxes or taxes based upon the receipt of rent, including gross receipts or sales taxes applicable to the receipt of rent, unless required to be paid by Tenant, personal property taxes imposed upon the fixtures, machinery, equipment, apparatus, systems and equipment, appurtenances, furniture and other personal property used in connection with the Project, or any portion thereof), which shall be paid or accrued during any Expense Year (without regard to any different fiscal year used by such governmental or municipal authority) because of or in connection with the ownership, leasing and operation of the Project, or any portion thereof (including, without limitation, the land upon which the Building and the parking facilities serving the Building are located).

1.1.5.2  Tax Expenses shall include, without limitation:  (i) Any tax on the rent, right to rent or other income from the Project, or any portion thereof, or as against the business of leasing the Project, or any portion thereof; (ii) Any assessment, tax, fee, levy or charge in addition to, or in substitution, partially or totally, of any assessment, tax, fee, levy or charge previously included within the definition of real property tax, it being acknowledged by Tenant and Landlord that Proposition 13 was adopted by the voters of the State of California in the June 1978 election ("**Proposition 13**") and that assessments, taxes, fees, levies and charges may be imposed by governmental agencies for such services as fire protection, street, sidewalk and road maintenance, refuse removal and for other governmental services formerly provided without charge to property owners or occupants, and, in further recognition of the decrease in the level and quality of governmental services and amenities as a result of Proposition 13, Tax Expenses shall also include any governmental or private assessments or the Project's contribution towards a governmental or private cost-sharing agreement for the purpose of augmenting or improving the quality of services and amenities normally provided by governmental agencies; (iii) Any assessment, tax, fee, levy, or charge allocable to or measured by the area of the Premises or the Rent payable hereunder, including, without limitation, any business or gross income tax or excise tax with respect to the receipt of such rent, or upon or with respect to the possession, leasing, operating, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises, or any portion thereof; (iv) Any assessment, tax, fee, levy or charge, upon this transaction or any document to which Tenant is a party, creating or transferring an interest or an estate in the Premises; and (v) all of the real estate taxes and assessments imposed on or with respect to the Building and all of the real estate taxes and assessments imposed on the land and improvements comprising the Project.

1.1.5.3  Any costs and expenses (including, without limitation, reasonable attorneys' fees) incurred in attempting to protest, reduce or minimize Tax Expenses shall be included in Tax Expenses in the Expense Year such expenses are paid.  Refunds of Tax Expenses shall be credited against Tax Expenses and refunded to Tenant regardless of when received, based on the Expense Year to which the refund is applicable, provided that in no event shall the amount to be refunded to Tenant for any such Expense Year exceed the total amount paid by Tenant as Tax Expenses under this **Exhibit C** for such Expense Year.  If Tax Expenses for any period during the Lease Term or any extension thereof are increased after payment thereof for any reason, including, without limitation, error or reassessment by applicable governmental or municipal authorities, Tenant shall pay Landlord upon demand Tenant's Share of any such increased Tax Expenses included by Landlord as Tax Expenses pursuant to the TCCs of this Lease.  Notwithstanding anything to the contrary contained in this Section 1.1.5.3 (except as set forth in Section 1.1.5.1 or 1.1.5.2, above), there shall be excluded from Tax Expenses (i) all excess profits taxes, franchise taxes, gift taxes, capital stock taxes, inheritance and succession taxes, estate taxes, federal and state income taxes, and other taxes to the extent applicable to Landlord's general or net income (as opposed to rents, receipts or income attributable to operations at the Project), (ii) any items included as Operating Expenses, and (iii) any items paid by Tenant under Section 4.2 of the Lease.  Notwithstanding anything to the contrary set forth in this Lease, only Landlord may institute proceedings to reduce Tax Expenses and the filing of any such proceeding by Tenant without Landlord's consent shall constitute an event of default by Tenant under this Lease.  Notwithstanding the foregoing, Landlord shall not be obligated to file any application or institute any proceeding seeking a reduction in Tax Expenses.

1.1.6    "**Tenant's Share**" shall mean the percentages set forth in Section 5 of the Summary.



1.1.7    "**Tenant's Tax Share**" shall mean the percentage set forth in Section 5 of the Summary.

1.2    **Allocation of Direct Expenses**.  The parties acknowledge that the Building is a part of a multi-building project and that the costs and expenses incurred in connection with the Project (*i.e.* the Direct Expenses) should be shared between the tenants of the Building and the tenants of the other buildings in the Project.  Accordingly, as set forth in Section 1.1 above, Direct Expenses (which consists of Operating Expenses and Tax Expenses) are determined annually for the Project as a whole, and a portion of the Direct Expenses, which portion shall be determined by Landlord on an equitable basis, may be allocated to the tenants of the Building (as opposed to the tenants of any other buildings in the Project) and such portion shall be the Direct Expenses for purposes of this Lease.  Such portion of Direct Expenses allocated to the tenants of the Building may include all Direct Expenses attributable solely to the Building and an equitable portion of the Direct Expenses attributable to the Project as a whole.  Further, at Landlord's option, such portion of Tax Expenses allocated to the tenants with premises located on Parcels 4 and 5 shall include all Tax Expenses attributable solely to Parcels 4 and 5 and an equitable portion of the Direct Expenses attributable to the Project as a whole.

1.2.1    **Cost Pools**.  Landlord shall have the right, from time to time, to equitably allocate some or all of the Direct Expenses for the Project among different portions or occupants of the Project (the "**Cost Pools**"), in Landlord's discretion.  Such Cost Pools may include, but shall not be limited to, the office space tenants of a building of the Project or of the Project, and the retail space tenants of a building of the Project or of the Project.  The Direct Expenses within each such Cost Pool shall be allocated and charged to the tenants within such Cost Pool in an equitable manner.

1.3    **Calculation and Payment of Additional Rent**.

1.3.1    **Statement of Actual Direct Expenses and Payment by Tenant**.  Landlord shall give to Tenant following the end of each Expense Year, a statement (the "**Statement**") which shall state in general major categories the Direct Expenses incurred or accrued for such preceding Expense Year, and which shall indicate the amount of Tenant's Share of Direct Expenses.  Landlord shall use commercially reasonable efforts to deliver such Statement to Tenant on or before May 1 following the end of the Expense Year to which such Statement relates.  Upon receipt of the Statement for each Expense Year commencing or ending during the Lease Term, Tenant shall pay, within thirty (30) days after receipt of the Statement, the full amount of Tenant's Share of Direct Expenses for such Expense Year, less the amounts, if any, paid during such Expense Year as "Estimated Direct Expenses," as that term is defined in Section 1.3.2, below, and if Tenant paid more as Estimated Direct Expenses than the actual Tenant's Share of Direct Expenses (an "**Excess**"), Tenant shall receive a credit in the amount of such Excess against Rent next due under this Lease.  The failure of Landlord to timely furnish the Statement for any Expense Year shall not prejudice Landlord or Tenant from enforcing its rights under this **Exhibit C**.  Even though the Lease Term has expired and Tenant has vacated the Premises, when the final determination is made of Tenant's Share of Direct Expenses for the Expense Year in which this Lease terminates, if Tenant's Share of Direct Expenses is greater than the amount of Estimated Direct Expenses previously paid by Tenant to Landlord, Tenant shall, within thirty (30) days after receipt of the Statement, pay to Landlord such amount, and if Tenant paid more as Estimated Direct Expenses than the actual Tenant's Share of Direct Expenses (again, an Excess), Landlord shall, within thirty (30) days, deliver a check payable to Tenant in the amount of such Excess.  The provisions of this Section 1.3.1 shall survive the expiration or earlier termination of the Lease Term.  Notwithstanding the immediately preceding sentence, Tenant shall not be responsible for Tenant's Share of any Direct Expenses attributable to any Expense Year which are first billed to Tenant more than two (2) calendar years after the Lease Expiration Date, provided that in any event Tenant shall be responsible for Tenant's Share of Direct Expenses which (x) were levied by any governmental authority or by any public utility companies (y) Landlord had not previously received an invoice therefor and which are currently due and owing (i.e., costs invoiced for the first time regardless of the date when the work or service relating to this Lease was performed), at any time following the Lease Expiration Date which are attributable to any Expense Year.

1.3.2    **Statement of Estimated Direct Expenses**.  In addition, Landlord shall endeavor to give Tenant a yearly expense estimate statement (the "**Estimate Statement**") which shall set forth in general major categories Landlord's reasonable estimate (the "**Estimate**") of what the total amount of Direct Expenses for the then-current Expense Year shall be and the estimated Tenant's Share of Direct Expenses (the "**Estimated Direct Expenses**").  The failure of Landlord to timely furnish the Estimate Statement for any Expense Year shall not preclude Landlord from enforcing its rights to collect any Estimated Direct Expenses under this **Exhibit C**, nor shall Landlord be prohibited from revising any Estimate Statement or Estimated Direct Expenses theretofore delivered to the extent necessary.  Thereafter, Tenant shall pay, within thirty (30) days after receipt of the Estimate Statement, a fraction of the Estimated Direct Expenses for the then-current Expense Year (reduced by any amounts paid pursuant to the second to last sentence of this Section 1.3.2).  Such fraction shall have as its numerator the number of months which have elapsed in such current Expense Year, including the month of such payment, and twelve (12) as its denominator.  Until a new Estimate Statement is furnished (which Landlord shall have the right to deliver to Tenant at any time), Tenant shall pay monthly, with the monthly Base Rent installments, an amount equal to one-twelfth (1/12) of the total Estimated Direct Expenses set forth in the previous Estimate Statement delivered by Landlord to Tenant.  Throughout the Lease Term Landlord shall maintain records with respect to Direct Expenses in accordance with sound real estate management and accounting practices, consistently applied.

EXHIBIT C
-4-

1542 N. CAHUENGA BOULEVARD



[Pink Teacup]

**EXHIBIT D**

**1542 N. CAHUENGA BOULEVARD**

**RULES AND REGULATIONS**

Tenant shall faithfully observe and comply with the following Rules and Regulations. Landlord shall not be responsible to Tenant for the nonperformance of any of said Rules and Regulations by or otherwise with respect to the acts or omissions of any other tenants or occupants of the Project. In the event of any conflict between the Rules and Regulations and the other provisions of this Lease, the latter shall control.

1.      Tenant shall not alter any lock or install any new or additional locks or bolts on any doors or windows of the Premises without obtaining Landlord's prior written consent. Tenant shall bear the cost of any lock changes or repairs required by Tenant. Two keys will be furnished by Landlord for the Premises, and any additional keys required by Tenant must be obtained from Landlord at a reasonable cost to be established by Landlord. Upon the termination of this Lease, Tenant shall restore to Landlord all keys of stores, offices, and toilet rooms, either furnished to, or otherwise procured by, Tenant and in the event of the loss of keys so furnished, Tenant shall pay to Landlord the cost of replacing same or of changing the lock or locks opened by such lost key if Landlord shall deem it necessary to make such changes.

2.      All doors opening to public corridors shall be kept closed at all times except for normal ingress and egress to the Premises.

3.      Landlord reserves the right to close and keep locked all entrance and exit doors of the Building during such hours as are customary for comparable buildings in the Hollywood, California area. Tenant, its employees and agents must be sure that the doors to the Building are securely closed and locked when leaving the Premises if it is after the normal hours of business for the Building. Any tenant, its employees, agents or any other persons entering or leaving the Building at any time when it is so locked, or any time when it is considered to be after normal business hours for the Building, may be required to sign the Building register. Access to the Building may be refused unless the person seeking access has proper identification or has a previously arranged pass for access to the Building. Landlord will furnish passes to persons for whom Tenant requests same in writing. Tenant shall be responsible for all persons for whom Tenant requests passes and shall be liable to Landlord for all acts of such persons. The Landlord and his agents shall in no case be liable for damages for any error with regard to the admission to or exclusion from the Building of any person. In case of invasion, mob, riot, public excitement, or other commotion, Landlord reserves the right to prevent access to the Building or the Project during the continuance thereof by any means it deems appropriate for the safety and protection of life and property.

4.      No furniture, freight or equipment of any kind shall be brought into the Building without prior notice to Landlord. All moving activity into or out of the Building shall be scheduled with Landlord and done only at such time and in such manner as Landlord designates. Landlord shall have the right to prescribe the weight, size and position of all safes and other heavy property brought into the Building and also the times and manner of moving the same in and out of the Building. Safes and other heavy objects shall, if considered necessary by Landlord, stand on supports of such thickness as is necessary to properly distribute the weight. Landlord will not be responsible for loss of or damage to any such safe or property in any case. Any damage to any part of the Building, its contents, occupants or visitors by moving or maintaining any such safe or other property shall be the sole responsibility and expense of Tenant.

5.      No furniture, packages, supplies, equipment or merchandise will be received in the Building or carried up or down in the elevators, except between such hours, in such specific elevator and by such personnel as shall be designated by Landlord.

6.      The requirements of Tenant will be attended to only upon application at the management office for the Project or at such office location designated by Landlord. Employees of Landlord shall not perform any work or do anything outside their regular duties unless under special instructions from Landlord.

7.      No sign, advertisement, notice or handbill shall be exhibited, distributed, painted or affixed by Tenant on any part of the Premises or the Building without the prior written consent of the Landlord. Tenant shall not disturb, solicit, peddle, or canvass any occupant of the Project and shall cooperate with Landlord and its agents of Landlord to prevent same.

8.      The toilet rooms, urinals, wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed, and no foreign substance of any kind whatsoever shall be thrown therein. The expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the tenant who, or whose servants, employees, agents, visitors or licensees shall have caused same.

9.      Tenant shall not overload the floor of the Premises, nor mark, drive nails or screws, or drill into the partitions, woodwork or drywall or in any way deface the Premises or any part thereof without Landlord's prior written consent. Tenant shall not purchase spring water, ice, towel, linen, maintenance or other like services from any person or persons not approved by Landlord.

10.      Except for vending machines intended for the sole use of Tenant's employees and invitees, no vending machine or machines other than fractional horsepower machines shall be installed, maintained or operated upon the Premises without the written consent of Landlord.

11.      Tenant shall not use or keep in or on the Premises, the Building, or the Project any kerosene, gasoline, explosive material, corrosive material, material capable of emitting toxic fumes, or other inflammable or combustible fluid chemical, substitute or material. Tenant shall provide material safety data sheets for any hazardous material or substance used or kept on the Premises.

12.      Tenant shall not without the prior written consent of Landlord use any method of heating or air conditioning other than that supplied or approved by Landlord.



13.     Tenant shall not use, keep or permit to be used or kept, any foul or noxious gas or substance in or on the Premises, or permit or allow the Premises to be occupied or used in a manner offensive or objectionable to Landlord or other occupants of the Project by reason of noise, odors, or vibrations, or interfere with other tenants or those having business therein, whether by the use of any musical instrument, radio, phonograph, or in any other way. Tenant shall not throw anything out of doors, windows or skylights or down passageways.

14.     Tenant shall not bring into or keep within the Project, the Building or the Premises any firearms, animals, birds, aquariums, or, except in areas designated by Landlord, bicycles or other vehicles.

15.     The Premises shall not be used for lodging or for any improper, objectionable or immoral purposes.

16.     The Premises shall not be used for manufacturing or for the storage of merchandise except as such storage may be incidental to the use of the Premises provided for in the Summary.  Tenant shall not occupy or permit any portion of the Premises to be occupied as an office for a messenger-type operation or dispatch office, public stenographer or typist, or for the manufacture or sale of liquor, narcotics, or tobacco in any form, or as a medical office, or as a barber or manicure shop, or as an employment bureau without the express prior written consent of Landlord.  Tenant shall not engage or pay any employees on the Premises except those actually working for such tenant on the Premises nor advertise for laborers giving an address at the Premises.

17.     Landlord reserves the right to exclude or expel from the Project any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of these Rules and Regulations.

18.     Tenant, its employees and agents shall not loiter in or on the entrances, corridors, sidewalks, lobbies, courts, halls, stairways, elevators, vestibules or any Common Areas for the purpose of smoking tobacco products or for any other purpose, nor in any way obstruct such areas, and shall use them only as a means of ingress and egress for the Premises.  .

19.     Tenant shall not waste electricity, water or air conditioning and agrees to cooperate fully with Landlord to ensure the most effective operation of the Building's heating and air conditioning system, and shall refrain from attempting to adjust any controls.  Tenant shall participate in recycling programs undertaken by Landlord.

20.     Tenant shall store all its trash and garbage within the interior of the Premises.  No material shall be placed in the trash boxes or receptacles if such material is of such nature that it may not be disposed of in the ordinary and customary manner of removing and disposing of trash and garbage in Los Angeles, California without violation of any law or ordinance governing such disposal.  All trash, garbage and refuse disposal shall be made only through entry-ways and elevators provided for such purposes at such times as Landlord shall designate.  If the Premises is or becomes infested with vermin as a result of the use or any misuse or neglect of the Premises by Tenant, its agents, servants, employees, contractors, visitors or licensees, Tenant shall forthwith, at Tenant's expense, cause the Premises to be exterminated from time to time to the satisfaction of Landlord and shall employ such licensed exterminators as shall be approved in writing in advance by Landlord.

21.     Tenant shall comply with all safety, fire protection and evacuation procedures and regulations established by Landlord or any governmental agency.

22.     Any persons employed by Tenant to do janitorial work shall be subject to the prior written approval of Landlord, and while in the Building and outside of the Premises, shall be subject to and under the control and direction of the Building manager (but not as an agent or servant of such manager or of Landlord), and Tenant shall be responsible for all acts of such persons.

23.     No awnings or other projection shall be attached to the outside walls of the Building without the prior written consent of Landlord, and no curtains, blinds, shades or screens shall be attached to or hung in, or used in connection with, any window or door of the Premises other than Landlord standard drapes.  All electrical ceiling fixtures hung in the Premises or spaces along the perimeter of the Building must be fluorescent and/or of a quality, type, design and a warm white bulb color approved in advance in writing by Landlord.  Neither the interior nor exterior of any windows shall be coated or otherwise sunscreened without the prior written consent of Landlord.  Tenant shall be responsible for any damage to the window film on the exterior windows of the Premises and shall promptly repair any such damage at Tenant's sole cost and expense.  Tenant shall abide by Landlord's regulations concerning the opening and closing of window coverings which are attached to the windows in the Premises.

24.     The sashes, sash doors, skylights, windows, and doors that reflect or admit light and air into the halls, passageways or other public places in the Building shall not be covered or obstructed by Tenant, nor shall any bottles, parcels or other articles be placed on the windowsills.

25.     Tenant must comply with requests by the Landlord concerning the informing of their employees of items of importance to the Landlord.

26.     Tenant must comply with any City of Los Angeles "**NO-SMOKING**" ordinances.  If Tenant is required under the ordinance to adopt a written smoking policy, a copy of said policy shall be on file in the office of the Building. In addition, no smoking of any substance shall be permitted within the Project except in specifically designated outdoor areas. Within such designated outdoor areas, all remnants of consumed cigarettes and related paraphernalia shall be deposited in ash trays and/or waste receptacles.  No cigarettes shall be extinguished and/or left on the ground or any other surface of the Project.  Cigarettes shall be extinguished only in ashtrays.  Furthermore, in no event shall Tenant, its employees or agents smoke tobacco products or other substances (x) within any interior areas of the Project, or (y) within two hundred feet (200') of the main entrance of the Building or the main entrance of any of the adjacent buildings, or (z) within seventy-five feet (75') of any other entryways into the Building.

27.     Tenant hereby acknowledges that Landlord shall have no obligation to provide guard service or other security measures for the benefit of the Premises, the Building or the Project.  Tenant hereby assumes all responsibility for the protection of Tenant and its agents, employees, contractors, invitees and guests, and the property thereof, from acts of third parties, including keeping doors locked and other means of entry to the Premises

closed, whether or not Landlord, at its option, elects to provide security protection for the Project or any portion thereof.  Tenant further assumes the risk that any safety and security devices, services and programs which Landlord elects, in its sole discretion, to provide may not be effective, or may malfunction or be circumvented by an unauthorized third party, and Tenant shall, in addition to its other insurance obligations under this Lease, obtain its own insurance coverage to the extent Tenant desires protection against losses related to such occurrences.  Tenant shall cooperate in any reasonable safety or security program developed by Landlord or required by law.

28.    All equipment of any electrical or mechanical nature shall be placed by Tenant in the Premises in settings approved by Landlord, to absorb or prevent any vibration, noise and annoyance.

29.    Tenant shall not use in any space or in the public halls of the Building, any hand trucks except those equipped with rubber tires and rubber side guards.

30.    No auction, liquidation, fire sale, going-out-of-business or bankruptcy sale shall be conducted in the Premises without the prior written consent of Landlord.

31.    No tenant shall use or permit the use of any portion of the Premises for living quarters, sleeping apartments or lodging rooms.

32.    Tenant shall not purchase spring water, towels, janitorial or maintenance or other similar services from any company or persons not approved by Landlord.  Landlord shall approve a sufficient number of sources of such services to provide Tenant with a reasonable selection, but only in such instances and to such extent as Landlord in its judgment shall consider consistent with the security and proper operation of the Building.

33.    Tenant shall install and maintain, at Tenant's sole cost and expense, an adequate, visibly marked and properly operational fire extinguisher next to any duplicating or photocopying machines or similar heat producing equipment, which may or may not contain combustible material, in the Premises.

Landlord reserves the right at any time to change or rescind any one or more of these Rules and Regulations, or to make such other and further reasonable Rules and Regulations as in Landlord's judgment may from time to time be necessary for the management, safety, care and cleanliness of the Premises, Building, the Common Areas and the Project, and for the preservation of good order therein, as well as for the convenience of other occupants and tenants therein, and based upon guidelines, rules and regulations provided from time to time by the Center for Disease Control ("**CDC**"), Building Owners and Managers Association International ("**BOMA**"), Occupational Health Standards Association ("**OSHA**") and others.  To the extent the guidelines, rules and regulations promulgated and developed by the CDC, OSHA, BOMA and other applicable organizations (collectively, "**Guidelines**") and other Laws conflict with these Rules and Regulations or provide more stringent requirements than these Rules and Regulations, the Guidelines and Laws shall apply.  Landlord may waive any one or more of these Rules and Regulations for the benefit of any particular tenants, but no such waiver by Landlord shall be construed as a waiver of such Rules and Regulations in favor of any other tenant, nor prevent Landlord from thereafter enforcing any such Rules or Regulations against any or all tenants of the  Project.  Tenant shall be deemed to have read these Rules and Regulations and to have agreed to abide by them as a condition of its occupancy of the Premises.

## EXHIBIT E

### 1542 N. CAHUENGA BOULEVARD

### FORM OF TENANT'S ESTOPPEL CERTIFICATE

The undersigned as Tenant under that certain Retail Lease (the "Lease") made and entered into as of _____, 20__ by and between _____ as Landlord, and the undersigned as Tenant, for Premises on the _____ floor(s) of the building located at _____, _____, California _____, certifies as follows:

1.     Attached hereto as Exhibit A is a true and correct copy of the Lease and all amendments and modifications thereto.  The documents contained in Exhibit A represent the entire agreement between the parties as to the Premises.

2.     The undersigned currently occupies the Premises described in the Lease, the Lease Term commenced on _____, and the Lease Term expires on _____, and the undersigned has no option to terminate or cancel the Lease or to purchase all or any part of the Premises, the Building and/or the Project.

3.     Base Rent became payable on _____.

4.     The Lease is in full force and effect and has not been modified, supplemented or amended in any way except as provided in Exhibit A.

5.     Tenant has not transferred, assigned, or sublet any portion of the Premises nor entered into any license or concession agreements with respect thereto except as follows:

6.       Tenant shall not modify the documents contained in Exhibit A without the prior written consent of Landlord's mortgagee.

7.     All monthly installments of Base Rent all Additional Rent and all monthly installments of estimated Additional Rent have been paid when due through _____.  The current monthly installment of Base Rent is $_____.

8.     All conditions of the Lease to be performed by Landlord necessary to the enforceability of the Lease have been satisfied and Landlord is not in default thereunder.  In addition, the undersigned has not delivered any notice to Landlord regarding a default by Landlord thereunder.

9.     No rental has been paid more than thirty (30) days in advance and no security has been deposited with Landlord except as provided in the Lease.

10.    As of the date hereof, there are no existing defenses or offsets, or, to the undersigned's knowledge, claims or any basis for a claim, that the undersigned has against Landlord.

11.    If Tenant is a corporation. limited liability company or partnership, each individual executing this Estoppel Certificate on behalf of Tenant hereby represents and warrants that Tenant is a duly formed and existing entity qualified to do business in California and that Tenant has full right and authority to execute and deliver this Estoppel Certificate and that each person signing on behalf of Tenant is authorized to do so.

12.    There are no actions pending against the undersigned under the bankruptcy or similar laws of the United States or any state.

13.    Other than in compliance with all Applicable Laws and incidental to the ordinary course of the use of the Premises, the undersigned has not used or stored any hazardous materials or substances in the Premises.

14.    To the undersigned's knowledge, all improvement work to be performed by Landlord under the Lease has been completed in accordance with the Lease and has been accepted by the undersigned and all reimbursements and allowances due to the undersigned under the Lease in connection with any improvement work have been paid in full.

The undersigned acknowledges that this Estoppel Certificate may be delivered to Landlord or to a prospective mortgagee or prospective purchaser, and acknowledges that said prospective mortgagee or prospective purchaser will be relying upon the statements contained herein in making the loan or acquiring the property of which the Premises is a part and that receipt by it of this certificate is a condition of making such loan or acquiring such property.

Executed at _____ on the _____ day of _____, 20__.

"Tenant":
 AH FOOD GROUP LIMITED LIABILITY COMPANY
_____,
a CA LIMITED LIABILITY COMPANY

By: *Astrid Headley Page*        1/6/2023
    AC1500A251AA478
    Its: ____MEMBER____

By: _____
    Its: ____MEMBER____

**EXHIBIT F**

**1542 N. CAHUENGA BOULEVARD**

**NOTICE OF LEASE TERM DATES**

To:    _____
        _____
        _____
        _____

Re:    Retail Lease dated _____, 20___ (the "**Lease**"), by and between _____, a _____ ("**Landlord**"), and _____, a _____ ("**Tenant**"), for _____ rentable square feet of space commonly known as Suite _____ (the "**Premises**"), located on the _____ (___) floor of that certain building located at _____, _____, _____ (the "**Building**").

Dear _____:

Notwithstanding any provision to the contrary contained in the Lease, this letter is to confirm and agree upon the following:

1.    Tenant has accepted the above-referenced Premises as being delivered in accordance with the Lease.

2.    The Lease Term shall commence on or has commenced on _____ for a term of _____ ending on _____.

3.    Rent commenced to accrue on _____, in the amount of _____.

4.    If the Lease Commencement Date is other than the first day of the month, the first billing will contain a pro rata adjustment. Each billing thereafter shall be for the full amount of the monthly installment as provided for in the Lease.

5.    Your rent checks should be made payable to _____ at _____.

6.    The rentable and usable square feet of the Premises are _____ and _____, respectively.

7.    Tenant's Share of Direct Expenses with respect to the Premises is _____% of the Project.

8.    Capitalized terms used herein that are defined in the Lease shall have the same meaning when used herein. Tenant confirms that the Lease has not been modified or altered except as set forth herein, and the Lease is in full force and effect. Landlord and Tenant acknowledge and agree that to each party's actual knowledge, neither party is in default or violation of any covenant, provision, obligation, agreement or condition in the Lease.

If the provisions of this letter correctly set forth our understanding, please so acknowledge by signing at the place provided below on the enclosed copy of this letter and returning the same to Landlord.

The parties hereto consent and agree that this letter may be signed and/or transmitted by facsimile, e-mail of a .pdf document or using electronic signature technology (e.g., via DocuSign or similar electronic signature technology), and that such signed electronic record shall be valid and as effective to bind the party so signing as a paper copy bearing such party's handwritten signature. The parties further consent and agree that (1) to the extent a party signs this letter using electronic signature technology, by clicking "SIGN", such party is signing this letter electronically, and (2) the electronic signatures appearing on this letter shall be treated, for purposes of validity, enforceability and admissibility, the same as handwritten signatures.

**"Landlord"**:

_____,

a _____

By: _____

      Name: _____

      Its: _____

By: _____

      Name: _____

      Its: _____

Agreed to and Accepted
as of _____, 20__.

**"Tenant"**:

_____,

a _____

By: _____

      Name: _____

      Its: _____

By: _____

      Name: _____

      Its: _____

**EXHIBIT G**

**APPROVED MENU**

[ATTACHED]

4861-1176-4027.5
376931.00016/1-5-23//cb

1542 N. CAHUENGA BOULEVARD

[Pink Teacup]





# The Pink Teacup

## Southern Table

*Lunch*

### Salads
(Served On Fresh Mesclun)

**Nothin' But Protein...12**
Grilled Chicken Breast w/ Walnuts, Cranberries, and Hard Boiled Eggs

**Blue Blue Sea...14**
Pan Seared Pure Blue Crab Lump Crab Cakes w/ Purple Cabbage & Home Made Blueberry Vinaigrette

**Southern Glory...11**
Fried Green Tomatoes w/ Ham Steak & Avocado

**Omega...12**
Wood Grilled Salmon w/ Hard Boiled Eggs & Avocado

**Cajun Life...14**
Cajun Boiled Crawfish & Fried Catfish w/ Peach, Raspberry Vinaigrette

### Omelette Bar $11
Choice of 3 Fillings

Mushrooms    Ham    Red Onions

Broccoli    Cheddar Cheese    Tomatoes

Bell Peppers    Black Beans    Bacon

Avocado    Feta Cheese    Baby Spinach

Smoked Salmon    Salsa    Fresh Mozzarella

Capers    Jalapeños

### Pancakes $11

Strawberry Shortcake

Carrot Cake

Blueberry Lemongrass Ricotta

Sweet Potato

Peach Cobbler Pecan

Apple Orchard

Plain

Chocolate Chunk

Pink Velvet

### Lunch Entrees

**Shrimp Po'boy...13**
Fried Jumbo Shrimp w/ Lettuce & Tomato on Toasted Whole Wheat Hoagie w/ Cayenne Mayo

**Buttermilk Fried Chicken & Biscuits ...14**
Southern Fried Chicken Breast on a Buttermilk Biscuit w/ Sausage Gravy

**Center Cut Pork Chops ...15**
Seasoned and Fried Golden served w/ French Fries & Mixed Baby Green Salad

**Birmingham BLT  13**
Maple Cured Bacon, Fried Green Tomatoes & Baby Spinach w/Cayenne Mayo

**Big Country Catfish ...13**
Battered and Fried Crispy served w/ French Fries & Mixed Baby Green Salad

**Alabama Salmon...15**
lightly Seasoned and Wood Grilled served w/ Stone Ground Cheddar Grits & Mixed Baby Greens

**Buttermilk Fried Chicken...15**
Southern Fried served w/ Mixed Baby Green Salad & French Fries

**Fried Oyster Po' Boy...14**
Cajun Seasoned, Battered and Fried on a Toasted Whole Wheat Hoagie w/ Cayenne Mayo  served w/ French Fries & Mixed Baby Green Salad

### A La Carte

| | |
|---|---|
| 6 Cheese Baked Mac...8 | Sautéed Mixed Greens...6 |
| Parmesan Fries...6 | Caramelized Butternut Squash...6 |
| Buttermilk Biscuit...3 | Sautéed Brussels Sprout...7 |
| Chicken Apple Sausage...8 | Fried Corn & Okra Succotash...6 |
| Two Eggs...7 | Avocado...4 |

### Beverages $3

| | |
|---|---|
| Sweet Tea | Strawberry Lemonade |
| Lemonade | Arnold Palmer |
| Boylans Soda's | Cucumber Mint Lemonade |
| Coke/Diet Coke | Sprite |
| Cranberry Juice | Pineapple Juice |
| Orange Juice | Apple Juice |

%20 Service Charge May Be Added To Parties of 6 or More



## The Pink Teacup

## Southern Table

### Dinner

**Appetizers**

Deviled Eggs...8

Chicken Wedge Salad...11

Fried Green Tomatoes...12

Honey Whiskey Wings...11

Grand Marnier Battered Rock Shrimp...14

Maryland Blue Crab Cakes...14

**Raw Bar** (M|P)

Oysters
Half Lobster
Chilled Crawfish
Jonah Crab Claw
Clams
Alaskan Crab Legs
Prawns

### Entrees

**Forest Rabbit...25**
Braised with maple cured bacon Served w/ Sautéed Green beans and Mushrooms & Rosemary Duck Fat Roasted Potatoes

**Apple Orchard Pork chops...23**
Grilled with Organic locally grown Apples Served w/ Garlic Mashed Potatoes & Broiled Brussels Sprout

**Pineapple Upside Down Salmon...24**
Grilled w/ Pineapples & Glazed w/ Ciroc Pineapple Reduction served w/ Grilled Radicchio & Fried Corn Okra Succotash

**Duck Pot Pie...26**
Roasted Duck Breast with Farm Fresh Vegetables in a Buttermilk Crust

**Buttermilk Southern Fried Chicken...23**
Buttermilk Dipped and Deep Fried served w/ 6 Cheese Mac & Sautéed Mixed Greens

**Stuffed Red Snapper...23**
Broiled Whole Red Snapper stuffed w/ Seasonal Vegetables served w/ Black Eye Peas & Yellow rice

**Rotisserie Herb Chicken...22**
Fresh Garden Herb Seasoned, served w/ Sautéed Mixed Greens & Caramelized Butternut Squash

**Mississippi Molasses Baby Back Ribs...25**
Burnt Molasses, Smoked and served w/ 6 Cheese Mac & Sour Cream and Chive Fries

**Baby Lamb Chops...23**
Broiled with Peach Mint Julep Coulis served w/ Sautéed Mixed Greens & Fried Corn Okra Succotash

**Buttermilk Fried Chicken & Waffle...20**
Southern Fried Chicken w/ Sweet Potato Waffle served w/ Maple Brown Sugar Butter

%20 Service Charge May Be added to Parties of 6 or more

## EXHIBIT H

## PARCELS 4 AND 5

(Legal Description)

THE LAND REFERRED TO HEREIN BELOW ("**Parcels 4 and 5**") IS SITUATED IN THE CITY OF LOS ANGELES, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 4:

THE SOUTH 20 FEET OF LOT 2 AND THE NORTH 20 FEET OF LOT 3 IN BLOCK 4 OF HOLLYWOOD, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 28 PAGES 59 AND 60 OF MISCELLANEOUS RECORDS. IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THE WEST 10 FEET THEREOF, AS CONVEYED TO THE CITY OF LOS ANGELES FOR STREET PURPOSES.

PARCEL 5:

THE EAST 171.5 FEET OF THE SOUTH 45 FEET OF LOT 3 AND THE EAST 171.5 FEET OF THE NORTH 16 FEET OF LOT 4 OF HOLLYWOOD, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 28 PAGES 59 AND 60 OF MISCELLANEOUS RECORDS. IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

1542 N. CAHUENGA BOULEVARD



[Pink Teacup]

DocuSign Envelope ID: 630CC051-31EE-4EE3-80D5-826038BA1949

**EXHIBIT I**

**FORM OF GUARANTY OF LEASE**

THIS GUARANTY OF LEASE (this "**Guaranty**") is made as of January 6, 2023, by ASTRID HEADLEY PAGE, an individual (the "**Guarantor**"), whose address is as set forth in Section 10 hereof, in favor of W-AP Cahuenga Owner VIII, L.P., a Delaware limited partnership ("**Landlord**"), whose address is as set forth in Section 10 hereof.

WHEREAS, Landlord and AH FOOD GROUP LIMITED LIABILITY COMPANY, a California limited liability company ("**Tenant**") desire to enter into that certain Retail Lease dated January 6, 2023  (the "**Lease**") concerning the premises on the ground floor, Suite  180, of the building located at 1542 N. Cahuenga Boulevard, Los Angeles, California;

WHEREAS, Guarantor has a financial interest in the Tenant; and

WHEREAS, Landlord would not execute the Lease if Guarantor did not execute and deliver to Landlord this Guaranty.

NOW, THEREFORE, for and in consideration of the execution of the foregoing Lease by Landlord and as a material inducement to Landlord to execute said Lease, Guarantor hereby absolutely, presently, continually, unconditionally and irrevocably guarantees (subject to Section 23 below) the prompt payment by Tenant of all rentals and other sums payable by Tenant under said Lease and the faithful and prompt performance by Tenant of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by Tenant, and further agrees as follows:

1.      It is specifically agreed and understood that the terms, covenants and conditions of the Lease may be altered, affected, modified, amended, compromised, released or otherwise changed by agreement between Landlord and Tenant, or by course of conduct and Guarantor does guaranty and promise to perform all of the obligations of Tenant under the Lease as so altered, affected, modified, amended, compromised, released or changed and the Lease may be assigned by or with the consent of Landlord or any assignee of Landlord without consent or notice to Guarantor and that this Guaranty shall thereupon and thereafter guaranty the performance of said Lease as so changed, modified, amended, compromised, released, altered or assigned.

2.      This Guaranty shall not be released, modified or affected by failure or delay on the part of Landlord to enforce any of the rights or remedies of Landlord under the Lease, whether pursuant to the terms thereof or at law or in equity, or by any release of any person liable under the terms of the Lease (including, without limitation, Tenant) or any other guarantor, including without limitation, any other Guarantor named herein, from any liability with respect to Guarantor's obligations hereunder.

3.      Subject to Section 23 below, Guarantor's liability under this Guaranty shall continue until all rents due under the Lease have been paid in full in cash and until all other obligations to Landlord have been satisfied, and shall not be reduced by virtue of any payment by Tenant of any amount due under the Lease.  If all or any portion of Tenant's obligations under the Lease is paid or performed by Tenant, the obligations of Guarantor hereunder shall continue and remain in full force and effect in the event that all or any part of such payment(s) or performance(s) is avoided or recovered directly or indirectly from Landlord as a preference, fraudulent transfer or otherwise.

4.      Guarantor warrants and represents to Landlord that Guarantor now has and will continue to have full and complete access to any and all information concerning the Lease, the value of the assets owned or to be acquired by Tenant, Tenant's financial status and its ability to pay and perform the obligations owed to Landlord under the Lease.  Guarantor further warrants and represents that Guarantor has reviewed and approved copies of the Lease and is fully informed of the remedies Landlord may pursue, with or without notice to Tenant, in the event of default under the Lease.  So long as any of the Guarantor's obligations hereunder remains unsatisfied or owing to Landlord, Guarantor shall keep fully informed as to all aspects of Tenant's financial condition and the performance of said obligations.

5.      Guarantor hereby covenants and agrees with Landlord that if a default shall at any time occur in the payment of any sums due under the Lease by Tenant or in the performance of any other obligation of Tenant under the Lease (including, without limitation, during any eviction moratorium, to the extent allowed by applicable laws), Guarantor shall and will forthwith upon demand pay such sums and any arrears thereof, to Landlord in legal currency of the United States of America for payment of public and private debts, and take all other actions necessary to cure such default and perform such obligations of Tenant.

6.      The liability of Guarantor under this Guaranty is a guaranty of payment and performance and not of collectibility, and is not conditioned or contingent upon the genuineness, validity, regularity or enforceability of the Lease or the pursuit by Landlord of any remedies which it now has or may hereafter have with respect thereto, at law, in equity or otherwise.

7.      Guarantor hereby waives and agrees not to assert or take advantage of to the extent permitted by law:  (i) all notices to Guarantor, to Tenant, or to any other person, including, but not limited to, notices of the acceptance of this Guaranty or the creation, renewal, extension, assignment, modification or accrual of any of the obligations owed to Landlord under the Lease and, except to the extent set forth in Section 9 hereof, enforcement of any right or remedy with respect thereto, and notice of any other matters relating thereto; (ii) notice of acceptance of this Guaranty; (iii) demand of payment, presentation and protest; (iv) any right to require Landlord to apply to any default any security deposit or other security it may hold under the Lease; (v) any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof; (vi) any right or defense that may arise by reason of the incapability, lack of authority, death or disability of Tenant or any other person; (vii) all principles or provisions of law which conflict with the terms of this Guaranty, and (viii) any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 through 2855, inclusive, of the California Civil Code.  Guarantor

further agrees that Landlord may enforce this Guaranty upon the occurrence of a default under the Lease, notwithstanding any dispute between Landlord and Tenant with respect to the existence of said default or performance of the obligations under the Lease or any counterclaim, set-off or other claim which Tenant may allege against Landlord with respect thereto. Moreover, Guarantor agrees that Guarantor's obligations shall not be affected by any circumstances which constitute a legal or equitable discharge of a guarantor or surety.

8.      Guarantor agrees that Landlord may enforce this Guaranty without the necessity of proceeding against Tenant or any other guarantor. Guarantor hereby waives the right to require Landlord to proceed against Tenant, to proceed against any other guarantor, to exercise any right or remedy under the Lease or to pursue any other remedy or to enforce any other right.

9.      (a)      Guarantor agrees that nothing contained herein shall prevent Landlord from suing on the Lease or from exercising any rights available to it thereunder and that the exercise of any of the aforesaid rights shall not constitute a legal or equitable discharge of Guarantor. Without limiting the generality of the foregoing, Guarantor hereby expressly waives any and all benefits under California Civil Code § § 2809, 2810, 2815, 2819, 2821, 2822, 2824, 2839, 2845, 2847, 2848, 2849, 2850, 2855, 2899 and 3433. In addition, Guarantor agrees that Landlord (not Tenant) shall have the right to designate the portion of Tenant's obligations under the Lease that is satisfied by a partial payment by Tenant.

(b)      Guarantor agrees that Guarantor shall have no right of subrogation against Tenant or any right of contribution against any other guarantor unless and until all amounts due under the Lease have been paid in full and all other obligations under the Lease have been satisfied. Guarantor further agrees that, to the extent the waiver of Guarantor's rights of subrogation and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation Guarantor may have against Tenant shall be junior and subordinate to any rights Landlord may have against Tenant, and any rights of contribution Guarantor may have against any other guarantor shall be junior and subordinate to any rights Landlord may have against such other guarantor.

(c)      The obligations of Guarantor under this Guaranty shall not be altered, limited or affected by any case, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Tenant or any defense which Tenant may have by reason of order, decree or decision of any court or administrative body resulting from any such case. Landlord shall have the sole right to accept or reject any plan on behalf of Guarantor proposed in such case and to take any other action which Guarantor would be entitled to take, including, without limitation, the decision to file or not file a claim. Guarantor acknowledges and agrees that any payment which accrues with respect to Tenant's obligations under the Lease (including, without limitation, the payment of rent) after the commencement of any such proceeding (or, if any such payment ceases to accrue by operation of law by reason of the commencement of such proceeding, such payment as would have accrued if said proceedings had not been commenced) shall be included in Guarantor's obligations hereunder because it is the intention of the parties that said obligations should be determined without regard to any rule or law or order which may relieve Tenant of any of its obligations under the Lease. Guarantor hereby permits any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person to pay Landlord, or allow the claim of Landlord in respect of, any such payment accruing after the date on which such proceeding is commenced. Guarantor hereby assigns to Landlord Guarantor's right to receive any payments from any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person by way of dividend, adequate protection payment or otherwise.

10.      Any notice, statement, demand, consent, approval or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this Guaranty or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Guaranty) and shall be deemed to have been properly given, rendered or made only if hand-delivered or sent by first-class mail, postage pre-paid, addressed to the other party at its respective address set forth below, and shall be deemed to have been given, rendered or made on the day it is hand-delivered or one day after it is mailed, unless it is mailed outside of Los Angeles County, California, in which case it shall be deemed to have been given, rendered or made on the third business day after the day it is mailed. By giving notice as provided above, either party may designate a different address for notices, statements, demands, consents, approvals or other communications intended for it.

To Guarantor:

Astrid Headley
1114 Myron Street
Uniondale, New York 11553

To Landlord:

W-AP Cahuenga Owner VIII, L.P.
c/o Walton Street Capital, LLC
900 North Michigan Avenue, 19th Floor
Chicago, IL 60611
Attention: Mr. James Holmes

and

Artisan Ventures LLC
2415 Main Street
Santa Monica, CA 90405
Attention: Mark Laderman & Collin Komae

and

EXHIBIT I
-2-

1542 N. CAHUENGA BOULEVARD



[Pink Teacup]

Allen Matkins Leck Gamble Mallory & Natsis LLP
1901 Avenue of the Stars, Suite 1800
Los Angeles, CA 90067
Attention:  John M. Tipton, Esq.

11.    Guarantor represents and warrants to Landlord as follows:

(a)    No consent of any other person, including, without limitation, any creditors of Guarantor, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by Guarantor in connection with this Guaranty or the execution, delivery, performance, validity or enforceability of this Guaranty and all obligations required hereunder.  This Guaranty has been duly executed and delivered by Guarantor, and constitutes the legally valid and binding obligation of Guarantor enforceable against such Guarantor in accordance with its terms.

(b)    The execution, delivery and performance of this Guaranty will not violate any provision of any existing law or regulation binding on Guarantor, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on Guarantor, or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which Guarantor is a party or by which Guarantor or any of Guarantor's assets may be bound, and will not result in, or require, the creation or imposition of any lien on any of Guarantor's property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract, or other agreement, instrument or undertaking.

12.    The obligations of Tenant under the Lease to execute and deliver estoppel statements, as therein provided, shall be deemed to also require the Guarantor hereunder to do and provide the same relative to Guarantor.

13.    This Guaranty shall be binding upon Guarantor, Guarantor's heirs, representatives, administrators, executors, successors and assigns and shall inure to the benefit of and shall be enforceable by Landlord, its successors, endorsees and assigns.  Any married person executing this Guaranty agrees that recourse may be had against community assets and against his separate property for the satisfaction of all obligations herein guaranteed.  As used herein, the singular shall include the plural, and the masculine shall include the feminine and neuter and vice versa, if the context so requires.

14.    The term "**Landlord**" whenever used herein refers to and means the Landlord specifically named in the Lease and also any assignee of said Landlord, whether by outright assignment or by assignment for security, and also any successor to the interest of said Landlord or of any assignee in the Lease or any part thereof, whether by assignment or otherwise.  So long as the Landlord's interest in or to the Premises (as that term is used in the Lease) or the rents, issues and profits therefrom, or in, to or under the Lease, are subject to any mortgage or deed of trust or assignment for security, no acquisition by Guarantor of the Landlord's interest in the Premises or under the Lease shall affect the continuing obligations of Guarantor under this Guaranty, which obligations shall continue in full force and effect for the benefit of the mortgagee, beneficiary, trustee or assignee under such mortgage, deed of trust or assignment, or any purchaser at sale by judicial foreclosure or under private power of sale, and of the successors and assigns of any such mortgagee, beneficiary, trustee, assignee or purchaser.

15.    The term "**Tenant**" whenever used herein refers to and means the Tenant in the Lease specifically named and also any assignee or sublessee of said Lease and also any successor to the interests of said Tenant, assignee or sublessee of such Lease or any part thereof, whether by assignment, sublease or otherwise.

16.    In the event of any dispute or litigation regarding the enforcement or validity of this Guaranty, Guarantor shall be obligated to pay all charges, costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by Landlord, whether or not any action or proceeding is commenced regarding such dispute and whether or not such litigation is prosecuted to judgment.

17.    This Guaranty shall be governed by and construed in accordance with the laws of the State of California, and in a case involving diversity of citizenship, shall be litigated in and subject to the jurisdiction of the courts of California.

18.    Every provision of this Guaranty is intended to be severable.  In the event any term or provision hereof is declared to be illegal or invalid for any reason whatsoever by a court of competent jurisdiction, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

19.    This Guaranty may be executed in any number of counterparts each of which shall be deemed an original and all of which shall constitute one and the same Guaranty with the same effect as if all parties had signed the same signature page.  Any signature page of this Guaranty may be detached from any counterpart of this Guaranty and re-attached to any other counterpart of this Guaranty identical in form hereto but having attached to it one or more additional signature pages.

20.    No failure or delay on the part of Landlord to exercise any power, right or privilege under this Guaranty shall impair any such power, right or privilege, or be construed to be a waiver of any default or any acquiescence therein, nor shall any single or partial exercise of such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

21.    This Guaranty shall constitute the entire agreement between Guarantor and the Landlord with respect to the subject matter hereof.  No provision of this Guaranty or right of Landlord hereunder may be waived nor may Guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Landlord.

22.    The liability of Guarantor and all rights, powers and remedies of Landlord hereunder and under any other agreement now or at any time hereafter in force between Landlord and Guarantor relating to the Lease shall

4861-1176-4027.5
376931.00016/1-5-23//cb

EXHIBIT I
-3-

1542 N. CAHUENGA BOULEVARD

[Pink Teacup]

be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Landlord by law.

      23.     Provided that, if, as of the thirty-sixth (36th) anniversary of the Lease Commencement Date, Tenant has not previously been nor is Tenant then in breach or in default under the Lease, this Guaranty shall be of no further force or effect as of such date.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the day and year first above written.

"GUARANTOR"

*Astrid Headley Page*

AC1500A251AA470...

ASTRID HEADLEY PAGE, an individual

Social Security Number: 795018794

**CONSENT OF SPOUSE**

     I acknowledge that I have read the entirety of the Office Lease to which this Consent of Spouse is attached, and the above Guaranty of Lease by my lawful spouse, Astrid Headley Page ("**My Spouse**"), and that I hereby consent to the execution of the Guaranty by My Spouse. I am aware that the obligations of My Spouse as Guarantor under the Guaranty are the obligations of the community and that my community and marital property interests (and certain other property interests) may be reached to satisfy those obligations. I have consulted with an attorney or have had the opportunity to do so prior to signing this consent.

By:_____

Date of Execution:_____

Print Name: _____,

          Spouse of Astrid Headley Page

4861-1176-4027.5
376931.00016/1-5-23//cb

EXHIBIT I
-4-

1542 N. CAHUENGA BOULEVARD

[Pink Teacup]

DocuSign Envelope ID: 630CC051-31EE-4EE3-80D5-826038BA1949

**RETAIL LEASE**

**1542 N. CAHUENGA BOULEVARD**

W-AP Cahuenga Owner VIII, L.P.,

a Delaware limited partnership,

as Landlord,

and

AH FOOD GROUP LIMITED LIABILITY COMPANY,

a California limited liability company,

as Tenant.

4861-1176-4027.5
376931.00016/1-5-23//cb

1542 N. CAHUENGA BOULEVARD



[Pink Teacup]

## TABLE OF CONTENTS

Page

ARTICLE 1    PREMISES, BUILDING, PROJECT, AND COMMON AREAS ...................................................... 1

ARTICLE 2    LEASE TERM; OPTION TERM ......................................................................................... 1

ARTICLE 3    RENT ......................................................................................................................... 2

ARTICLE 4    ADDITIONAL RENT...................................................................................................... 3

ARTICLE 5    USE OF PREMISES ...................................................................................................... 4

ARTICLE 6    SERVICES AND UTILITIES ............................................................................................ 6

ARTICLE 7    REPAIRS .................................................................................................................... 7

ARTICLE 8    ADDITIONS AND ALTERATIONS.................................................................................... 8

ARTICLE 9    COVENANT AGAINST LIENS......................................................................................... 9

ARTICLE 10   INDEMNIFICATION AND INSURANCE ............................................................................ 9

ARTICLE 11   DAMAGE AND DESTRUCTION..................................................................................... 11

ARTICLE 12   NONWAIVER.............................................................................................................. 12

ARTICLE 13   CONDEMNATION ...................................................................................................... 12

ARTICLE 14   ASSIGNMENT AND SUBLETTING................................................................................. 13

ARTICLE 15   SURRENDER OF PREMISES; OWNERSHIP AND  REMOVAL OF TRADE FIXTURES ........... 14

ARTICLE 16   HOLDING OVER ........................................................................................................ 15

ARTICLE 17   ESTOPPEL CERTIFICATES.......................................................................................... 15

ARTICLE 18   SUBORDINATION ...................................................................................................... 15

ARTICLE 19   DEFAULTS; REMEDIES .............................................................................................. 16

ARTICLE 20   COVENANT OF QUIET ENJOYMENT............................................................................. 17

ARTICLE 21   SECURITY DEPOSIT .................................................................................................. 17

ARTICLE 22   SUBSTITUTION OF OTHER PREMISES ......................................................................... 18

ARTICLE 23   SIGNS...................................................................................................................... 18

ARTICLE 24   COMPLIANCE WITH LAW ........................................................................................... 19

ARTICLE 25   LATE CHARGES ........................................................................................................ 19

ARTICLE 26   LANDLORD'S RIGHT TO CURE DEFAULT; PAYMENTS BY TENANT .................................. 19

ARTICLE 27   ENTRY BY LANDLORD ............................................................................................... 20

ARTICLE 28   TENANT PARKING ..................................................................................................... 20

ARTICLE 29   MISCELLANEOUS PROVISIONS................................................................................... 21

EXHIBITS

A    OUTLINE OF PREMISES
B    INTENTIONALLY OMITTED
C    OPERATING EXPENSE DEFINITIONS AND CALCULATION PROCEDURES
D    RULES AND REGULATIONS
E    FORM OF TENANT ESTOPPEL CERTIFICATE
F    NOTICE OF LEASE TERM DATES
G    APPROVED MENU
H    PARCELS 4 AND 5
I    FORM OF GUARANTY OF LEASE

1542 N. CAHUENGA BOULEVARD

[Pink Teacup]

**INDEX**

Page(s)

Abatement Event ............................................................................................................. 8
Accountant ..................................................................................................................... 5
Additional Notice ............................................................................................................ 8
Additional Rent ............................................................................................................... 4
Alterations ...................................................................................................................... 9
Alternative Electricity ...................................................................................................... 7
Applicable Laws ............................................................................................................ 21
Audit Period ................................................................................................................... 4
Bank Prime Loan ........................................................................................................... 21
Base Building ................................................................................................................. 9
Base Rent ...................................................................................................................... 3
Base Rent Abatement .................................................................................................... 3
Base Rent Abatement Period ......................................................................................... 3
BOMA ............................................................................................................................ 3
Broker ........................................................................................................................... 24
Building ......................................................................................................................... 1
Building Common Areas, ................................................................................................ 1
Casualty ........................................................................................................................ 13
CC&Rs ........................................................................................................................... 6
CDC .............................................................................................................................. 3
Common Areas .............................................................................................................. 1
Comparable Transactions .............................................................................................. 2
Concessions................................................................................................................... 2
Contingency Date .......................................................................................................... 3
Control........................................................................................................................... 16
Cosmetic Alterations ..................................................................................................... 9
Cost Pools ........................................................................................................*Exhibit C*
Direct Expenses ...............................................................................................*Exhibit C*
Estimate ...........................................................................................................*Exhibit C*
Estimate Statement ..........................................................................................*Exhibit C*
Estimated Direct Expenses ..............................................................................*Exhibit C*
Event of Default ............................................................................................................. 17
Excess...............................................................................................................*Exhibit C*
Exercise Notice .............................................................................................................. 2
Expense Year ...................................................................................................*Exhibit C*
Force Majeure ............................................................................................................... 23
Gross Sales.................................................................................................................... 7
Guidelines ..................................................................................................................... 3
HVAC ............................................................................................................................ 8
Identification Requirements ........................................................................................... 25
Initial Notice .................................................................................................................. 8
Interest Rate.................................................................................................................. 21
Landlord ........................................................................................................................ 1
Landlord Parties ............................................................................................................ 11
Landlord Repair Notice .................................................................................................. 13
Landlord Response Date ................................................................................................ 2
Landlord Response Notice.............................................................................................. 2
Landlord's Option Rent Calculation ............................................................................... 2
Lease ............................................................................................................................. 1
Lease Commencement Date ........................................................................................... 1
Lease Expiration Date..................................................................................................... 1
Lease Month .................................................................................................................. 2
Lease Term .................................................................................................................... 1
Lease Year ..................................................................................................................... 1
LEED ............................................................................................................................. 1
Lines.............................................................................................................................. 25
Liquor Licenses .............................................................................................................. 6
Market Rent................................................................................................................... 2
Notices .......................................................................................................................... 24
Operating Expenses ....................................................................................................... 1
Option Rent.................................................................................................................... 2
Option Term .................................................................................................................. 2
Original Improvements................................................................................................... 11
Original Tenant .............................................................................................................. 2
OSHA ............................................................................................................................ 3
Other Improvements ...................................................................................................... 25
Parcels 4 and 5 .............................................................................................................. 2
Parking Area, ................................................................................................................. 21
Parking Operator............................................................................................................ 22
Permit Contingency........................................................................................................ 3
Permitted Assignee ........................................................................................................ 5
Permitted Transferee Assignee ...................................................................................... 16

**Page(s)**

Permitted Transferees ................................................................................................ 16
Permitted Use ............................................................................................................. 2
Premises ..................................................................................................................... 1
Premises HVAC .......................................................................................................... 8
Project Common Areas, .............................................................................................. 1
Proposition 13 ................................................................................................. Exhibit C
Ratification Notice ....................................................................................................... 2
Renovations .............................................................................................................. 25
rent ........................................................................................................................... 18
Rent. ........................................................................................................................... 4
Rules and Regulations ................................................................................................ 6
Secured Property ...................................................................................................... 16
Security Deposit ........................................................................................................ 19
Signs ......................................................................................................................... 20
Statement ....................................................................................................... Exhibit C
Subject Space ........................................................................................................... 14
Summary ..................................................................................................................... 1
Tax Expenses ................................................................................................. Exhibit C
TCCs ........................................................................................................................... 1
Tenant ......................................................................................................................... 1
Tenant Parties ........................................................................................................... 11
Tenant's Option Rent Calculation ............................................................................... 2
Tenant's Share ................................................................................................ Exhibit C
Tenant's Tax Share ......................................................................................... Exhibit C
Third Party Contractor ............................................................................................... 12
Transfer ..................................................................................................................... 15
Transfer Premium ...................................................................................................... 15
Transferee ................................................................................................................. 14
Transfers ................................................................................................................... 14

4861-1176-4027.5
376931.00016/1-5-23//cb

1542 N. CAHUENGA BOULEVARD

[Pink Teacup]

# Exhibit 2

## GUARANTY OF LEASE

THIS GUARANTY OF LEASE (this "**Guaranty**") is made as of January 6, 2023, by ASTRID HEADLEY PAGE, an individual (the "**Guarantor**"), whose address is as set forth in <u>Section 10</u> hereof, in favor of W-AP Cahuenga Owner VIII, L.P., a Delaware limited partnership ("**Landlord**"), whose address is as set forth in <u>Section 10</u> hereof.

WHEREAS, Landlord and AH FOOD GROUP LIMITED LIABILITY COMPANY, a California limited liability company ("**Tenant**") desire to enter into that certain Retail Lease dated January 6, 2023  (the "**Lease**") concerning the premises on the ground floor, Suite  180, of the building located at 1542 N. Cahuenga Boulevard, Los Angeles, California;

WHEREAS, Guarantor has a financial interest in the Tenant; and

WHEREAS, Landlord would not execute the Lease if Guarantor did not execute and deliver to Landlord this Guaranty.

NOW, THEREFORE, for and in consideration of the execution of the foregoing Lease by Landlord and as a material inducement to Landlord to execute said Lease, Guarantor hereby absolutely, presently, continually, unconditionally and irrevocably guarantees (subject to <u>Section 23</u> below) the prompt payment by Tenant of all rentals and other sums payable by Tenant under said Lease and the faithful and prompt performance by Tenant of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by Tenant, and further agrees as follows:

1.      It is specifically agreed and understood that the terms, covenants and conditions of the Lease may be altered, affected, modified, amended, compromised, released or otherwise changed by agreement between Landlord and Tenant, or by course of conduct and Guarantor does guaranty and promise to perform all of the obligations of Tenant under the Lease as so altered, affected, modified, amended, compromised, released or changed and the Lease may be assigned by or with the consent of Landlord or any assignee of Landlord without consent or notice to Guarantor and that this Guaranty shall thereupon and thereafter guaranty the performance of said Lease as so changed, modified, amended, compromised, released, altered or assigned.

2.      This Guaranty shall not be released, modified or affected by failure or delay on the part of Landlord to enforce any of the rights or remedies of Landlord under the Lease, whether pursuant to the terms thereof or at law or in equity, or by any release of any person liable under the terms of the Lease (including, without limitation, Tenant) or any other guarantor, including without limitation, any other Guarantor named herein, from any liability with respect to Guarantor's obligations hereunder.

3.      Subject to <u>Section 23</u> below, Guarantor's liability under this Guaranty shall continue until all rents due under the Lease have been paid in full in cash and until all other obligations to Landlord have been satisfied, and shall not be reduced by virtue of any payment by Tenant of any amount due under the Lease.  If all or any portion of Tenant's obligations under the Lease is paid or performed by Tenant, the obligations of Guarantor hereunder shall continue and remain in full force and effect in the event that all or any part of such payment(s) or performance(s) is avoided or recovered directly or indirectly from Landlord as a preference, fraudulent transfer or otherwise.

4.      Guarantor warrants and represents to Landlord that Guarantor now has and will continue to have full and complete access to any and all information concerning the Lease, the value of the assets owned or to be acquired by Tenant, Tenant's financial status and its ability to pay and perform the obligations owed to Landlord under the Lease.  Guarantor further warrants and represents that Guarantor has reviewed and approved copies of the Lease and is fully informed of the remedies Landlord may pursue, with or without notice to Tenant, in the event of default under the Lease.  So long as any of the Guarantor's obligations hereunder remains unsatisfied or owing to Landlord, Guarantor shall keep fully informed as to all aspects of Tenant's financial condition and the performance of said obligations.

5.      Guarantor hereby covenants and agrees with Landlord that if a default shall at any time occur in the payment of any sums due under the Lease by Tenant or in the performance of any other obligation of Tenant under the Lease (including, without limitation, during any eviction moratorium, to the extent allowed by applicable laws), Guarantor shall and will forthwith upon demand pay such sums and any arrears thereof, to Landlord in legal currency of the United States of America for payment of public and private debts, and take all other actions necessary to cure such default and perform such obligations of Tenant.

6.      The liability of Guarantor under this Guaranty is a guaranty of payment and performance and not of collectibility, and is not conditioned or contingent upon the genuineness, validity, regularity or enforceability of the Lease or the pursuit by Landlord of any remedies which it now has or may hereafter have with respect thereto, at law, in equity or otherwise.

7.      Guarantor hereby waives and agrees not to assert or take advantage of to the extent permitted by law:  (i) all notices to Guarantor, to Tenant, or to any other person, including, but not limited to, notices of the acceptance of this Guaranty or the creation, renewal, extension, assignment, modification or accrual of any of the obligations owed to Landlord under the Lease and, except to the extent set forth in <u>Section 9</u> hereof, enforcement of any right or remedy with respect thereto, and notice of any other matters relating thereto; (ii) notice of acceptance of this Guaranty; (iii) demand of payment, presentation and protest; (iv) any right to require Landlord to apply to any default any security deposit or other security it may hold under the Lease; (v) any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof; (vi) any right or defense that may arise by reason of the incapability, lack of authority, death or disability of Tenant or any other person; (vii) all principles or provisions of law which conflict with the terms of this Guaranty, and (viii) any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 through 2855, inclusive, of the California Civil Code.  Guarantor

1542 N. CAHUENGA BOULEVARD



[Pink Teacup]

further agrees that Landlord may enforce this Guaranty upon the occurrence of a default under the Lease, notwithstanding any dispute between Landlord and Tenant with respect to the existence of said default or performance of the obligations under the Lease or any counterclaim, set-off or other claim which Tenant may allege against Landlord with respect thereto. Moreover, Guarantor agrees that Guarantor's obligations shall not be affected by any circumstances which constitute a legal or equitable discharge of a guarantor or surety.

8.      Guarantor agrees that Landlord may enforce this Guaranty without the necessity of proceeding against Tenant or any other guarantor. Guarantor hereby waives the right to require Landlord to proceed against Tenant, to proceed against any other guarantor, to exercise any right or remedy under the Lease or to pursue any other remedy or to enforce any other right.

9.      (a)      Guarantor agrees that nothing contained herein shall prevent Landlord from suing on the Lease or from exercising any rights available to it thereunder and that the exercise of any of the aforesaid rights shall not constitute a legal or equitable discharge of Guarantor. Without limiting the generality of the foregoing, Guarantor hereby expressly waives any and all benefits under California Civil Code § § 2809, 2810, 2815, 2819, 2821, 2822, 2824, 2839, 2845, 2847, 2848, 2849, 2850, 2855, 2899 and 3433. In addition, Guarantor agrees that Landlord (not Tenant) shall have the right to designate the portion of Tenant's obligations under the Lease that is satisfied by a partial payment by Tenant.

(b)      Guarantor agrees that Guarantor shall have no right of subrogation against Tenant or any right of contribution against any other guarantor unless and until all amounts due under the Lease have been paid in full and all other obligations under the Lease have been satisfied. Guarantor further agrees that, to the extent the waiver of Guarantor's rights of subrogation and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation Guarantor may have against Tenant shall be junior and subordinate to any rights Landlord may have against Tenant, and any rights of contribution Guarantor may have against any other guarantor shall be junior and subordinate to any rights Landlord may have against such other guarantor.

(c)      The obligations of Guarantor under this Guaranty shall not be altered, limited or affected by any case, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Tenant or any defense which Tenant may have by reason of order, decree or decision of any court or administrative body resulting from any such case. Landlord shall have the sole right to accept or reject any plan on behalf of Guarantor proposed in such case and to take any other action which Guarantor would be entitled to take, including, without limitation, the decision to file or not file a claim. Guarantor acknowledges and agrees that any payment which accrues with respect to Tenant's obligations under the Lease (including, without limitation, the payment of rent) after the commencement of any such proceeding (or, if any such payment ceases to accrue by operation of law by reason of the commencement of such proceeding, such payment as would have accrued if said proceedings had not been commenced) shall be included in Guarantor's obligations hereunder because it is the intention of the parties that said obligations should be determined without regard to any rule or law or order which may relieve Tenant of any of its obligations under the Lease. Guarantor hereby permits any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person to pay Landlord, or allow the claim of Landlord in respect of, any such payment accruing after the date on which such proceeding is commenced. Guarantor hereby assigns to Landlord Guarantor's right to receive any payments from any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person by way of dividend, adequate protection payment or otherwise.

10.      Any notice, statement, demand, consent, approval or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this Guaranty or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Guaranty) and shall be deemed to have been properly given, rendered or made only if hand-delivered or sent by first-class mail, postage pre-paid, addressed to the other party at its respective address set forth below, and shall be deemed to have been given, rendered or made on the day it is hand-delivered or one day after it is mailed, unless it is mailed outside of Los Angeles County, California, in which case it shall be deemed to have been given, rendered or made on the third business day after the day it is mailed. By giving notice as provided above, either party may designate a different address for notices, statements, demands, consents, approvals or other communications intended for it.

To Guarantor:

Astrid Headley
1114 Myron Street
Uniondale, New York 11553

To Landlord:          W-AP Cahuenga Owner VIII, L.P.
c/o Walton Street Capital, LLC
900 North Michigan Avenue, 19th Floor
Chicago, IL 60611
Attention: Mr. James Holmes

and

Artisan Ventures LLC
2415 Main Street
Santa Monica, CA 90405
Attention: Mark Laderman & Collin Komae

and

1542 N. CAHUENGA BOULEVARD
[Pink Teacup]



Allen Matkins Leck Gamble Mallory & Natsis LLP
1901 Avenue of the Stars, Suite 1800
Los Angeles, CA 90067
Attention:  John M. Tipton, Esq.

11.    Guarantor represents and warrants to Landlord as follows:

(a)    No consent of any other person, including, without limitation, any creditors of Guarantor, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by Guarantor in connection with this Guaranty or the execution, delivery, performance, validity or enforceability of this Guaranty and all obligations required hereunder.  This Guaranty has been duly executed and delivered by Guarantor, and constitutes the legally valid and binding obligation of Guarantor enforceable against such Guarantor in accordance with its terms.

(b)    The execution, delivery and performance of this Guaranty will not violate any provision of any existing law or regulation binding on Guarantor, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on Guarantor, or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which Guarantor is a party or by which Guarantor or any of Guarantor's assets may be bound, and will not result in, or require, the creation or imposition of any lien on any of Guarantor's property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract, or other agreement, instrument or undertaking.

12.    The obligations of Tenant under the Lease to execute and deliver estoppel statements, as therein provided, shall be deemed to also require the Guarantor hereunder to do and provide the same relative to Guarantor.

13.    This Guaranty shall be binding upon Guarantor, Guarantor's heirs, representatives, administrators, executors, successors and assigns and shall inure to the benefit of and shall be enforceable by Landlord, its successors, endorsees and assigns.  Any married person executing this Guaranty agrees that recourse may be had against community assets and against his separate property for the satisfaction of all obligations herein guaranteed. As used herein, the singular shall include the plural, and the masculine shall include the feminine and neuter and vice versa, if the context so requires.

14.    The term "**Landlord**" whenever used herein refers to and means the Landlord specifically named in the Lease and also any assignee of said Landlord, whether by outright assignment or by assignment for security, and also any successor to the interest of said Landlord or of any assignee in the Lease or any part thereof, whether by assignment or otherwise.  So long as the Landlord's interest in or to the Premises (as that term is used in the Lease) or the rents, issues and profits therefrom, or in, to or under the Lease, are subject to any mortgage or deed of trust or assignment for security, no acquisition by Guarantor of the Landlord's interest in the Premises or under the Lease shall affect the continuing obligations of Guarantor under this Guaranty, which obligations shall continue in full force and effect for the benefit of the mortgagee, beneficiary, trustee or assignee under such mortgage, deed of trust or assignment, or any purchaser at sale by judicial foreclosure or under private power of sale, and of the successors and assigns of any such mortgagee, beneficiary, trustee, assignee or purchaser.

15.    The term "**Tenant**" whenever used herein refers to and means the Tenant in the Lease specifically named and also any assignee or sublessee of said Lease and also any successor to the interests of said Tenant, assignee or sublessee of such Lease or any part thereof, whether by assignment, sublease or otherwise.

16.    In the event of any dispute or litigation regarding the enforcement or validity of this Guaranty, Guarantor shall be obligated to pay all charges, costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by Landlord, whether or not any action or proceeding is commenced regarding such dispute and whether or not such litigation is prosecuted to judgment.

17.    This Guaranty shall be governed by and construed in accordance with the laws of the State of California, and in a case involving diversity of citizenship, shall be litigated in and subject to the jurisdiction of the courts of California.

18.    Every provision of this Guaranty is intended to be severable.  In the event any term or provision hereof is declared to be illegal or invalid for any reason whatsoever by a court of competent jurisdiction, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

19.    This Guaranty may be executed in any number of counterparts each of which shall be deemed an original and all of which shall constitute one and the same Guaranty with the same effect as if all parties had signed the same signature page.  Any signature page of this Guaranty may be detached from any counterpart of this Guaranty and re-attached to any other counterpart of this Guaranty identical in form hereto but having attached to it one or more additional signature pages.

20.    No failure or delay on the part of Landlord to exercise any power, right or privilege under this Guaranty shall impair any such power, right or privilege, or be construed to be a waiver of any default or any acquiescence therein, nor shall any single or partial exercise of such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

21.    This Guaranty shall constitute the entire agreement between Guarantor and the Landlord with respect to the subject matter hereof.  No provision of this Guaranty or right of Landlord hereunder may be waived nor may Guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Landlord.

22.    The liability of Guarantor and all rights, powers and remedies of Landlord hereunder and under any other agreement now or at any time hereafter in force between Landlord and Guarantor relating to the Lease shall

1542 N. CAHUENGA BOULEVARD



[Pink Teacup]

be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Landlord by law.

23.     Provided that, if, as of the thirty-sixth (36th) anniversary of the Lease Commencement Date, Tenant has not previously been nor is Tenant then in breach or in default under the Lease, this Guaranty shall be of no further force or effect as of such date.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the day and year first above written.

"GUARANTOR"

DocuSigned by:

*Astrid Headley Page*

AC1500A251AA478...

ASTRID HEADLEY PAGE, an individual

Social Security Number: 795018794

**CONSENT OF SPOUSE**

I acknowledge that I have read the entirety of the Office Lease to which this Consent of Spouse is attached, and the above Guaranty of Lease by my lawful spouse, Astrid Headley Page ("**My Spouse**"), and that I hereby consent to the execution of the Guaranty by My Spouse.  I am aware that the obligations of My Spouse as Guarantor under the Guaranty are the obligations of the community and that my community and marital property interests (and certain other property interests) may be reached to satisfy those obligations.  I have consulted with an attorney or have had the opportunity to do so prior to signing this consent.

By:_____

Date of Execution:_____

Print Name: _____,

Spouse of Astrid Headley Page

Exhibit 3

**1520 Cahuenga Blvd.**
Monthly Parking Agreement and Update Information

Send completed agreements via email to **galvarez@lazparking.com**    For questions please call Facility Manager 818-579-2259

| **Effective date** | | Non-overnight Month to Month Pass<br>⊗ Unreserved $200.00<br>◯ Reserved $350.00 |
|---|---|---|
| Charges will start on effective date. Proration can only be done after the 15th for adding a new parker. | | $ _____ |

**Action Requested:**    New Parker [X]    Update ONLY [ ]    Parker Change [ ]

Replacement Pass [ ]

Replacing (name): _____

Additional information and/or terms requested

Replacing Card Tag# _____    New Card Tag# _____

Manager Approved:    Yes    No

## COMPANY/ PARKERS INFORMATION

| Company Name (or Self Parker) | Authorized Contact Name | Contact Phone # |
|---|---|---|
| PTC Villa | Lawrence Page | ( 310 ) 619 - 3338 |

| Billing Address          Suite/Apt # | Authorized Contact E-mail |
|---|---|
| 1542 N Cahuenga Blvd, Los Angeles CA 90028 | lpfilms@yahoo.com |

## INDIVIDUAL INFORMATION

| Parkers Name | Phone # |
|---|---|
| Lawrence Page | ( 310 ) 619 - 3338 |

## VEHICLE INFORMATION

| First Vehicle: Make | Model | Color | Lic. Plate # or VIN | Second Vehicle: Make | Model | Color | Lic. Plate # or VIN |
|---|---|---|---|---|---|---|---|
| Chevrolet | Corvette | Grey | AL47ZA | | | | |
| Third Vehicle: Make | Model | Color | Lic. Plate # or VIN | Fourth Vehicle: Make | Model | Color | Lic. Plate # or VIN |
| | | | | | | | |

## PARKING RULES & REGULATIONS

* Monthly parking fees are due the first (1st) of every month. After the fifth (5th) business day of the month, parking privileges are subject to cancellation and a 10% late fee will be applied. NO deductions or allowances from the monthly rate will be made for days customer does not use parking facility.
* Payments are acceptable through our online portal at LAZPARKING.COM or can be sent via check made payable to LAZ PARKING referencing your account and/or invoice number. Bounced checks will be subject to a $65.00 fee. All Cancellation must be sent via email with a minimum of 5 business day notice. All monthly parking contracts are on a month-to-month basis, unless stated otherwise in your lease
* **Valid monthly tag must be visible and posted in the vehicle AT ALL TIMES** while parked in the garage. Violators can be charged daily rates, cited leading up to termination of parking privileges. Any added charges will be added to the account on file. All hangtags expire at the end of each month.
* Reach out to the parking manager if a hang tag has been misplaced or forgotten to prevent any additional daily charges. A $35.00 Hang Tag set-up fee will be added for all replacements.
* Car Maintenance or outside vendors are prohibited on site.
* Parker must park in his/her assigned parking area. Please advise parking attendant if someone else is parked in your area to take further action. Parkers are subject to tandem parking and must leave their keys with the attendant on site. Blocking a vehicle will result in towing if keys are not left behind at owner's expense.
* Handicapped stall usage is strictly monitored, and offenders are subject to enforcement and ticketing by the city.
* Under no circumstances should a monthly parker render exchange or assist any other parker or visitor to gain entrance or exit with their Hang tag. The monthly parker will be required to pay the other person's parking fees if this practice is observed.
* Passes cannot be transferred or reassigned without Parking Manager's office consent.
* Please contact the parking manager immediately when changing vehicles (i.e. new car) or deleting a Hang tag user. **New Hang tags will not be issued without current license plate # or VIN**.
* LAZ Parking, its associates and Management are not responsible for contents of vehicles parked in the facility. Please do not leave valuables such as cell phones or other items in your vehicle. Always lock your car each time you park.
* Monthly parker agrees to report any damage caused by customer's vehicle. Additional financial responsibility information may be required.
* No overnight parking or storage of vehicles is allowed without a written request to – and written approval by – the parking manager. All unauthorized vehicles will be charged a $25 overnight fee/ per night and can be impounded at owner's expense. LAZ Parking, its associates and Property Management does not assume responsibility for vehicles left in the lot.
* Monthly permit holders must park in designated areas. Customer agrees to follow the instructions of parking personnel, posted signage, and all rules & regulations. It is the parkers responsibility to observe all safety signs. **Maximum speed limit is 5 MPH**. Violation of any garage rule may result in suspension, termination of parking privileges and may cause additional charges to the account.
* LAZ Parking reserves the right to terminate and confiscate all non-valid or non-renewed permits.

I AGREE TO ACCEPT MONTHLY PARKING PRIVILEGES UPON THE ABOVE RATES, TERMS AND CONDITIONS

| _Authorizers Signature_ | _Parkers Signature_ | 2/13/23<br>_Date_ |
|---|---|---|

### FOR INTERNAL USE ONLY

Starting total cost: _____

Date Entered: _____

Account #  | 6 | 7 | 0 | 7 | 9 | 6 | |

Restrictions or added information:

Form Rev 01312020

# Exhibit 4



Add a Caption

Friday · Dec 27, 2024 · 12:54 PM                                    Adjust

IMG_9640

Apple iPhone 14 Pro Max                                            HEIF

Ultra Wide Camera — 13 mm ƒ2.2
12 MP · 4032 × 3024 · 1.4 MB                                       WARM

| ISO 250 | 14 mm | 0 ev | ƒ2.2 | 1/99 s |





Add a Caption

Friday · Dec 27, 2024 · 12:54 PM          Adjust

IMG_9641

| Apple iPhone 14 Pro Max | | | | HEIF |
| --- | --- | --- | --- | --- |
| Ultra Wide Camera — 13 mm $f2.2$ | | | | |
| 12 MP · 4032 × 3024 · 1.3 MB | | | | WARM |
| ISO 320 | 14 mm | 0 ev | $f2.2$ | 1/90 s |





Add a Caption

Friday · Dec 27, 2024 · 12:54 PM                                    Adjust

IMG_9642

Apple iPhone 14 Pro Max                                            HEIF

Ultra Wide Camera — 13 mm ƒ2.2
12 MP · 4032 × 3024 · 1.1 MB                                       WARM

| ISO 320 | 14 mm | 0 ev | ƒ2.2 | 1/60 s |



Add a Caption

Friday · Dec 27, 2024 · 12:54 PM                    Adjust

IMG_9645

| Apple iPhone 14 Pro Max | | | | HEIF |
|---|---|---|---|---|
| Ultra Wide Camera — 13 mm $f2.2$ | | | | |
| 12 MP · 4032 × 3024 · 838 KB | | | | WARM |
| ISO 1250 | 14 mm | 0 ev | $f2.2$ | 1/30 s |





Add a Caption

Look Up **Place** >

Friday · Dec 27, 2024 · 12:54 PM          Adjust

IMG_9646

| Apple iPhone 14 Pro Max | HEIF |
|---|---|

Ultra Wide Camera — 13 mm *f*2.2

12 MP · 4032 × 3024 · 1.4 MB          WARM

| ISO 400 | 14 mm | 0 ev | *f*2.2 | 1/60 s |







# Exhibit 5

BASE RENT AND ADDITIONAL RENT THROUGH MARCH 2028

| | | | |
|---|---|---|---|
| 3/1/2026 | $ 10,583.55 | $ 5,745.19 | $ 16,328.74 |
| 4/1/2026 | $ 10,583.55 | $ 5,745.19 | $ 16,328.74 |
| 5/1/2026 | $ 10,583.55 | $ 5,745.19 | $ 16,328.74 |
| 6/1/2026 | $ 10,583.55 | $ 5,745.19 | $ 16,328.74 |
| 7/1/2026 | $ 10,583.55 | $ 5,745.19 | $ 16,328.74 |
| 8/1/2026 | $ 10,583.55 | $ 5,745.19 | $ 16,328.74 |
| 9/1/2026 | $ 10,583.55 | $ 5,745.19 | $ 16,328.74 |
| 10/1/2026 | $ 10,583.55 | $ 5,745.19 | $ 16,328.74 |
| 11/1/2026 | $ 10,583.55 | $ 5,745.19 | $ 16,328.74 |
| 12/1/2026 | $ 10,583.55 | $ 5,745.19 | $ 16,328.74 |
| 1/1/2027 | $ 10,583.55 | $ 5,917.55 | $ 16,501.10 |
| 2/1/2027 | $ 10,899.84 | $ 5,917.55 | $ 16,817.39 |
| 3/1/2027 | $ 10,899.84 | $ 5,917.55 | $ 16,817.39 |
| 4/1/2027 | $ 10,899.84 | $ 5,917.55 | $ 16,817.39 |
| 5/1/2027 | $ 10,899.84 | $ 5,917.55 | $ 16,817.39 |
| 6/1/2027 | $ 10,899.84 | $ 5,917.55 | $ 16,817.39 |
| 7/1/2027 | $ 10,899.84 | $ 5,917.55 | $ 16,817.39 |
| 8/1/2027 | $ 10,899.84 | $ 5,917.55 | $ 16,817.39 |
| 9/1/2027 | $ 10,899.84 | $ 5,917.55 | $ 16,817.39 |
| 10/1/2027 | $ 10,899.84 | $ 5,917.55 | $ 16,817.39 |
| 11/1/2027 | $ 10,899.84 | $ 5,917.55 | $ 16,817.39 |
| 12/1/2027 | $ 10,899.84 | $ 5,917.55 | $ 16,817.39 |
| 1/1/2028 | $ 10,899.84 | $ 5,917.55 | $ 16,817.39 |
| 2/2/2028 | $ 11,226.84 | $ 6,095.08 | $ 17,321.91 |
| 3/1/2028 | $ 11,226.84 | $ 6,095.08 | $ 17,321.92 |
| Total | $269,670.81 | $146,570.20 | $416,241.01 |